

1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022

PHONE 212.999.5800
FAX 212.999.5899
www.wsgr.com

May 7, 2019

**VIA CM/ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      **Re:**    ***United States v. Mark Nordlicht, et al.*, No. 1:16-cr-00640-BMC**

Dear Judge Cogan:

      The government seeks to introduce evidence that Mr. Levy was willing to commit an unidentified fraud to support the inference that he committed the crimes charged in the Indictment.  That is propensity evidence. Given the bedrock principle that propensity evidence is not admissible, the government has offered a panoply of unsupported theories in an attempt to establish the relevance of Mr. Bruno's testimony regarding the alleged phone call to the schemes charged in the Indictment. For the reasons set forth below, Mr. Levy respectfully requests that the Court preclude this improper and highly prejudicial testimony.

**I.**      **Background**

      **A.  Allegations Contained in the Indictment**

      In December 2016, the government indicted Mr. Levy and six other defendants on charges related to two schemes.  *See* Indictment ¶ 41.  Specifically, the Indictment alleged that the defendants engaged in "a scheme to defraud investors and prospective investors in Platinum through material misrepresentations and omissions relating to, among other things: (i) the performance of some of PPVA's Level 3 assets; (ii) PPVA's liquidity; (iii) the purpose of PPNE and the use of PPNE's proceeds; (iv) PPVA's preferential redemption process; and (v) related party transactions involving PPVA and PPCO," referred to as the alleged "Investment Scheme."  Indictment ¶ 42 (emphasis added).  The Indictment further alleged that the defendants engaged in a "scheme to defraud third-party holders of the [Black Elk Bonds] and to deprive the Bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over the [Black Elk] Bonds," referred to as the alleged "Black Elk Bond Scheme."  Indictment ¶ 73.

**WSGR** **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
May 7, 2019
Page 2 of 10

As a part of the purported Investment Scheme, the Indictment further alleged that, "rather than reducing [Black Elk's and Golden Gate's] valuations based on known actual results, NORDLICHT set forth a plan to obscure the true values of these companies by: (i) causing Northstar to purchase many of Black Elk's remaining assets; and (ii) combining Golden Gate and Northstar (including the Black Elk assets) under a new name called 'PPVA Oil & Gas,' to be valued as one asset." Indictment ¶ 51. The Indictment does *not* allege that Platinum deceived anyone by presenting the Northstar-Black Elk transaction as an arm's-length transaction instead of one between related parties (because it did not), *nor* does it allege that the consideration paid by Northstar for the Black Elk assets was less than fair value. And, of course, nowhere in the Indictment is it alleged that the transaction constituted a fraudulent conveyance.

**B. Clifford Joseph Bruno**

Mr. Bruno is former police officer (and subject of an IAB investigation) who, following an attempt to open a sandwich shop, became a welder and fitter performing offshore engineering work for companies in the Gulf of Mexico. After working on certain projects for Black Elk as a contractor, Mr. Bruno accepted a construction-related position with Black Elk in the fall of 2011. In the wake of the West Delta explosion, Mr. Bruno became the Construction Manager overseeing all of Black Elk's work in the Gulf of Mexico. Mr. Bruno claims to be part of the management team and sat in management meetings. *See* Exhibit A. Mr. Bruno worked at Black Elk even after the company entered bankruptcy in 2015, and continues to work for the Black Elk bankruptcy Trustee to this day. *See id.* at 13.

**C. Mr. Bruno's Potential Testimony**

According to the FBI's 302 report covering Mr. Bruno's October 2018 meeting with the government, Mr. Bruno stated that, following the Renaissance transaction (which is the subject of the alleged Black Elk Bond Scheme), in order to consummate a transaction between Black Elk and Northstar, Platinum needed a "legal opinion to say that the deal was legit and there were no problems. However none of the attorneys from Black Elk would sign off on the deal or provide a legal opinion." *Id.* at 10. Mr. Bruno also stated that, when Mr. Shulse allegedly did not want to sign a legal opinion related to the transaction, "SHULSE noted that PM wanted to pay approximately $25,000 to a 'soup can' attorney. SHULSE would not sign off on the opinion letter. SHULSE said that PM found a lawyer to sign off on the opinion letter. SHULSE said in his office while COMBS and BRUNO were present that he was going to have a conference call with LEVY." *Id.*. Mr. Bruno described for the government a particular phone call he purportedly listened in on:

