

1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022

PHONE 212.999.5800
FAX 212.999.5899

www.wsgr.com

June 11, 2019

**VIA CM/ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   ___United States v. Mark Nordlicht, et al.___, No. 1:16-cr-00640-BMC

Dear Judge Cogan:

We respectfully submit this letter in response to the government's submission on June 9, 2019 (Dkt. 741). The government has failed, in both its argument and its brief, to point to any competent evidence in support of the offenses charged in the Indictment. Instead, it has provided the Court with mere argument and an aspirational recitation of what the government ***wishes*** its evidence established. Indeed, almost a third of the exhibits cited by the government in its brief are ***not even in evidence***.[1] The government has also failed to come forward with any further evidence that David Levy committed any of the charged crimes.[2] Accordingly, we respectfully request that the Court grant Mr. Levy's motions in their entirety.

**I.      Background**

On June 7, 2019 at the close of the government's case-in-chief, the defendants made nine motions:[3]

---

[1] The use of such documents is particularly egregious in the government's section on alleged co-conspirator statements, where the majority of the exhibits cited by the government are not in evidence or have been explicitly precluded by the Court. Gov. Br. at 13-16. The government belatedly contends that it had planned on introducing these exhibits prior to the Rule 29 argument. Gov. Br. at 15 n.9. The defense never agreed to the admission of additional email exhibits beyond the list provided for the testimony of Agent Amato's testimony. *See* Dkt. 741; Exhibit 1 (list of additional exhibits the government seeks to admitted after resting its case-in-chief); Exhibit 2 (list of emails to be introduced through Agent Amato's direct testimony). The email exhibits the government now intends to introduce with the sole purpose of bolstering its Rule 29 arguments are outside the scope of the exhibits the defendants agreed the government could introduce following the close of the government's case-in-chief. *See* Dkt. 743. The government cannot be allowed to rest, listen to arguments on Rule 29, and then introduce additional exhibits to address the gaps in proof pointed out by the defendants.

[2] *See* Tr. 6051-57.

[3] We address here only venue and those items raised by the government in its brief. Defendants are happy to provide further briefing on any of the remaining motions to the extent that the Court would find it helpful.

**WSGR   Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 2 of 23

- Motion to dismiss the Indictment based on the government's introduction of false and misleading evidence;[4]
- Motion for a mistrial based on *United States ex rel. Edward O'Donnell v. Countrywide Home Loans*, 822 F.3d 650, 662 (2d Cir. 2016) ("*Countrywide*");
- Motion in limine to exclude evidence based on *Countrywide*;
- Motion for a mistrial based on the introduction of "co-conspirator" statements;
- Motion in limine regarding valuations;
- Motion for acquittal under Rule 29(a) based on the lack of venue for Counts Six through Eight (the "Black Elk Bond Scheme" counts);
- Motion for acquittal under Rule 29(a) regarding the government's claim that Platinum rigged the Black Elk bond vote;
- Motion for acquittal under Rule 29(a) regarding insufficient evidence that the BBIL and BAM legal affiliates of PPVA; and
- Motion for acquittal under Rule 29(a) based on insufficient evidence regarding Count 4 (the "PPNE" count).

## II.     Applicable Legal Standard

Rule 29 permits the Court to enter a judgment of acquittal at the close of the government's case for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a judgment is appropriate when the Court determines that "the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)). If the Court "concludes that upon the evidence there must be such a doubt in a reasonable mind, [it] must grant the motion." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

In a sufficiency-of-the-evidence challenge, "the evidence [should] be viewed in the light most favorable to the government and all permissible inferences drawn in its favor[.]" *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (citation omitted). However, "the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). While the jury may draw reasonable inferences from the evidence, a conviction may not stand on mere "speculation and surmise." *Id.* In fact, the Court is "obligated to take a hard look at the evidence and accord the government the benefit of only 'legitimate inferences.'" *United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) (citation omitted). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt[,]" and the Court should enter a

---

[4] We note that the government did not contest the lack of veracity of the government's portfolio company witnesses, Tr. at 6067-04, or cooperating witnesses, *id. See also* Tr. 3405 (Kaplan testimony regarding the false transcript in GX 7124).

**WSGR** **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 3 of 23

judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks and citations omitted); *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005). Accordingly, courts in the Second Circuit have not hesitated to enter a judgment of acquittal where the defendant's conviction rests on unsupported inferences or improper guesswork, where the evidence suggests innocence with equal force as it suggests guilt, or where the evidence cannot prove the defendant's knowledge and intent beyond a reasonable doubt. *See, e.g.*, *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004); *Glenn*, 312 F.3d at 58; *United States v. Irving*, 682 F. Supp. 2d 243, 250-51 (E.D.N.Y. 2010); *United States v. Yannotti*, 415 F. Supp. 2d 280, 291 (S.D.N.Y. 2005); *United States v. Stewart*, 305 F. Supp. 2d 368, 378 (S.D.N.Y. 2004). *United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004); *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989); *United States v. Wiley*, 846 F.2d 150 (2d Cir. 1988); *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir. 1984); *United States v. Bufalino*, 285 F.2d 408, 416 (2d Cir. 1960).

## III.    The Government's Failed to Prove Defendants Had the Requisite Intent under *Countrywide*

The government has failed to present evidence that any of the alleged misstatements on which it attempts to rely, including the quarterly redemption term in the governing documents, were false or misleading when they were made or that the defendants made such statements with the intent to defraud PPVA's investors.  Under controlling Second Circuit precedent, the charges related to the "Investment Scheme" should be dismissed, or, in the alternative, the jury should be precluded from considering any and all alleged misstatements for which the government has not proven contemporaneous fraudulent intent.

### A.    Legal Standard

Under the Second Circuit's recent decision in *Countrywide*, "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution.  Absent such proof, a subsequent breach of that promise – even where willful and intentional – cannot in itself transform the promise into a fraud."  *United States ex rel. Edward O'Donnell v. Countrywide Home Loans*, 822 F.3d 650, 662 (2d Cir. 2016).  This case addressed the question: "what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?"  *Id.* at 658.[5]  *Countrywide*, a civil RICO action, centered on the interpretation of federal mail and wire statutes as well as the specific meaning of a "scheme to defraud" under federal statutes.  *See, e.g.*, *id.* at 657.  In interpreting those statutes, the court held that the paramount inquiry regarding whether the defendants committed fraud is the question of their intent *at the time* the representations were made, *id.* at 658, because "it is emphatically the case – and has been for more than a century – that a representation is fraudulent only if made with the ***contemporaneous intent*** to induce harmful reliance."  *Id.* (emphasis added).

---

[5] The defense concedes that the instant case does not involve widgets, *see* Gov. Br. at 4 n.3, but then again, neither did *Countrywide*.  Additionally, GX-3105, the exhibit on which the government seeks to rely, is ***not in evidence***.

**WSGR** **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 4 of 23

### B.     Application

Despite the government's characterization, the defendants do not raise *Countrywide* as part of their argument related to the materiality of statements made to investors.  Rather, the defendants rely on *Countrywide* in support of their arguments that (1) to the extent that the quarterly redemption term[6] in the governing documents – and the "late" payment of redemptions pursuant to that term – form the basis for the charges, the government has failed to prove that the defendants did not intend to honor that contractual promise ***at the time it was made***, and (2) the government has not proven any requisite intent in relation to the alleged "non-contractual" misstatements on which it seeks to rely.