> Later, SHULSE asked BRUNO to come into SHULSE's office. COMBS also agreed to come into SHULSE's office. SHULSE went into the general counsel's office for Black Elk and also asked him to come into SHULSE's office. All three (FUERST, COMBS, and BRUNO) went to SHULSE's office. SHULSE closed his door and put the telephone on speaker phone. LEVY was on the phone. LEVY was talking about North Start and the attorney who signed off on the opinion

WSGR   Wilson Sonsini Goodrich & Rosati
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
May 7, 2019
Page 3 of 10

> letter. During the conversation, SHULSE said something along the lines of, "I
> can't do this you know... this is fraud." LEVY said, "So what if this is fraud, do
> you know how long it will take for them to find this out?" LEVY said this in a
> loud voice.

*Id*. at 10-11.  Mr. Bruno told the government that he and Mr. Combs continue to discuss this call
"until this present day." *Id*. at 11.  Yet when the government attempted to corroborate Mr. Bruno's
account with Mr. Combs, one of the alleged eyewitnesses, he maintained that he "could not recall
the specifics of any phone calls he had with SHULSE and LEVY."  Exhibit B at 4.  Nor is there any
account from Mr. Shulse or Mr. Fuerst to verify Mr. Bruno's recollection above.

The government confirmed to the Court that the witness cannot testify as to whether the
"fraud" that the alleged comment referred to related to an alleged fraudulent conveyance, the
Northstar-Black Elk transaction, or some other conduct.  *See* Exhibit C at 1627:23-1628:7 ("MS.
ELBERT: That's Mr. Fodeman's interpretation of the comment. The witness will testify that he
overheard this remark in the context of a meeting talking about transferring the assets from Black
Elk to Northstar. We don't have more context around the comment than that.  Mr. Fodeman is
welcome to present evidence or cross-examine the witness to try to show that it should be properly
interpreted as a comment on a fraudulent conveyance and not on a fraud against investors, but we
don't really know.").

### D.  The Government's New Allegations

The government argues that Mr. Bruno's potential testimony is relevant to both of the
charged schemes.  The government asserts that that the Northstar-Black Elk transaction is relevant to
the Black Elk Bond Scheme because Platinum's reliance on lawyers for the consent solicitation and
bond vote is somehow undermined by Platinum's alleged search for a lawyer to "sign off" on the
Northstar-Black Elk transaction.  *See id.* at 1706:19-1707:7 ("[T]hey used a lawyer as a cover in that
scheme, now when they get to North Star people are pushing back and they try to find another
lawyer to get it done.").

The government also asserts that the Northstar-Black Elk transaction is "critical" to the
Investment Scheme because (1) it was presented to PPVA's investors as an "accretive positive
transaction" in that Platinum presented the Black Elk assets as being worth more than their true
value when they were acquired by Northstar, and (2) the repackaging of the Black Elk assets and
Northstar's subsequent management over them was all presented as being "in the best interests of
PPVA" when really the Black Elk assets were worthless and saddled with high interest debt.  *Id.* at
1702:17-1703:15.

**W**S**G**R   Wilson Sonsini Goodrich & Rosati
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
May 7, 2019
Page 4 of 10

## II.    Argument

### A.  The Proffered Evidence Is Not Direct Evidence

Evidence of uncharged wrongs are subject to Rule 404(b)'s prohibition against "other acts" evidence unless such acts "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citation omitted); *see also United States v. Kassir*, No. 04 CR.356 (JFK), 2009 WL 976821, at *3 (S.D.N.Y. Apr. 9, 2009) (requiring 404(b) analysis for evidence "not essential to understanding the sequence of events surrounding the charged conduct").  As an initial matter, the government has conceded that Mr. Bruno cannot identify which "fraud" Mr. Levy was referring to during the purported phone call. Exhibit C. at 1627:23-1628:7.  Given the focus of Ms. Cooley's arguments to Your Honor, the government apparently intends to insinuate that, in light of the context of that purported phone call, Mr. Levy's alleged statement referred to the Northstar-Black Elk transaction (not the Black Elk bond consent solicitation).  *See, e.g.*,. at 1702-1703.  To the extent that the testimony relates to the Northstar-Black Elk transaction, it is irrelevant to both schemes alleged in the Indictment.