The government alleges that the defendants and their co-conspirators made material misrepresentations and omissions regarding "(1) the performance of the fund's investments, (2) the liquidity of the fund and its redemption terms, (3) the fund's ability to pay redemptions, and (4) the fund managers' adherence to principles of good faith and fair dealing."[7]  Gov. Br. at 4.  In support of its argument that all of the alleged misstatements and omissions in this case fall outside of *Countrywide*, the government cites to (1) the testimony of investor witnesses about the importance of various representations, Gov. Br. at 4 n.2; (2) testimony of Andrew Kaplan regarding targeted investment strategies in October 2015; (3) a September 2015 due diligence questionnaire ("DDQ"); and (4) representations regarding the projected return in April 2015.  *See* Gov. Br. at 4-5.  Each statement on which the government seeks to rely was either true at the time it was made, made without the requisite intent, or immaterial.

### 1.     Contractual Representations

The defendants have established with ample evidence that the relationship between PPVA and its investors was governed by contractual documents.  *See, e.g.*, Tr. 415-416.  By signing the subscription agreement for PPVA, each investor was declaring that they had "carefully read, underst[oo]d, and agree[d] to abide by the terms set forth in the [Private Placement] Memorandum and the LP Agreement. . . ."  *See, e.g.*, 1-DX-3313 at JH-000000211; Tr. 410-412.  The governing documents explicitly warned investors that they could not rely on marketing materials (*see, e.g.*, 1-DX-3313 at JH-000000211 ("Subscriber has been advised that no person is authorized to give any information or to make any statement not contained in the Memorandum, and that any information or statement not contained therein must not be relied upon as having been authorized by the Partnership.")), forward looking statements (*see, e.g.*, GX-3403 at AS 000001376-77 ("Any projections or other estimates in this Memorandum, including estimates of return or performance, are forward-looking statements and are based upon certain assumptions.  Other events which were

---

[6] Evidence in the record establishes that Mr. Nordlicht had sole discretion over the timing and form of redemption payments under the LP Agreement (GX-1828) and Master Fund LP Agreement (DX-1130).

[7] This list, of course, differs from the one in the Indictment, which included, "(i) the performance of some of PPVA's Level 3 assets; (ii) PPVA's liquidity; (iii) the purpose of PPNE and the use of PPNE's proceeds; (iv) PPVA's preferential redemption process; and (v) related party transactions involving PPVA and PPCO."  Ind. at ¶42.

WSGR  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 5 of 23

not taken into account may occur and may significantly affect the analysis.  Any assumptions should not be construed to be indicative of the actual events which will occur.  Actual events are difficult to predict and may depend upon factors that are beyond the Partnership's and the Investment Manager's control.")), or oral representations made outside of the contractual documents (*see, e.g.*, 1-DX-3313 at JH-000000211 ("In deciding to invest in the Partnership, Subscriber has relied solely upon the information in the Memorandum and has not relied on any oral representations or warranties.")), and that past performance was not a promise of future results (*see, e.g.*, GX-3403 at AS 000001403 ("An investment in any type of Financial Instrument bears the risk of loss of capital. As with any investment approach or strategy, no assurances can be given that the Investment Manager's strategy and methodology will be successful or that the Partnership's or the Master Fund's investment objective will in fact be realized.  Any past success with any strategy or methodology cannot assure future results.")).  As discussed further in Section IV, *infra*, the record plainly demonstrates that an objective, ***reasonable*** (and in this case, sophisticated) PPVA investor would not have relied, in making their investment decisions, on statements on which they were explicitly warned not to rely.  The defendants thus contend that the government's case regarding the alleged "Investment Scheme" should be subject to the standard articulated in *Countrywide* that "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise ***at the time of contract execution***.  Absent such proof, a subsequent breach of that promise – even where willful and intentional – cannot in itself transform the promise into a fraud." *Countrywide*, 822 F.3d at 662 (emphasis added).

There is simply no evidence in the record that PPVA's redemption payments were made outside of the quarterly liquidity term contained in the governing documents until January 31, 2015 (the day that redemptions effective in Q4 2014 were "due" to be paid).[8]  Even following January 31, 2015, record evidence demonstrates that PPVA paid all investor redemptions (with the exception of insiders), even if late, through and including those effective Q2 2015, which were "due" July 31, 2015.  *See* GX-131-1.  There is thus no evidence that the defendants did not intend to – or could not

---

[8] Despite the uncited and unsupported claims in the government's brief, *see* Gov. Br. at 8 (claiming that PPVA's "large and illiquid positions comprised such a large percentage of PPVA's portfolio that, when redemptions came due even as early as 2014, the defendants and their co-conspirators shared their desperation and fear with one another over coming up with the cash to meet those redemptions."); *id.* at 12 ("[T]he defendants failed to tell investors in 2014 that they were unable to realize cash from their illiquid, underperforming and even insolvent oil and gas positions and thus they could not meet investor redemptions on a quarterly schedule with 60 days' notice . . . ."), record evidence universally supports the conclusion that prior to January 31, 2015, PPVA paid redemptions timely on a quarterly basis. *See* Tr. 1185 (government cooperator Naftali Manela stating he "[did not] know specifically" whether PPVA had missed any redemption requests prior to the second half of 2015 and was "not aware" of any time PPVA missed a redemption request); *id.* at 4185-86 (government cooperator Daniel Mandelbaum testifying that he started at Platinum in January 2015, and that year-end 2014 redemptions, which he claimed PPVA did not have cash to pay, were due January 2015); *id.* at 2094 (Amir Shaked testifying that his year-end 2014 redemption was paid in January 2015); *id.* at 2390-91 (Shaked further testifying that all redemption requests he made into 2015 were paid in cash, and that Platinum told him in the course of his diligence that they had not missed a redemption payment prior to 2011); *id.* at 2564-66 (Joshua Zeitman testifying that he was paid on his $500,000 redemption, submitted November 2014 and effective for March 31, 2015); and DX-3927 (demonstrating Zeitman was paid quarterly redemptions throughout 2014).

**W**S**G**R   Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 6 of 23

– meet the quarterly liquidity term contained in the governing document until, at the very least, January 31, 2015.

### 2.    "Non-Contractual" Representations

### a)    Investor Witness Testimony

Additionally, all of the investor witness testimony cited by the government in its brief at Note 2 (Gov. Br. at 4), fails under *Countrywide*:

- Dr. John Huth:

  ○ Tr. 208 contains a portion of Dr. Huth's testimony regarding the redemption term discussed in GX-4212, a marketing powerpoint from August 2007.  *See* Tr. at 201. The government has presented no evidence that the defendants did not intend to, or could not, meet the redemption term in August 2007.

  ○ Tr. 220 contains a portion of Dr. Huth's testimony regarding the quarterly redemption term in his PPM, contained in GX-1828.  *See* Tr. 212.  This testimony falls squarely under *Countrywide*, as the government alleges that this is a contractual misrepresentation regarding future performance under the contract.  The government has introduced no evidence that the defendants did not intend to, or could not, meet the redemption term in March 2008.

  ○ Tr. 252 contains a portion regarding Dr. Huth's decision to defer a redemption request in light of Mr. Kaplan's statement about predicted positive performance in April 2015.  The government has not proven that statements regarding potential positive performance in April 2015 were false or intentionally misleading when made.  *See* Section III.B.2.d, *infra*.