### 1.   The Government Cannot Establish Relevance to Either Alleged Scheme as the Witness is Unable to Confirm the Transaction to Which Mr. Levy Allegedly Referred

As an initial matter, the government cannot establish the relevance of Mr. Bruno's potential testimony to either scheme alleged in the Indictment, because the government concedes that the witness cannot confirm whether the "fraud" referred to in the alleged comment was in reference to the alleged fraudulent conveyance or some other conduct.  Specifically, the government told Your Honor:

> MS. ELBERT: That's Mr. Fodeman's interpretation of the comment. The witness will testify that he overheard this remark in the context of a meeting talking about transferring the assets from Black Elk to Northstar. We don't have more context around the comment than that.  Mr. Fodeman is welcome to present evidence or cross-examine the witness to try to show that it should be properly interpreted as a comment on a fraudulent conveyance and not on a fraud against investors, but we don't really know.

*Id.*at 1627:23-1628:7.  The government's acknowledged lack of "context around the comment" undermines the potential relevance—if any—that Mr. Levy's purported reference to "fraud" may have in connection with the two alleged schemes. The mere fact that the comment was made within the period of the charged conspiracies is not sufficient to establish its relevance.

**WSGR**   **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
May 7, 2019
Page 5 of 10

### 2.   The Alleged Black Elk Bond Scheme

The government's alleged Black Elk Bond Scheme is limited to "a scheme to defraud third-party holders of the BE Bonds (the 'Bondholders') and to deprive the Bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations about, among other things, Platinum's ownership and control over the BE Bonds."  Indictment ¶ 73.  The Indictment contains no allegations concerning the Black Elk Bond Scheme related to any time period after September 2014.  *See, e.g.*, Indictment ¶¶ 86, 101.  Thus, the Northstar-Black Elk transaction cannot arise out of, be inextricably intertwined with, or provide any necessary context to the charged offenses related to the use of proceeds from the Black Elk-Renaissance transaction.  The Northstar-Black Elk transaction also has no connection to misrepresentations or omissions related to Platinum's ownership of the Black Elk bonds.  In light of the lack of overlap between the alleged victims, time period, and transactions, Mr. Bruno's testimony is not direct evidence in support of the alleged Black Elk Bond Scheme as charged in the Indictment.

The government's argument regarding the relevance of Mr. Bruno's testimony in light of the references in defendants' opening statements to the reliance on legal advice related to the Black Elk Indenture is equally unavailing. That Mr. Levy allegedly disagreed with a lawyer's assessment that an unspecified transaction was potentially fraudulent  has no bearing  on the question of whether he relied in good faith on the advice provided by Baker Hostetler regarding the Indenture – advice which was sought and heeded months prior to the events at issue.  Indeed, even if Mr. Levy ignored a lawyer's advice in every other transaction he entered into, he could still rely on a lawyer's advice in good faith in that instance.  Should the Court accept that there is some modicum of relevance on this point, the government's objective is better established by admitting only Mr. Bruno's testimony regarding Mr. Shulse's comments relating the use of a "soup can attorney" when Mr. Shulse did not want to sign the opinion letter, Exhibit A at 10, which does not have the same overwhelmingly prejudicial impact as references to fraud.

### 3.   Allegations Regarding the Valuations and the Purported Investment Scheme

Mr. Bruno's testimony is also irrelevant to the alleged Investment Scheme.  The government's arguments regarding the relevance to this scheme focus primarily on the general relevance of the Nothstar-Black Elk transaction itself (not the fact that Mr. Levy allegedly believed it was a fraud) and the representations made by Platinum to its investors regarding the overvaluation of Black Elk assets (as subsumed into Northstar).  Whether Mr. Levy believed the consideration in the Northstar-Black Elk transaction was insufficient or that the transaction between Northstar and Black Elk was otherwise a fraudulent conveyance is irrelevant to the Investment Scheme as charged in the Indictment.