- Abraham Gulkowitz:

  ○ Tr. 1480 contains Mr. Gulkowitz's testimony that he was purportedly never told that PPVA was seeking out high interest loans to cover liquidity needs, including the payment of redemptions, and that such information would have been important to his decision to invest.  The record, however, establishes that Mr. Gulkowitz met with Platinum employees to roll over his PPBE investment into PPVA in the summer of 2014, *see* Tr. 1458, eventually signing his subscription agreement sometime in August 2014, but no later than September 1, 2014.  *See* DX-2257; Tr. 1601.  Platinum did not enter into the 16% PPNE Note until September 18, 2014.  *See* GX-260. Additionally, loans taken out by PPVA were disclosed to all investors in both the 2013 and 2014 audited financial statements. *See* DX-2006 at CR_DOJ_0000035151-

W S G R  **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 7 of 23

> 54; 1-DX-5107 at CR_WP_PPVA-MASTER_2014_DOJ_0000081-85.

- Amir Shaked:

  - Testimony contained on pages Tr. 1749, 1754, 1756, 1772, 1774, 1776, 1789, 1805, and 1988 through 1989 all concern statements made prior to May 2012. *See also* GX-415, GX-3403, DX-1278, GX-4704, and GX-4708. The government has introduced no evidence that the defendants did not intend to, or could not, meet the contractual terms of Mr. Shaked's investment at any time leading up to May 2012. The government has similarly failed to introduce any evidence that the monthly returns or PPVA's targeted allocation of investment strategies contained in tear sheets issued by PPVA were false or intentionally misleading prior to May 2012. Nor has the government introduced any evidence that the information contained in PPVA's 2010 audit was false.

    - Testimony contained on pages Tr. 1772, 1774, and 1776 specifically relates to Mr. Shaked's reading of his contractual documents (including GX-3403). This testimony falls squarely under *Countrywide*, as the government alleges that this is a contractual misrepresentation regarding future performance under the contract.

  - Tr. 2001 contains testimony regarding alleged conversations between Mr. Shaked and Mr. Landesman between August 2012 and August 2014 regarding the liquidity of Platinum's investments. *See* Tr. 2000-01. Mr. Shaked's recollection of Mr. Landesman's statements was that "[h]e always said that even the furniture in Platinum's conference room was for sale at a price. And the price was always marked low so that the upside was there. And if they could get to the price they wanted, they would sell it." Tr. 2001. There is no evidence that Mr. Landesman's statement was false at the time it was made, or that there was any representation in the documents governing Mr. Shaked's investment that the defendants did not intend to or could not abide by in the identified time period.

  - Tr. 2111 contains testimony relating to the March 31, 2015 quarterly investor conference call for Q1 2015, and in particular, Mr. Shaked's allegation that Mr. Nordlicht "stated that there would be likely a 21 percent annualized return for 2015." In reality, Mr. Nordlicht told investors that "hopefully we'll be up somewhere around . . . seven percent. My goal for the year is to really, to try and annualize that number which would be I guess around a 21 percent. Seven times three is 21, so I haven't lost the basic math skills at least. Um, so, um, that's really my hope . . . ."

W S G R   **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
June 11, 2019
Page 8 of 23

GX-4507 at 5.[9]  There is no evidence that Mr. Nordlicht's statements were false or misleading at the time they were given.  First, PPVA did in fact post returns of approximately 7 percent in April 2015, and nearly 6 percent for the quarter.  *See* GX-4743.  Second, Mr. Nordlicht's statements were heavily qualified by language indicating that they were forward-looking statements upon which the investors should not rely ("hopefully;" "[m]y goal for the year;" "that's really my hope"), and further qualified by the disclaimer at the start of the call.  *See* GX-4507 at 1 ("This call does not constitute an offer to sell or a solicitation of an offer to buy any security in any of the Platinum funds and may not be relied upon in connection with any offer or sale of securities.  Such offer or solicitation may only be made pursuant to the current offering memorandum of the applicable Platinum fund that will be provided only to qualified offerees.  This call is qualified in its entirety by information appearing in the applicable offering memorandum and fund documents which should be carefully reviewed prior to investing. . . .  This call is being provided for informational purposes solely to existing investors and to prospective investors . . . and is not an offer of investment advisory services and is not an advertisement.").  The record makes clear that Mr. Shaked harbors an irrational and idiosyncratic view that these forward-looking statements are binding promises.  *See* Tr. 2428-30.  No reasonable investor would view Mr. Nordlicht's statements as false or misleading.

○  Tr. 2136 contains Mr. Shaked's testimony that he "could not understand" Mr. Nordlicht's statement on the November 23, 2015 investor conference call that the decision to institute a side pocket was "not a redemption-driven event[.]"  Prompted by a question from the government, Mr. Shaked's testimony ignores the whole of Mr. Nordlicht's statement: "This was not a redemption driven type of—of—of move that we've made, and in fact we've had less redemptions than you would expect in a fund of our size.  And so this was really a situation where it got to a point where we just had too many private equity positions. . . .  We'll try to liquidate as quickly as we can."  GX-4510 at 9.[10]  Mr. Nordlicht's statement is neither false nor misleading.  While the side pocket was created "in part" to "help with the flow of redemptions," the impetus for its creation was PPVA's inability to generate sufficient cash flow from or liquidate its Level 3 assets.  *See* Tr. 869.  This is entirely consistent with Mr. Nordlicht's statement.  Moreover, it has been established on the record that the amount of redemptions PPVA received in 2015 was within the normal range for the fund.  *See* Tr. 3633-35; DX-3943.

---

[9]  GX-4507, which is the government-provided transcript correlating to the Q1 2015 quarterly conference call, is not in evidence; the audio which it corresponds to is in evidence as 1-DX-4407.  We have cited from the transcript provided by the government for ease of use in this submission.

[10]  Like GX-4507, GX-4510 is not in evidence, but is the government-provided transcript corresponding to the audio of 1-DX-4410, which is in evidence.

**WSGR** **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 9 of 23

- Joshua Zeitman:

  - Tr. 2592 contains testimony relating to Mr. Zeitman's allegations that he was not informed that PPVA took out loans, including from PPCO, to cover liquidity needs, including the payment of redemptions.  The loans incurred by PPVA were disclosed to all investors in the 2013 and 2014 audits.  *See* DX-2006 at CR_DOJ_0000035151-54; 1-DX-5107 at CR_WP_PPVA-MASTER_2014_DOJ_0000081-85.  There is thus no evidence that the defendants intended to mislead Mr. Zeitman regarding loans to PPVA.

### b)      Mr. Kaplan's Call with Investor John Cecil

The government also cites to Mr. Kaplan's call with PPVA investor John Cecil.   *See* Gov. Br. at 5.  The government's first allegation, that Mr. Kaplan falsely told Mr. Cecil that "PPVA was 50/50 liquid and illiquid" in October 2015, Gov. Br. at 5, mischaracterizes the evidence.  Mr. Nordlicht, in fact, told Mr. Cecil that PPVA *targeted* a mix of 50/50 liquid strategies.  In response to Mr. Cecil's invitation for Mr. Nordlicht to walk through the Fund's investment strategies, Mr. Nordlicht responded, "we really seek uh to have like a balanced portfolio of 50% liquid trading strategies and 50% senior secured lending type strategies, um, and um with the caveat that I very often cheat a little bit.  I'll, admittedly, to the senior secured lending because a lot of times that's really the best.  You know if you tolerate a little bit of illiquidity you get a little bit better risk adjusted returns but we try to stay as close as possible um in the long term to 50/50."  GX-7119 at 2.  Not only did Mr. Nordlicht not give an allocation of investment strategies to Mr. Cecil, the government has pointed to no evidence establishing what the allocation of PPVA's investment strategies was in October 2015, or whether those strategies were relatively "liquid" or "illiquid."