The fact that Mr. Levy may have believed that the consideration in the Northstar-Black Elk transaction was insufficient (i.e., Northstar did not pay enough for them) is contrary to the

**WSGR**  Wilson Sonsini Goodrich & Rosati
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
May 7, 2019
Page 6 of 10

government's allegation that Platinum overvalued the Black Elk assets. Acknowledging this, Ms. Cooley tried to convince Your Honor that, "[t]he argument is not predicated on the purchase price of the assets. The argument is predicated on the fact that rather than acknowledge the poor performance and issues that continue to plague these positions, they are repackaged as a new company, as PPVA Oil and Gas at a critical time in this crisis relating to the liquidity of the fund and the issues with these companies." Exhibit Cat 1714:5-11. Unless the government can prove that Mr. Levy's alleged reference to fraud referred to the packaging of PPVA's oil and gas assets into a "PPVA Oil & Gas" – which it cannot because Mr. Bruno cannot testify what transaction Mr. Levy allegedly referred to – Mr. Bruno's testimony is irrelevant to the Investment Scheme as charged in the Indictment.

Ms. Cooley went on to argue that perhaps the consideration in this transaction was instead too steep, because Northstar received the Black Elk assets along with high interest debt. *Id.* at 1714:17-1715:2. Mr. Bruno's testimony, of course, cannot be deemed relevant on this basis because Mr. Levy's alleged belief that the purchase price was fraudulently insufficient would be inapposite.

### B.  The Proffered Evidence is Not Admissible Under Rule 404(b)

Mr. Bruno's testimony is also inadmissible pursuant to Rule 404(b). In evaluating evidence sought to be admitted under this Rule, the Court must first determine whether the evidence is "introduced for a proper purpose" rather than to prove the defendant's bad character or criminal propensity. *United States v. Gilan*, 967 F.2d 776, 780 (2d Cir. 1992) (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988)). Should the evidence be offered for a proper purpose, the Court must next determine whether the evidence is "relevant to an issue in the case pursuant to Rule 402, as enforced through Rule 104(b)." *Id.* Rule 404(b) evidence is neither presumed relevant nor automatically admissible, and the government bears the burden of proof as to admissibility. *United States v. Curley*, 639 F.3d 50 (2d Cir. 2011); *accord United States v. Nachamie*, 101 F. Supp. 2d 134, 137 (S.D.N.Y. 2000) (citing, *inter alia*, *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984) ("The government . . . must explain in detail the purposes for which the evidence is sought to be admitted.")). To do so, the government must demonstrate that the evidence is relevant "to an issue truly in dispute[.]" *United States v. Halper*, 590 F.2d 422, 432 (2d Cir. 1978).

"[E]ven if the evidence is deemed relevant, the trial court must still weigh the probative value of the evidence against its prejudicial consequences before admitting it." *Id.* at 432. In making this determination, the Court must first determine whether the evidence increases the likelihood of unfair prejudice. *Nachamie*, 101 F. Supp. 2d at 141. The likelihood of unfair prejudice increases where the introduction of the proposed evidence risks confusing jurors by creating a "trial within a trial." *See United States v. Aboumoussallem*, 726 F.2d 906, 912-13 (2d Cir. 1984) (affirming exclusion of otherwise relevant similar act evidence under Rule 403 on the ground that confusion and delay caused by likely trial within a trial would have substantially outweighed probative value of evidence); *United States v. Green*, No. 12-CR-83S (1)(2)(3)(5), 2017 WL 4803957, at *4 (W.D.N.Y. Oct. 25, 2014) (excluding evidence where its introduction "could require a trial within a trial and be confusing and distracting to the jury"); *United States v. Ferguson*, 246 F.R.D. 107, 116 (D. Conn. 2007) (limiting inclusion of 404(b) evidence which posed a "risk [of] diverting the jury's attention to

WSGR   **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
May 7, 2019
Page 7 of 10

the collateral question of whether the . . . transactions [raised in the 404(b) motion] were in fact
fraudulent, and [of] creating a trial within a trial on this issue.").