The government's second allegation related to Mr. Kaplan and Mr. Nordlicht's call with Mr. Cecil, that their representation regarding "the fund was experiencing normal inflows and outflows at that time," Gov. Br. at 5, was also shown to be false.  Specifically, despite his direct testimony that the level of redemptions and subscriptions in October 2015 was not "normal," Tr. 3222-23, Mr. Kaplan admitted on cross that he was not in fact aware of the PPVA's "normal" level of redemptions and subscriptions.  Tr. 3636.  The defendants also demonstrated that PPVA's level of redemptions was "normal" in 2015.  *See* DX-3943 and DX-3945. The defense also established on cross that Mr. Cecil did not invest additional money following this call and, to the contrary, put in redemption requests.  *See* Tr. 3637-40.

### c)      DDQ

The government also cites to Mr. Shaked's testimony regarding a September 2015 PPVA DDQ.  *See* Gov. Br. at 5.  The government mischaracterizes Mr. Shaked's testimony in an attempt to substitute Mr. Shaked's idiosyncratic understanding of what the DDQ *meant* for what the DDQ actually *said*.  *See id.* at 5; GX-4103; Tr. 2141.  In the section on "Risk Management and Control Mechanisms" the DDQ includes item 8.5 regarding the "Fund's policy on the management of its

**WSGR  Wilson Sonsini Goodrich & Rosati**

PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 10 of 23

level of liquidity" which describes how Platinum monitors and attempts to hedge liquidity risks.  *See* GX-4103 at AS 000000439.  It does ***not*** say that the Fund will always have the liquidity to meet a quarterly redemption term.  *Id.*  Additionally, the DDQ included an entire page of warnings and caveats in capitalized, bold language, including, *inter alia*, "portfolio composition and risk management information are shown for illustration and discussion purposes only and are not a guarantee of the composition of the funds at any point in time."  *Id.* at AS 000000405.  Significantly, at the time of the issuance of this DDQ (September 2015), PPVA was in the process of paying redemptions from Q2 2015 (other than to insiders), and Q3 2015 redemptions were not yet due.  *See* GX-131-1.

> **d)  Statements Made by Platinum Employees Regarding April 2015 Performance**

Finally, the government cites to statements made by Platinum employees encouraging investors to postpone redemptions or invest additional funds in anticipation of a strong April 2015 return.  Gov. Br. at 5.[11]  However, the government has introduced no evidence that statements related to the anticipated return were false or intentionally misleading.  Rather, the evidence shows that PPVA investors did in fact receive an approximately 7 percent return in April, *see* GX-4743 and Tr. 394 (Huth testimony confirming his account showed an approximately 7 percent return in April 2015), and that both Sterling and Alvarez & Marsal ("A&M"), the independent third-party valuation companies hired by Platinum, confirmed the reasonableness of PPVA's Q2 2015 valuations.  *See* 1-DX-5218; 1-DX-5220.[12]

## IV.  The Government Failed to Prove that the Defendants' Statements were Material

Because the government has failed to prove that the defendants' statements to investors were both false (or intentionally misleading) and material at the time they were made, the defendants are entitled to a judgement of acquittal.

### A.  Legal Standard

"A misstatement in a securities transaction is material so long as there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'"  *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("*Litvak II*") (citing *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013)).  A misrepresentation is important if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the ***reasonable investor*** as having ***significantly altered the 'total mix' of information made available***.'"

---

[11] Notably, the government specifically writes, that "***the defendants*** also encouraged existing investors . . ." Gov. Br. at 5 (emphasis added).  There is no evidence on the record that Mr. Levy or Mr. SanFilippo made any such statements or that any defendants were misled by them.

[12] Indeed, government cooperator Mr. Kaplan admitted, after much equivocating, that he may have even told prosecutors that he had no reason at the time to doubt what Mr. Nordlicht was saying about an 8 percent forecast during the March 2015 marketing meeting.  *See* Tr. 3646-47.

**W S G R**   **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 11 of 23

*Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)) (emphasis added).  In the Second
Circuit, the standard of a "reasonable investor" is an objective one, and therefore may vary "with the
nature of the traders involved in the particular market."  *Id.* at 64-65.  Thus, "[t]he reasonable
investor in a market in which many individual investors trade will be deemed to be somewhat less
schooled and sophisticated than a reasonable investor in a market . . . in which only institutions trade
with the help of complex computer programs and professional traders."  *Id.* at 65.  As such, courts
may find misstatements immaterial as a matter of law where the misstatements are "so obviously
unimportant to a reasonable investor that reasonable minds could not differ on the question of their
importance."  *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("*Litvak I*").

> **B.    Application**

The government's argument as to why the alleged misstatements and omissions are material
consists of nothing more than unsupported blanket statements.  Instead of marshalling specific
instances of misstatements or omissions, the government summarily argues that (1) the defendants
and their co-conspirators continued to accept new investors for PPVA and new investments
throughout 2015; and (2) had the defendants "ceased their campaign of deception and disclosed the
truth about the liquidity crisis and their inability to pay redemptions," PPVA investors could have
otherwise preserved the capital that they instead invested in the fund.  Gov. Br. at 5.  The
government further argues that those investors invested in multiple Platinum funds could have
withdrawn their full investment, "thereby avoiding losses they would go on to suffer as investors in
PPCO."  *Id.*  Lastly, the government argues that timely disclosure "likely would have hastened the
involvement of regulators, resulting in . . . avoidance of a scenario in which insiders a certain select
PPVA redeeming investors received payment, and ensuring that all similarly situated investors were
instead treated fairly."  *Id.*

The government's arguments miss the point.  As an initial matter, the only specific references
to the record in the government's entire argument above are two exhibits, GX-1325 and GX-1377,
***neither of which is in evidence***, and at any rate do not shed any light on what the purported
misrepresentations were in those particular instances.  More importantly, as the government has not
only failed to point to specific examples of misstatements and/or omissions – let alone material
misstatements – it cannot show how the purported misrepresentations "significantly altered ***the 'total
mix' of information made available***."  *Litvak II*, 889 F.3d at 64.

Furthermore, the government misunderstands the defendants' Rule 29 argument on
materiality.  Defendants do ***not*** assert that the government must prove reliance or loss.  *Cf.* Gov. Br.
at 3.  Rather, defendants assert that the alleged misstatements and omissions are immaterial because
(1) the alleged misstatements and omissions do not "significantly alter the total mix of information
made available" to the investors; (2) any alleged misstatements made following an investor's
redemption request cannot have been material, because an "investment decision" was already made
at that point; and (3) for those alleged misstatements made prior to redemption, the government has
failed to show that those misstatements and omissions were false when made.

**W S G R   Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 12 of 23

### 1.    The Government Fails to Address the "Total Mix" of Information Made Available to Investors

Through cross examination, the defendants have established that Platinum provided important disclosures to prospective and current investors in PPVA, as summarized below.

#### a)    Disclosures in the PPM

The PPM – a document that each investor testified as having reviewed, or at least received, prior to investing[13] – contains ample disclosures regarding the fund's potential illiquidity and redemption terms.  For example, there are no less than eight times that investors are warned about illiquidity in the PPM's risk factors section (*see* Tr. 421-28) (Huth), including:

- "Volatility or illiquidity could impair the Master Fund's profitability or result in losses" (GX-1828 at JH-000000579);

- "[T]he market to sell [unregistered securities] may be illiquid," and "[c]ertain private investments made by the Master Fund will share many of the same risk characteristics as venture capital investing, offering the opportunity for significant gains, but also involving a high degree of risk, including the complete loss of capital"  (GX-1828 at JH-000000580);

- "Certain investment positions of the Master Fund may be highly illiquid" (GX-1828 at JH-000000580); and

- "An investment in the Partnership is suitable only for sophisticated investors who have no need for liquidity in this investment" (GX-1828 at JH-000000590).