In this case, the government seeks to admit evidence that Mr. Levy believed something
(potentially the Northstar-Black Elk transaction) was a fraud in order to prove that Mr. Levy had a
fraudulent "state of mind and intent at that time." Exhibit C at 1627:14-16. *See also id.* at 1707:1-7
(Mr. Levy's references to fraud are relevant to whether he or others at Platinum would have lied to
Baker Hostetler on prior occasions). To the extent that the government cannot prove that Mr.
Bruno's recollections are related to a fraud charged in the Indictment – which it has already admitted
it cannot – Mr. Bruno's testimony is irrelevant and impermissible propensity evidence under Rule
404(b).

### 1. The Reference to Fraud Described by Mr. Bruno is Uncharged Wrongdoing Covered by Rule 404(b)

In light of the language of paragraph 51 and the irrelevance of Mr. Bruno's testimony to both
the Indictment's alleged schemes (as described above), the reference to fraud is thus uncharged and
unnoticed wrongdoing under Rule 404(b).

Despite representing to the defendants and the Court on multiple occasions that everything
the defendants needed to know about the allegations was contained in the Indictment, the
government now insists that the defendants should have divined from paragraph 51 that the
transaction between Northstar and Black Elk was itself fraudulent (as between those two parties). In
fact, what the government, alleged in paragraph 51 was that Platinum repackaged the Northstar,
Black Elk, and Golden Gate assets into a single investment position so that it could continue to
overvalue its oil and gas assets. Indictment ¶ 51 (Platinum engaged in a plan to "obscure the true
value of [Black Elk and Golden Gate] by: (i) causing Northstar to purchase many of Black Elk's
remaining assets; and (ii) combining Golden Gate and Northstar (including the Black Elk assets)
under a new name called 'PPVA Oil & Gas,' to be valued as one asset."). There are no references
in that paragraph to the consideration paid by Northstar for the Black Elk assets, nor to the
transaction potentially rendering Black Elk insolvent.

In light of the language of paragraph 51 and the irrelevance of Mr. Bruno's testimony to both
the Indictment's alleged schemes, the reference to fraud is thus uncharged and unnoticed
wrongdoing under Rule 404(b). The government provided the defendants with no notice that they
would introduce evidence that the transaction between Northstar and Black Elk was fraudulent or
that Mr. Levy believed some other unidentified transaction he participated in was a fraud. The
deadline for the government to disclose evidence they intended to offer under Rule 404(b) was May
30, 2018. The government filed its 404(b) notice on May 30, 2018. Dkt. No. 340. The defense
received the handwritten notes of Mr. Bruno's first government interview on October 5, 2018, and
the typed 302 report on January 8, 2019. The government made no further 404(b) disclosures. For
the first time in court on May 6, 2019, the government indicated that it would attempt to elicit Mr.
Bruno's unreliable testimony regarding an alleged phone call he overheard with Mr. Levy. Having

**WSGR**   **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
May 7, 2019
Page 8 of 10

received Mr. Comb's 302 reports containing contrary information, and with no 404(b) notice from the government, Mr. Levy's counsel had previously concluded that the government would not be offering this unreliable, inadmissible testimony.

### 2.     The Proffered Evidence Fails to Speak to Mr. Levy's Knowledge or Intent as Required by Rule 404(b)

In this case, the government seeks to admit evidence that Mr. Levy believed something (potentially the Northstar-Black Elk transaction) was a fraud in order to prove that Mr. Levy had a fraudulent "state of mind and intent at that time." Exhibit C at 1627:15-16. *See also id*. at 1707:1-7 (Mr. Levy's references to some fraud where lawyers were involved is relevant to whether he or others at Platinum would have lied to Baker Hostetler on prior occasions). To the extent that the government cannot prove that this alleged phone call was related to the consent solicitation and use of Renaissance proceeds – which it has already admitted it cannot – Mr. Bruno's testimony is irrelevant and impermissible propensity evidence under Rule 404(b).