Subsequent iterations of the PPVA PPM included even more disclosures regarding illiquidity and redemptions, such as:

- Redemptions "may be paid in cash and/or in kind," and "[t]he Partnership assets included in an in kind distribution will be determined by the Investment Manager in its sole discretion" (GX-3403 at AS 000001390); and

- "The sale of restricted and illiquid securities often requires more time . . . .  The Master Fund may not be able to readily dispose of such illiquid investments and . . . [a]s a result, the Master Fund may be required to hold such securities despite adverse price movements and thus unable to make timely redemption payments."  (DX-3803-1 at EDNY-PP-FIREWALL-003963351).

---

[13] *See* Tr. 200 (Huth); Tr. 1527-28 (Gulkowitz); Tr. 1767 (Shaked); and Tr. 2612 (Zeitman).

**WSGR** **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 13 of 23

### b)   Disclosures in the Investor Calls

PPVA's illiquidity was also disclosed during the quarterly investor calls, which were made available to all investors.  *See* 1-DX-4401; 1-DX-4402; 1-DX-4403; 1-DX-4404; 1-DX-4405; 1-DX-4406; 1-DX-4407; 1-DX-4408;1-DX-4409;  1-DX-4410; 1-DX-4411.  In fact, such disclosures were made as early as January 14, 2015 on the Q4 2014 investor call, when Mr. Nordlicht told investors that "PPVA ended up with private equity positions[.]"  GX-4506 at 3.[14]  Other examples include:

- Mr. Nordlicht disclosing to investors in the Q4 2014 investor call that "underperformance in energy" also creates issues with "money that is tying up," and that the same energy positions were "hogging up" liquidity (GX-4506 at 3);

- Mr. Nordlicht disclosing to investors in the Q1 2015 investor call that PPVA is dealing "with a more transitionary year where we're trying to move towards liquid strategies" (GX-4507 at 6);

- Mr. Nordlicht disclosing to investors in the Q2 2015 investor call that some investors "have commented that in PPVA we have become more like a private equity fund, disguised as a hedge fund and that we've somewhat deemphasized some of our liquid trading strategies," and noting that "we are in the process of rejiggering the portfolio . . . to reallocate to the more liquid trading positions . . . like we used to have of fifty-fifty" (GX-4508 at 3);

- Mr. Nordlicht disclosing to investors in the Q3 2015 investor call that "in terms of solving the overall liquidity [profile] of the funds, and getting back to more 50-50 type of between liquid and illiquid strategies we've had in the past, that's something we're working on very very aggressively right now . . . ." (GX-4509 at 9);

- Mr. Nordlicht disclosing to investors in the Q4 2015 investor call that "January was a particularly ugly set of circumstances for our overall portfolio," and, in discussing the side pocket, noting that PPVA is "dealing with two very very, you know, negative events in terms of a meltdown in—in crude oil prices . . . as well as a development in our China [P]ost [investment]," (GX-4510 at 2).

### c)   Disclosures in the PPVA Year-End Audits

Additionally, PPVA's illiquidity was also disclosed in its year-end audited financials. Indeed, a review of the audited financials shows that the PPVA fund was:

- 87.03% illiquid as of December 31, 2010 (DX-1278 at EDNY-PP-SW1-002091237);

---

[14] As noted above, the transcripts cited in this portion are not in evidence, but are included as reference to the corresponding, admitted audio exhibits.

**W S G R    Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
June 11, 2019
Page 14 of 23

- 93.81% illiquid as of December 31, 2011 (DX-2003 at EDNY-PP-SW1-001901688);

- 83.98% illiquid as of December 31, 2012 (1-DX-5105 at CR_DOJ_0000046457, 46469);

- 90% illiquid as of December 31, 2013 (DX-2006 at CR_DOJ_0000035118, 35130); and

- 104.09% illiquid as of December 31, 2014 (1-DX-5107 at CR_WP_PPVA-MASTER_2014_DOJ_0000032).

*See also* DX-2482 (demonstrative).  Furthermore, even if the government were to argue that disclosure was incomplete because the 2013 and 2014 audited financials were delayed until February and September 2015, respectively, the fact remains that the 90% and 104.9% illiquid figures for those years would have been available to prospective and current investors putting in new subscriptions and investments in 2015 – the time period at issue in the government's brief.

In light of the above evidence, it is clear that any purported misrepresentation made to an investor – and it is unclear from the government's brief whether any such misrepresentation even exists in the record – regarding Platinum's illiquidity and, relatedly, its inability to meet redemptions, cannot have substantially altered the "total mix of information made available" to investors on these topics.

### 2.  Alleged Misstatements Made Post-Redemption Request Occurred After An Investment Decision Was Already Made

To the extent the government is alleging that misstatements were made to investors following their redemption requests, the law makes clear that such misstatements cannot be material.  In such a scenario, the investor has already made the investment decision to redeem; therefore, there is no further investment decision that would have been affected by such misstatements.  *See Litvak II*, 889 F.3d at 64 (a misstatement is material so long as there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important *in making an investment decision*.") (internal citation omitted) (emphasis added).

### 3.  The Government Fails to Provide Concrete Examples of Misstatements Made Pre-Redemption Request

Other than the government's blanket assertion that "defendants and their co-conspirators continued to accept new investors for PPVA, and new investments, throughout 2015," the government only points to the March 2015 redemption deferrals as evidence of Platinum's "deception."  *See* Gov. Br. at 5.  The government yet again fails to meet the legal standard, for the government cannot point to any evidence showing that the 7 percent return in April 2015 was actually a misrepresentation.  Rather, the evidence suggests that Platinum was *hopeful* for an 8 percent return, *see, e.g.*, GX-4508 at 2, 5, and 16, and that the return for April did in fact turn out to be close to 8 percent, *see, e.g.*, GX-4743.  Indeed, Mr. Kaplan, a cooperating witness, admitted (after

**WSGR** **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 15 of 23

some equivocating) that he may have even told prosecutors that he had no reason at the time to doubt what Mr. Nordlicht was saying about an 8 percent forecast during the March 2015 marketing meeting. *See* Tr. 3646-47. In the face of such a record, it is difficult to understand where the "lie" is with respect to the 7 percent return in April 2015, much less where the "material lie" is.