Rather than speaking to knowledge or intent, the government's characterizations of this testimony amounts to prohibited propensity evidence: under the government's theory, either (1) Mr. Levy was generally operating with fraudulent intent in 2014 and 2015, or (2) if Mr. Levy was willing to engage in and avoid getting caught in another fraud involving lawyers, he must have been willing to commit the charged crimes (even though those also involved lawyers). *See, e.g.*, *United States v. Levin*, No 15-CR-101, 2016 WL 8711458, at *6 (S.D.N.Y. Jan. 8, 2016) (it is "improper to receive evidence ostensibly as probative of knowledge and intent when it is in reality 'propensity evidence in sheep's clothing.'") (citing *United States v. McCallum*, 584 F. 3d 471, 477 (2d Cir. 2009)). *See, e.g., Huddleston*, 485 U.S. at 689 (the government may not use Rule 404(b) to "parade past the jury a litany of potentially prejudicial similar acts that have been established . . . only by unsubstantiated innuendo.").

### C.  This Evidence is Highly Prejudicial and Would Lead to Confusion of the Issues

The government should be precluded from eliciting testimony from Mr. Bruno related to this purported call, as its prejudicial value significantly outweighs any possible probative value. The probative value of this testimony is minimal, because   nexus between the allegations in the Indictment and the purported statements made by Mr. Levy is tenuous at best. The government has already conceded that it has almost no "context" surrounding the purported event and "[doesn't] really know" whether Mr. Levy's alleged comments related to the civil concept of fraudulent conveyance or some other nebulous "fraud" on Platinum's investors. Exhibit C at 1627:23-1628:7.

The evidence is also inherently unreliable. As noted above, the government has no evidence corroborating Mr. Bruno's dubious story, and has conceded that it cannot demonstrate that Mr. Levy's comments related to any alleged fraud on Platinum's investors as opposed to a discussion on the issue of fraudulent conveyance. The government has not demonstrated that Mr. Bruno is even aware of the concept of fraudulent conveyance – thus, Mr. Bruno's memory of Mr. Levy's

**WSGR**   Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
May 7, 2019
Page 9 of 10

statements is necessarily being recalled through a skewed lens.  Inherently unreliable evidence is irrelevant evidence, and the court's power to exclude such evidence under Rule 403 has been recognized by both federal and state courts.

While the unreliability of testimony is generally a subject for cross examination, the incredibly prejudicial nature of this testimony renders cross examination inadequate.  In a case as complex as this, it is highly unlikely that the jury will be able to distinguish between the discussion of "fraudulent conveyance" relating to a Northstar-Black Elk transaction and the government's alleged "fraud" relating to those companies more generally as Platinum investments.  As recognized by the Court, evidence this misleading has done its damage the second it is introduced – it is a bell that cannot be unrung.  *See* Exhibit C at 1728:19-21.

The admission of such non-probative evidence would confuse the jury and divert attention from evidence relevant to the counts charged.  *See*, *e.g.*, *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007) (Rule 403 considerations supported exclusion where proof of the Rule 404(b) transactional evidence would take time and were "likely to divert the jury's attention from the charged transactions, which are sufficiently complicated in themselves, to another set of complex transactions.").  Mr. Levy would be forced to defend and explain to the jury, via fact and expert witnesses as well as significant documentary evidence, the complex facts encompassed within the Northstar-Black Elk transaction, the civil bankruptcy concept of a fraudulent conveyance, the legal advice sought from Platinum's attorneys in relation to this transaction, and the eventual conclusion of the deal (in which third parties verified that the assets were sold for fair consideration).  This would create time-consuming "mini-trials" on irrelevant side issues, which are not charged in the Indictment, and which stand to increase the length of a trial that is already estimated to last two months.

Accordingly, there is no reason to allow the government to present this irrelevant evidence, and doing so risks misleading the jury.  Any potential probative value the proffered evidence could have is substantially outweighed by the danger of unfair prejudice and confusion of the issues; thus, this evidence should be excluded under Federal Rules of Evidence 403 and 404(b).

**W SGR** Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
May 7, 2019
Page 10 of 10

### <u>CONCLUSION</u>

For the foregoing reasons, Mr. Levy respectfully requests that the Court preclude Mr. Bruno's testimony regarding the phone call he allegedly overheard with Mr. Levy.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

<u>s/ Michael S. Sommer</u>
Michael S. Sommer
Morris J. Fodeman
Kate T. McCarthy
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899
msommer@wsgr.com
mfodeman@wsgr.com
kmccarthy@wsgr.com

*Counsel for Defendant David Levy*

Cc:  All Counsel of Record (via CM/ECF)