## V.   The Government Failed to Prove that the Defendants Materially Misled Investors Regarding PPVA Redemptions

We will not repeat here the arguments made in court on June 7, 2019. We will note, however, that in its brief, the government relies exclusively on (1) forward-looking statements regarding the anticipated timing or form of redemption payments made to investors *after* the investor had made a redemption request and (2) exhibits that are *not in evidence*.[15] The government has neither proven that the selective payment of redemptions was contrary to the terms of the governing documents nor that the payment of selective redemptions constituted as a fraud on PPVA investors.[16]

Each of the misstatements regarding redemptions identified in its brief are qualified, forward-looking statements made *after* the relevant investor had made their redemption requests.[17] *See* GX-1865 (in response to Dr. Huth's inquiry regarding a redemption not yet paid, Mr. Kaplan offered the forward-looking statement, "we are working on closing two deals over the next few months . . . but neither have been finalized. We *expect* the proceeds to provide the cash for all redemptions.") (emphasis added); GX-1629 (in response to Mr. Gulkowitz's inquiry regarding a late redemption payment, Mr. Kaplan responds, "we *anticipate* paying/wiring the whole 3/31 class together sometime in July (or maybe earlier). This is based on our current liquidity and the *anticipated* sales of two companies.") (emphasis added);[18] GX-1332 (contains Mr. Landesman's description of the effects side pocket on an existing redemption request and an offer to pay DeVeste's redemption in kind, "[a]s with all redemptions from [December 31, 2015] on, 35 percent in cash, with the rest

---

[15] The two non-binding SEC cases cited by the government are also distinguishable. First, *SEC v. Falcone*, No. 12-CV-5028, 2013 U.S. Dist. LEXIS 132300 (S.D.N.Y. Sept. 16, 2013) is a consent judgment in which the defendants waived findings of facts and conclusions of law. *Falcone* is also factually distinguishable. For example, in that case, the individual defendant loaned himself money to pay taxes while prohibiting other investors from redeeming, and withheld the existence of side letters from the fund's Board of Directors. *SEC v. Conrad*, 16-CV-2572 (LMM), 2019 U.S. Dist. LEXIS 46159 (N.D. Ga. Jan. 17, 2019) is similarly distinguishable. In that case, the court ruled in favor of summary judgment on, among other things, preferentially paid redemptions exclusively to friends, family, and insiders, in light of the defendants' failure to offer "arguments in their briefing on either motion to rebut Plaintiff's arguments and supporting evidence[.]" *Id.* at *53. Here of course, the government has pointed to no representations that were both material and false at the time they were made.

[16] As we noted on June 7, 2019, nothing in the contractual documents requires that redeeming investors be paid *pari passu*, or that all redeeming investors will be treated equally. *See, e.g.*, GX-1828. Additionally, the DDQs made clear that the Fund may enter into side agreements that would allow different investors to have, among other things "preferred liquidity terms[.]" *See* GX-4103 at AS 000000435.

[17] Additionally, two of the instances cited by the government, GX-1865 and GX-1338, relate to the treatment of redemptions following the imposition of the side pocket and thus even for investors who had made only partial redemption requests, they were unable to redeem funds covered by the side pocket.

[18] Notably, one of the deals that Mr. Kaplan is likely referring to in both GX-1629 and GX-1865 was Agera.

**W S G R   Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 16 of 23

*subject to monetizations*, unless you want actual positions, in which case we could give you 100 percent.") (emphasis added); GX-1338 (in which Mr. Shaked writes regarding existing redemption requests following the November 23, 2015 side pocket call, and Mr. Landesman informs him, that like all other redemption requests, Mr. Shaked will be subjected to the restrictions in the side pocket).   Notably, of the four exhibits cited in this section of the government's brief, three are *not in evidence*.  *See* GX-1629; GX-1332; GX-1338.

Additionally, and despite its unsupported claims in its brief, the government has cited to no evidence that the defendants or their alleged co-conspirators knew that these forward-looking statements were false or intentionally misleading *at the time* the statements were made.[19]  Even if the government's contention that, at the time the statements were made, Platinum was paying the redemptions of some individuals and not others were true, the government still has introduced no evidence that the defendants knew that selective payments would continue following the anticipated future liquidity events.

## VI.    The Government Failed to Prove that the Valuation of PPVA's Level 3 Assets were Unreasonable

The government's allegations regarding the reasonableness of PPVA's Level 3 valuations fail as a matter of law.  Not only has the government failed to point to a single specific false value that PPVA provided to its investors, the government has offered no evidence that the defendants or the third-parties who confirmed the reasonableness of PPVA's valuations failed to take into account the "negative events" cited by the government's portfolio company witnesses.  The government has also cited to no evidence that Mr. Levy knew that PPVA's valuations were unreasonable.

First, the government's reliance on the testimony of witnesses involved in Platinum's oil and gas positions (Art Garza, Joe Bruno, Dennis Corkran, Glynn Roberts, and Lily Cheung) to support the contention that Platinum somehow did not properly value the oil and gas assets on its books is wholly unavailing.  Each of these witnesses, to a one, testified that they had *no idea* how Platinum valued the oil and gas assets such as Black Elk, Golden Gate, or Northstar on its books.  *See* Tr. 684, 700 (Garza); *id.* at 1446 (Cheung); *id.* at 1913 (Bruno); *id.* at 2800, 2831 (Corkran); *id.* at 5385-86 (Roberts).  These witnesses were not aware that Platinum had hired independent, third-party valuation companies to confirm Platinum's valuations.  *See* Tr. 686, 9690-9691 (Garza); *id.* at 1446-1447 (Cheung); *id.* at 1913 (Bruno); *id.* at 2831-2832 (Corkran); *id.* at 5491-5492 (Roberts).  Moreover, these witnesses were not competent to testify as to the validity of Platinum's valuations, and did not provide any relevant evidence that Platinum improperly valued its oil and gas assets, let alone what role, if any, Mr. Levy had in valuing those assets, *see e.g.*, Tr. 684.

Moreover, the government's theory that allegedly poor drilling performance or cash flow on the portfolio company level must necessarily equate to a lower valuation has been debunked by its own witnesses.  *See, e.g.*, Tr. 5456-57 (Glynn Roberts testifying that simply because Northstar was

---

[19] Mr. Kaplan was not asked about GX-1865 or GX-1629 in the government's case-in-chief.

WSGR   **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 17 of 23

cash deficient and in debt did not make it worthless, and indeed fetched an $80 million purchase price). Thus, the government's case on valuations contains a gaping hole: there has been no witness to testify (including, notably, no expert witness on hedge fund valuation of oil and gas assets) and no documentary evidence to establish that Platinum improperly valued any of its assets. There has been no witness to testify that Platinum wilfully ignored the "negative events" cited by the government, put undue weight on certain performance metrics such as PV-10, or used rigged models to reach the valuations it disclosed to investors. Only improper innuendo and argument supports the government's theory that Platinum did not reasonably value its assets.[20]

Indeed, not even the government's cooperating witnesses testified that they had any knowledge of Platinum creating or providing to investors any false or fraudulent valuations. Both Mr. Mandelbaum and Mr. Kaplan stated they had no role in Platinum's valuations beyond ministerial tasks, and Mr. Kaplan conceded that he would not be able to offer any insight into valuations. *See* Tr. 2970, 3676, 4398. While Mr. Kaplan initially equivocated on the record as to his understanding of Mr. Nordlicht's projections of 8 percent returns in April 2015, he admitted that he "may have" earlier told the government that he had no reason to doubt those projections. *See* Tr. 3646-47.[21]

Further, the record is clear that Platinum's valuations were confirmed by independent third-party valuation companies Sterling and A&M, as well as by the auditors. There is no evidence on the record that Platinum misled its auditors or valuation companies. For example, both Mr. Manela and Mr. Mandelbaum testified that Sterling was sophisticated, reputable, and independent, *see* Tr. 1245-56, 4549-50, and Mr. Manela further testified that, in his personal experience, Sterling was "hard-working" and "honest[.]" Tr. 1257. Mr. Manela and Mr. Mandelbaum both acknowledged that the Sterling and A&M reports confirmed Platinum's valuation of its assets, including, specifically, Northstar and Golden Gate, as well as Agera, China Horizon, Urigen, and Minque

---

[20] The government places significant weight on Mr. Nordlicht's statements to investors in the November 23, 2015 conference call – specifically, Mr. Nordlicht's statement that the energy assets were currently not monetizable at the value they were marked on PPVA's books. *See* Gov. Br. at 11-12. Setting aside the point Mr. Nordlicht was actually trying to make on the call – that PPVA was not holding these assets at a fire sale price, but rather at a valuation Platinum reasonably understood the assets to be worth in a fair transaction – the government has failed to introduce any evidence that PPVA or any hedge fund is required to mark assets at the value they could sell the assets for at a moment's notice. To the contrary, Platinum investors were well aware that PPVA held illiquid assets that would take time to liquidate, or else sell at a steep discount. *See* DX-3803-1 at EDNY-PP-FIREWALL-003963350 ("The Master Fund may invest in equity, convertible securities and fixed income obligations, the disposition of which may be restricted under applicable U.S. securities laws. Whether or not restricted, the market to resell such securities may be illiquid. Therefore, such investments may be required to be held for a lengthy period of time or, if the Master Fund were forced to liquidate its position in such securities, such liquidation may be taken at a substantial discount to the underlying value or result in the entire loss of the value of such investment.").

[21] Additionally, the Indictment cites only to the alleged valuation of Black Elk, Golden Gate, and Northstar. The government also confirmed, in its opposition to our request for a Bill of Particulars that everything the defendants needed to know about valuations was contained in the Indictment. To the extent that the government now seeks to rely exclusive of the positions that make up the positive return in April 2015 (Urigen, Vistagen, and China Horizon, *see* GX-7112), that constitutes a constructive amendment of the Indictment.

**W S G R   Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 18 of 23

Limited.  *See* Tr. 1258-60, 1265-67, 1271-72, 4559-66, 4569-71; *see also* DX-2512.[22]  Mr. Manela confirmed that the auditors engaged their own valuation experts to confirm Platinum's valuations.  *See* Tr. 1256-57.  Mr. Manela further testified that he never lied to the valuation companies and never lied to or misled the auditors.  *See* Tr. 1148, 1211, 1255, 1362.  As it relates specifically to Mr. Levy, Mr. Manela confirmed that Mr. Levy was not the person at Platinum deciding the value of the fund's assets.  *See* Tr. 1141.

## VII.   The Government Failed to Prove that Each of the Individuals for whom Hearsay Statements were Admitted were Co-conspirators

The government has not proven, even by a preponderance of the evidence, that Gilad Kalter, David Steinberg, Zack Weiner, and Samuel Salfati were members of a conspiracy with the defendants.[23]  Regarding Mr. Kalter, the government relied solely on allegations relating to the projected April 2015 return numbers.  *See* Gov. Br. at 14.  As noted above, the government has introduced no evidence that any statements surrounding these numbers were false or misleading.  As for Mr. Steinberg, the government appears to be arguing that he was a member of both the alleged Investment Scheme and the Black Elk Bond Scheme.  *See* Gov. Br. at 14.  To support these contentions, the government cites only to (1) GX-1794, a May 2014 email that *is not in evidence*, where Mr. Steinberg informs Mr. Nordlicht that in order to sell bonds to Beechwood, Platinum would need Beechwood's DTC information, (2) GX-273 and GX-890, emails that *are not in evidence* and which related to alleged market manipulation of Black Elk bonds, a topic the Court specifically excluded, Dkt. Nos. 704, 732; (3) GX-1883 in which Mr. Steinberg forwards a PR piece on a Platinum position and which – contrary to the government's assertions – does not contain any references to PPVA's liquidity or any indication that Mr. Nordlicht himself was "drumming up" positive news stories on PPVA's positions; and (4) GX-289, which does not prove that Mr. Steinberg "was aware of Platinum's liquidity crisis and was intimately involved in trying to selectively pay only certain individuals and entities, while deliberately failing to disclose to investors Platinum's dire situation[,]"  Gov. Br. at 15, but instead shows Mr. Steinberg forwarding instructions from Mr. Nordlicht and then being dropped from the email chain.

The government's proof similarly fails with respect to Mr. Weiner.  Here again, the government seeks to rely primarily on *exhibits not in evidence*, GX-1816 and GX-1101.  The government relies on GX-1816 to establish that Mr. Weiner was part of a conspiracy to lie to Black Elk bond holder Dixon Yee about Black Elk's performance in February 2015 – *months* after the close of the Consent Solicitation in August 2014.  The Indictment charges the defendants with misleading Black Elk bond holders about Platinum's ownership and control of the Black Elk bonds in order to deprive the Black Elk bond holders of the proceeds of the Renaissance sale.  Ind. at ¶ 73.

---

[22] Indeed, Mr. Mandelbaum confirmed that A&M even valued some of PPVA's assets higher than Platinum had.  *See* Tr. 4571-74; DX-2512.

[23] Notably, to support the inference that Bernie Fuchs was a member of the alleged conspiracy, the government cites primarily to allegations regarding the projected April 2015 return numbers.  *See* Gov. Br. at 13-14.  As noted above, the government has introduced no evidence that any statements surrounding these numbers was false or misleading.

**WSGR  Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 19 of 23

Not only does GX-1816 have nothing to do with Platinum's ownership and control of the Black Elk bonds, but by February 2015, the proceeds of the Renaissance sale had already been disbursed. The only admitted exhibit to which the government cites, GX-1039, is an email commenting on low production numbers at Northstar, a fact the parties do not dispute.

The government fails to even address Samuel Salfati, an additional co-conspirator the defendants raised. Tr. 6023.

Finally, and importantly, none of the government's cooperating witnesses testified that they conspired with David Steinberg, Zack Weiner, or Samuel Salfati.

## VIII. The Government Failed to Establish Venue for Counts Four, Six, Seven, and Eight

The government has failed to prove that the Eastern District is the proper venue for Counts Four, Six, Seven, and Eight. The defendants are thus entitled to a judgment of acquittal under Rule 29(a) on those counts.

### A. Legal Standard

A criminal defendant has the right to be tried in the "district wherein the crime shall have been committed[.]" U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18. Under 15 U.S.C. § 78aa, venue for securities fraud violations is proper "in the district wherein any act or transaction constituting the violation occurred." The Second Circuit has found that, for alleged securities fraud violations, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). Moreover, in the Second Circuit, "in a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *Id.* (internal quotation marks and citations omitted).

The government bears the burden of proving venue with respect to each count by a preponderance of the evidence. *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (citing *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999)).

### B. Application

#### 1. The "PPNE Scheme"

Count Four of the Indictment, relating to the alleged "PPNE Scheme," alleges a substantive violation of securities fraud pursuant to 18 U.S.C. 78j(b) and 78ff. Ind. at ¶¶ 41-42. Because the government has failed to offer any competent proof that any "act or transaction constituting the [securities fraud] violation occurred" in the Eastern District, 15 U.S.C. § 78aa, a judgment of acquittal should be entered for this Count.

**W**S**G**R **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Brian M. Cogan
June 11, 2019
Page 20 of 23

The government has identified ***one*** alleged misstatement to an investor relating to the PPNE note – a March 24, 2015 email to David Israel, a current PPVA investor and PPNE lender, attaching an "Executive Summary" to David Israel, stating that "PPVA is seeking to borrow $50 million to participate in the Northstar GOM Holdings Group LLC (a majority-owned subsidiary of PPVA) offering of approximately $75,000,000 in debt . . . ." *See* GX-261; Tr. 3136-38, 3140-43; *see also* Tr. 6096. Yet there is no evidence that Mr. Israel or his related entities, Sarital Corp. or Boris 31 Corp., reside in Brooklyn. Indeed, the only relevant evidence in the record in this regard are the bank records introduced by the government, which only establish that the bank account registered with Platinum for Boris 31 Corp. is in Manhattan. *See* GX-2124-7.

It is uncontested that Platinum's offices were located in Manhattan. There is no evidence that the email sent to Mr. Israel originated from anywhere other than Manhattan, and no evidence that the email was received in Brooklyn. *See Tzolov*, 642 F.3d at 318-19 ("We have little difficulty concluding that the government failed to offer competent proof that any 'act or transaction constituting the [securities fraud] violation occurred' in the Eastern District. . . . Butler did not transmit any false or misleading information into or out of the Eastern District. All the fraudulent statements that were part of the government's proof, whether made by Butler or Tzolov, were made in telephone calls or emails from Credit Suisse's Madison Avenue offices located in the Southern District or in meetings with investors. None of this activity occurred in the Eastern District."). There is no evidence that money was wired into or out of Brooklyn. *Cf. United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001).

The only other response the government made in its oral argument was the blanket statement that "[t]hroughout 2015, [the defendants were] soliciting new investments into PPNE even though that deal has closed and they are not disclosing to the note holders that those funds are actually being used to pay PPNE redemptions. There's also evidence in the record relating to the preferential payments of PPNE investor redemptions." Tr. 6096. This too is insufficient to establish venue. The government has not pointed to – and indeed, the record is wholly devoid of – any evidence of the defendants "soliciting" any additional investments into PPNE. Even if the government had pointed to such evidence, there would be no evidence whatsoever that the investors solicited to lend via PPNE note were located in the Eastern District.

## 2. The "Black Elk Bond Scheme"

Counts Six, Seven, and Eight of the Indictment relate to the alleged "Black Elk Bond Scheme." Counts Six and Seven allege allege conspiracies to commit securities fraud and wire fraud, respectively, and Count Eight alleges a substantive securities fraud violation. A judgment of acquittal should be entered for each of these Counts for failure to establish venue.

As with the "PPNE Scheme," the government has cited to only ***one*** exhibit that it claims establishes venue on the Black Elk Counts. According to the government, GX-566 is "the DTC participant list that identifies the bondholders who participated in the consent solicitation" which

**WSGR** **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 21 of 23

"includes several bondholders who are living in the Eastern District of New York, who voted on that consent solicitation." Tr. 6092. The government's argument is flawed in several respects.

First, GX-566 does not establish that any bondholders resided in Brooklyn, let alone during the relevant time period. The only Brooklyn entry on GX-566 is "00000352 JPMC CLEAR, ERIC OSZUSTOWICZ 3476432914, 3 CHASE METROTECH CENTER, PROXY DEPT./NY1-H034, BROOKLYN NY 11245-0001" (at EDNY-PP-SW1-000055247). The Brooklyn address corresponds to JP Morgan Chase ("JPMC"), the broker for the bonds, and not Mr. Oszustowicz, the beneficiary/owner of those bonds. *See* Tr. 4776 (government witness W. Robert Shearer explaining: "So the bonds are held by the Depository Trust Company. They are held in record names. They are held in the names of banks who act as brokers and trade in these bonds. Those record holders don't actually own the bonds from an economic perspective or voting perspective. They have clients and the clients own the bonds. So here you're having both the record holder, who's listed on the record of DTC a owning the bonds, agreeing to the consent to the indenture and they're doing that because their client has instructed them to do so."). There is no evidence that Mr. Oszustowicz or *any Black Elk bondholder* has *ever* resided in Brooklyn or were even present in Brooklyn during the relevant time period. *Cf. Royer*, 549 F.3d at 894 (finding venue where there was evidence of six subscribers potentially involved in trades at issue residing in the Eastern District of New York during the relevant time period). Indeed, the Brooklyn address itself in the exhibit means nothing – the address is a purely nominal address for the JPMC account.

Second, there is no evidence that Mr. Oszustowicz was even a Black Elk bondholder at the time of the consent solicitation process. GX-566 is an email dated March 28, 2014, attaching a DTC participant list – *i.e.*, a list of Black Elk bondholders – as of March 26, 2014, almost four months before the consent solicitation and tender offer was issued, and nearly five months before the offer closed. It is uncontested that the Black Elk bonds were publicly traded. *See*, *e.g.*, Tr. 5158. Thus, Mr. Oszustowicz may well have traded his Black Elk bonds to another participant prior to the consent solicitation.

"To establish venue in the district for a conviction of securities fraud . . . the Government must prove that a criminal act occurred in the district of venue." *United States v. Lange*, 834 F.3d 58, 69-70 (2d Cir. 2016). The government has not established that any criminal act in relation to the alleged Black Elk Bond Scheme occurred in Brooklyn. Platinum's headquarters was located in Manhattan; Black Elk was located in Houston, Texas. GX-566 does not establish that any fraudulent statements were made or received in the Eastern District. *See Tzolov*, 642 F.3d at 318-19. That Mr. Nordlicht and Mr. Levy received GX-566 in no way establishes that they could foresee – let alone intend or know – that any actions taken in furtherance of the alleged scheme would occur in the Eastern District.

The government has similarly failed to establish that the defendants committed or caused the commission of any overt acts in furtherance of the alleged securities fraud and wire fraud conspiracies in the Eastern District. Unlike cases in this Circuit in which defendants or their alleged conspirators engaged in overt actions in the relevant district—such as causing communications in

WSGR   Wilson Sonsini Goodrich & Rosati
       PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 22 of 23

furtherance of the conspiracy to be transmitted into the relevant district (*see, e.g.*, *Kim*, 246 F.3d at 192; *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008))—there is no evidence whatsoever that would permit a jury to find by a preponderance of the evidence that venue has been properly established in the Eastern District.  The government has not even established that any electronic communications allegedly in furtherance of the Black Elk scheme were received in the Eastern District.  *Cf. Lange*, 834 F.3d at 70 ("Venue is also proper in the district where an electronic communication was received.").

     That Black Elk bonds held in a broker's account nominally located in Brooklyn participated in the consent solicitation does not establish that the defendants committed or caused any acts in the Eastern District.[24]  The JPMC account noted in the DTCC participant list is for ***all*** JPMC Black Elk bondholders, and has no physical nexus to Brooklyn.  Any voting by JPMC was purely a "ministerial" task, which would not have been foreseeable to the defendants.  *See United States v. Bezmalinovic*, 962 F. Supp. 435, 437 (S.D.N.Y. 1997) (venue in bank fraud prosecution improper in the Southern District of New York where the defendant committed all relevant acts at banks in the Eastern District of New York and the only contact with the Southern District was the banks' cashing and payment of checks through their clearing houses in Manhattan).  Even if the defendants' actions "ultimately resulted" in votes nominally occurring in Brooklyn, their conduct was "too anterior and remote to confer venue" in the Eastern District.  *United States v. Geibel*, 369 F.3d 682, 697 (2d Cir. 2004) (finding lack of venue where there was no evidence showing defendants contacted New York or utilized the New York-based facilities for exchange or brokerage firms when engaging in insider trading).

          \*\*\*

---

[24] While GX-761-B indicates that some bondholder that held bonds at JPMC/DTCC 352 were tendered in August 2014, the government has provided no evidence that the holder of those bonds resided in Brooklyn, or that Brooklyn was still the nominee address for JPMC in July or August 2014.

**WSGR** Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Brian M. Cogan
June 11, 2019
Page 23 of 23


       For the foregoing reasons, we respectfully request that the Court grant Mr. Levy's motions made on June 7, 2019.


                   Respectfully submitted,

                   WILSON SONSINI GOODRICH & ROSATI
                   Professional Corporation

                   *s/ Michael S. Sommer*
                   Michael S. Sommer
                   Morris J. Fodeman


Cc:  All Counsel of Record (via CM/ECF)