**MANDATE**

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5th day of November, two thousand twenty-one.

Before:     Robert D. Sack,
            Denny Chin,
            Raymond J. Lohier, Jr.,
            *Circuit Judges.*

_____

United States of America,

       Plaintiff - Appellant,

   v.

Uri Landesman, Joseph Sanfilippo, Joseph Mann, Daniel Small, Jeffrey Shulse,

       Defendants,

David Levy, Mark Nordlicht,

       Defendants - Appellees.

_____

**JUDGMENT**

Docket Nos. 19-3207(L),
19-3209(CON)

The appeals in the above captioned case from an order and judgment of the United States District Court for the Eastern District of New York were argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's order and judgment are VACATED, and the cause is REMANDED for further proceedings consistent with this Court's opinion.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 1/05/2022**

19-3207-cr (L)
*United States of America v. Levy*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2020

(Argued: December 3, 2020     Decided: November 5, 2021)

Docket Nos. 19-3207-cr/19-3209-cr

───────────────────────

UNITED STATES OF AMERICA,
*Appellant,*

v.

URI LANDESMAN, JOSEPH SANFILIPPO, JOSEPH MANN,
DANIEL SMALL, JEFFREY SHULSE,
*Defendants,*

DAVID LEVY, MARK NORDLICHT,
*Defendants-Appellees.*

───────────────────────

Before:      SACK, CHIN, AND LOHIER, *Circuit Judges.*

After a nine-week jury trial, defendants-appellees David Levy and Mark

Nordlicht were convicted of securities fraud, in violation of 15 U.S.C. §§ 78j(b)

and 78ff, conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371,

and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  The

convictions relate to the defendants' participation in a fraudulent scheme to

defraud bondholders of an oil and gas company, Black Elk Energy Offshore

Operations, LLC, from the proceeds of a lucrative asset sale.  Following the trial,

the defendants moved for a judgment of acquittal pursuant to Federal Rule of

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Federal

Rule of Criminal Procedure 33.  The district court (Brian M. Cogan, *Judge*)

granted Levy's motion for a judgment of acquittal and conditionally granted his

motion for a new trial in the event the judgment of acquittal was later vacated or

reversed.  The district court denied Nordlicht's motion for a judgment of

acquittal, but nevertheless granted his motion for a new trial.  The government

appeals, arguing that the district court erred in granting the defendants' post-trial

motions.  For the reasons set forth below, we agree.  We therefore

> VACATE the district court's order and judgment granting the defendants' post-trial motions, and REMAND for further proceedings consistent with this opinion.

> LAUREN HOWARD ELBERT, Assistant United States Attorney (Kevin Trowel, David Pitluck, Lauren Howard Elbert, Patrick Hein, Assistant United States Attorneys, *on the brief*), for Jacquelyn M. Kasulis, Acting United States Attorney for the Eastern District of New York;
>
> MICHAEL S. SOMMER (Morris J. Fodeman, Katherine T. McCarthy, *on the brief*), Wilson Sonsini Goodrich & Rosati, P.C., *for Defendant-Appellee David Levy;*
>
> WILLIAM A. BURCK (Daniel R. Koffman, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, *for Defendant-Appellee Mark Nordlicht.*

2

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

S<small>ACK</small>, *Circuit Judge*:

This appeal concerns a scheme allegedly executed by defendants-appellees

Mark Nordlicht and David Levy to defraud bondholders of an oil and gas

company, Black Elk Energy Offshore Operations, LLC ("Black Elk"), of the

proceeds of a lucrative asset sale to Renaissance Offshore, LLC (the "Black Elk

Scheme").  In connection with their participation in the Black Elk Scheme, the

defendants were both convicted of securities fraud, conspiracy to commit

securities fraud, and conspiracy to commit wire fraud.

Central to the alleged Black Elk Scheme was a New York-based hedge

fund known as Platinum Partners L.P. ("Platinum").  Platinum consisted of

multiple investment funds, including Platinum Partners Value Arbitrage Fund,

L.P. ("PPVA"), Platinum Partners Credit Opportunities Master Fund, L.P.

("PPCO"), and Platinum Partners Liquid Opportunity Master Fund, L.P.

("PPLO").  Nordlicht and others founded Platinum in 2003, and Nordlicht was

the Chief Investment Officer ("CIO") of PPVA, PPCO, and PPLO.  Platinum also

had a relationship with a reinsurance company named Beechwood, which was

founded in or around early 2014 by a group of investors that included Nordlicht.

Beechwood included several entities:  Beechwood Bermuda International Ltd.

3

("BBIL"), Beechwood Re, and B Asset Management ("BAM"). Levy worked at Platinum as a portfolio manager. In early 2014, Levy left Platinum and joined Beechwood as its CIO. He later returned to Platinum where he became co-CIO with Nordlicht.

One of Platinum's largest investments was in Black Elk, an oil and gas company headquartered in Houston, Texas. In 2010, Black Elk raised capital by issuing $150 million in bonds. Black Elk also issued a Series E preferred security in early 2013, of which Platinum purchased the majority.

But Black Elk experienced significant financial setbacks between 2012 and 2014. An explosion in November 2012 at one of its offshore oil platforms in the Gulf of Mexico, coupled with ensuing civil litigation and regulatory scrutiny, resulted in a sharp decline in its business. Black Elk was also plagued by rampant mismanagement and poor financial planning. By 2014, it appeared to be spiraling towards bankruptcy.

At trial, the government alleged that Nordlicht, Levy, and their co-conspirators sought to limit Platinum's losses in the event of a Black Elk bankruptcy. They did so by orchestrating the sale of Black Elk's most valuable assets, and fraudulently manipulating the priority structure by which Black Elk

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

debt and equity holders would be repaid to ensure that the proceeds of any asset

sales went to the preferred equity holders (among whom Platinum was

prominent) instead of the bondholders who would have otherwise had priority

to those proceeds.  In order to modify the priority structure, it was necessary for

a majority of the outstanding bonds to consent (against their interest) to an

amendment to the bond indenture.  The government alleged that the defendants

rigged the vote of bondholders by fraudulently concealing their control over

certain bonds – in violation of the bond indenture – to ensure that the

amendment would pass.  As a result of this alleged fraud, the defendants

unlawfully diverted nearly $100 million in asset sale proceeds from the

bondholders to the preferred equity holders – who were not entitled to it – to

Platinum's benefit.

    After a nine-week trial, a jury convicted Nordlicht and Levy on the charges

related to the Black Elk Scheme.  After the verdict, Nordlicht and Levy both

moved for judgments of acquittal or, in the alternative, for new trials.  The

district court denied Nordlicht's motion for a judgment of acquittal, concluding

that "when viewed in the light most favorable to the Government, the

Government adduced sufficient evidence . . . to make a judgment of acquittal

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

under Rule 29 inappropriate." *United States v. Nordlicht*, No. 16-cr-00640 (BMC), 2019 WL 4736957, at *9 (E.D.N.Y. Sept. 27, 2019). Despite this, however, the district court concluded that "letting the verdict stand against Nordlicht would be a manifest injustice" and therefore granted his motion for a new trial. *Id.* at *16. The district court separately granted Levy's motion for a judgment of acquittal, reasoning that "[e]ven making reasonable inferences in favor of the Government, and deferring to the role of the jury in weighing evidence and assessing credibility, the Government failed to meet its burden of proving beyond a reasonable doubt that Levy had criminal intent." *Id.* at *14. The district court also "conditionally grant[ed] Levy's motion for a new trial in the event that the judgment of acquittal [was] later vacated or reversed." *Id.* at *18. The government now appeals.

For the reasons set forth below, we conclude that the district court erred in granting the defendants' respective Rule 29 and Rule 33 motions. We therefore vacate the district court's judgment of acquittal as to Levy, vacate the district court's order granting new trials to Levy and Nordlicht, and remand for further proceedings consistent with this opinion.

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

# BACKGROUND

*Factual Background[1]*

 *A. The Relevant Entities*

  *1. Platinum Partners L.P.*

Defendant-appellee Mark Nordlicht and his two partners, Murray Huberfeld and David Bodner, founded Platinum – a New York-based hedge fund – in 2003. Platinum consisted of multiple investment funds, which included PPVA, PPCO, and PPLO. Nordlicht was the CIO of Platinum and its various hedge funds, and in his role as CIO, Nordlicht made the "final decision" regarding investments. GA.194.

Defendant-appellee David Levy is Huberfeld's nephew. Levy worked as a portfolio manager at Platinum until around early 2014. As a portfolio manager, Levy was responsible for overseeing some of Platinum's portfolio investments, as

---

[1] Because the defendants appeal their convictions following a jury trial, for purposes of our review of the district court's decision on the Rule 29 motions, "our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016); *see infra* pp. 46-47. For purposes of our review of the district court's decision on the Rule 33 motions, "all facts and circumstances" must be examined to "make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013); *see infra* pp. 76-77.

well as finding other potential investment opportunities.  One of Platinum's

largest investments, on which Levy worked, was in a company named Black Elk.

In early 2014, Levy left Platinum to join a reinsurance company,

Beechwood, as its CIO.  Around late 2014 or early 2015, after his brief stint as

Beechwood's CIO, Levy returned to Platinum as its co-CIO alongside Nordlicht.

*Black Elk*

### a)  *Platinum's Relationship with Black Elk*

Black Elk was a Houston-based oil and gas exploration company that held

and managed valuable oil and gas assets in the Gulf of Mexico.  Black Elk raised

money for its operations by issuing common equity as well as various forms of

debt.  In November 2010, Black Elk issued $150 million of publicly traded senior

secured bonds.  In 2013, to raise additional capital, Black Elk also issued a Series

E preferred security, which functioned like debt.  In the event of a bankruptcy or

liquidation, the secured bondholders would be paid first, followed by those with

preferred equity and then those with common equity.

Platinum was a significant investor in Black Elk.  Levy and Daniel Small –

another portfolio manager at Platinum – co-managed Platinum's position in the

company.  PPVA continued investing in Black Elk over time.  By 2014, PPVA

owned 85% of Black Elk's common equity.  As of 2014, PPVA, PPLO, and PPCO

also held most of its preferred equity.

Because of Platinum's significant investments in Black Elk, Nordlicht,

Levy, and Small were involved in Black Elk's management.  Nordlicht, Levy, and

Small maintained close communication with Black Elk management, including

its co-founder and Chief Executive Officer ("CEO") John Hoffman, Chief

Financial Officer ("CFO") Jeffrey Shulse, Chief Technical Officer Art Garza, and

Vice President of Operations Joseph Bruno.  For example, Black Elk management

met with Nordlicht, Levy, and Small to discuss prospective Black Elk

acquisitions and strategic objectives.  Nordlicht, Levy, and Small also often

worked out of Black Elk's offices and participated in its management meetings.

*The Indenture*

The relationship between Black Elk and its bondholders was governed by

an indenture (the "Indenture").  The Indenture contains several key provisions,

including ones that govern the use of proceeds from an asset sale (Section 4.10),

establish limitations on Black Elk's annual capital expenditures (Section 4.21), set

forth the circumstances under which a default could be called and waived

(Sections 6.01 and 6.04), and establish the procedure for amending the Indenture (Article 9).

Under Section 4.10(b) of the Indenture, Black Elk could use any asset sale proceeds: (1) to repay indebtedness, including money owed to Black Elk bondholders; (2) to acquire assets of an oil and gas business; (3) to acquire the majority of the voting stock of an oil and gas business; or (4) to make capital expenditures or acquire long-term assets for its oil and gas business. Under the Indenture, the proceeds from a sale of Black Elk's assets could not be paid to any equity holder.

Section 4.21 of the Indenture sets forth strict limitations on Black Elk's capital expenditures in any one year. Section 6.01 provides that holders of 25% of the aggregate principal amount of the bonds may call a default alleging that Black Elk violated the terms of the Indenture. Section 6.04, however, allows holders of a majority of the aggregate principal amount of the bonds to waive any default called by the bondholders.

Section 9.02(a) permits amendment of the Indenture with the consent of the holders of a majority in aggregate principal amount of the outstanding bonds. Section 2.09 (the "Affiliate Rule"), however, explains that – when

10

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

determining consent – bonds held "by the Permitted Holders, the Issuers or any

Guarantor, or by any Person directly or indirectly controlling or controlled by or

under direct or indirect common control with the Permitted Holders, the Issuers

or any Guarantor, will be considered as though not outstanding."  GA.888.[2]  In

other words, such Black Elk bonds could not be counted in determining whether

holders of a majority in aggregate principal amount of the bonds consented to

any proposed amendments.

In Section 1.01, the Indenture defines the terms "affiliate" and "control" as

follows:

> "*Affiliate*" of any specified Person means any other Person directly or
> indirectly controlling or controlled by or under direct or indirect common
> control with such specified Person.  For the purposes of this definition,
> "*control*," as used with respect to any Person, means the possession,
> directly or indirectly, of the power to direct or cause the direction of the
> management or policies of such Person, whether through the ownership of
> voting securities, by agreement or otherwise; *provided* that beneficial
> ownership of 10% or more of the Voting Stock of a Person will be deemed
> to be control.  For purposes of this definition, the terms "*controlling*,"
> "*controlled by*" and "*under common control with*" have correlative meanings.

GA.861 (emphases in original).

---

[2] As cited herein, "GA" refers to the Government Appendix, "Supp. GA" refers to the
Government's Supplemental Appendix, "SGA" refers to the Government's Special
Appendix submitted with its opening brief, and "SA" refers to the defendants'
Supplemental Appendix.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

### 2. *Beechwood*

Around 2013 or early 2014, a group of investors – consisting of the founders of Platinum (Nordlicht, Huberfeld, and Bodner), as well as Mark Feuer and Scott Taylor – founded a reinsurance company named Beechwood. Beechwood was paid a premium by primary insurers to invest those companies' funds. BAM, BBIL, and Beechwood Re were entities related to Beechwood.

Nordlicht, Levy, and their associates at Platinum retained significant control over Beechwood's investment decisions. Email correspondence among Feuer, Huberfeld, and Nordlicht from 2013 outlined Beechwood's corporate terms as follows: "1-Nordlicht group to put any capital necessary to secure funds"; "2-Capital to receive 8 percent preferred return"; "3-Capital to be returned and preferred return to be re[]paid before any profit split"; "4-Feuer group to receive 750k a year in draws (deducted from their profit split) after 100 million in funds deployed"; "5-Feuer group will run the insurance end"; "6-Nordlicht group will run the investment allocation side"; "7-all profits split 50-50 to each group (After paying back the original capital)"; "8-Nordlicht group to retain all fees generated by invest[m]ents in Platinum funds." GA.582-83. Consistent with this, when Beechwood was first created, Nordlicht and Levy together decided which

12

investments would be purchased and transferred from Platinum to Beechwood.
And Beechwood invested in many portfolio companies and securities in which
Platinum was already invested, including Black Elk, and in the Platinum funds
themselves.

Shortly after Beechwood was founded, Levy left Platinum to become CIO
of Beechwood.  As such, he controlled the investment side of Beechwood and
made investment decisions on behalf of the company on a day-to-day basis,
while Feuer and Taylor ran the "insurance side" of the company.  GA.206.  While
CIO of Beechwood, Levy also continued to work for Platinum on its investment
in Black Elk.

Platinum and Beechwood also shared employees, and Platinum employees
frequently worked out of Beechwood's office, which was only a few blocks away
from Platinum's.  While CIO of Beechwood, Levy, as mentioned, continued
working for Platinum on Black Elk-related issues.  Nordlicht would periodically
enter the Beechwood office to take phone calls and participate in meetings.
Naftali Manela, who was CFO of PPCO through late 2014, also worked
simultaneously at Platinum and Beechwood; at Beechwood, Manela assisted
Nordlicht in figuring out how much money Beechwood could invest in Platinum

and what form those investments could take.  In addition, Israel Wallach –

although never a Platinum employee – worked at BAM as a portfolio manager

from January 2014 to March 2016 and had links to Nordlicht:  He learned about

the position at Beechwood from Nordlicht, met with Nordlicht to discuss the

position at Beechwood, and communicated with Nordlicht about his work at

Beechwood after he was hired.

Manela testified, on cross-examination, that Feuer and Taylor engaged

legal counsel to ensure that Beechwood was structured in such a way that it

would not be an "affiliate" of Platinum.  Manela further testified that Levy was

present for one conversation where Feuer and Taylor stated that Beechwood was

not an affiliate of Platinum.

### B.  *Black Elk Spirals Towards Bankruptcy*

Black Elk began experiencing significant financial difficulties from late

2012 through early 2014.  In November 2012, Black Elk's business suffered a

sharp decline after one of its oil platforms, West Delta 32, exploded in the Gulf of

Mexico, resulting in three fatalities.  Following the explosion, government

regulators shut down several of Black Elk's platforms, rendering them non-

operational and unable to produce revenue.  The cessation of oil production,

heightened regulatory scrutiny, and ensuing civil lawsuits put a cash flow strain

on the company. As a result, Black Elk did not have enough incoming revenue to

cover its expenses and was having trouble paying its bills.  There was also

evidence that Black Elk's executives and employees engaged in extravagant

spending, including on private jet travel (in at least one instance with New

Orleans Saints Cheerleaders onboard), trips to Mardi Gras in New Orleans, the

purchase of a fleet of helicopters, the purchase of a condo on Bourbon Street in

New Orleans, attendance at strip clubs, hunting trips, and the purchase of a

speedboat.  By the end of 2013, Black Elk was heavily in debt.

At Black Elk management meetings during the period following the West

Delta 32 explosion, Black Elk management discussed with Levy and Small Black

Elk's financial difficulties and the possibility of putting Black Elk into

bankruptcy.  Black Elk's Vice President of Operations, Joseph Bruno, testified

that at one such management meeting at which Levy was present, Levy – in

response to the prospect of bankruptcy – stated, "We cannot do that.  It's a lot of

money to lose."  Bruno testified that it was his impression that Levy was in

charge of managing Platinum's investment in Black Elk.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

C. *Platinum Seeks to Sell Black Elk's Assets to Pay Preferred Equity Holders* Despite

Black Elk's financial difficulties, its oil and gas reserves retained significant value.

In 2014, to raise cash, the company began contemplating the sale of its most

valuable assets – its oil and gas wells – to a variety of companies, including

Renaissance Offshore, Fieldwood, Talos Energy, and W&T Offshore.

On March 16, 2014, Small emailed Nordlicht about the severe financial

challenges Black Elk was facing.  Small wrote that, in 2012, Black Elk had been

generating more than $100 million in annualized earnings before interest, taxes,

depreciation, and amortization ("EBITDA") and negotiating to sell itself for more

than $500 million but "[w]e know what happened subsequently – two major

wells watered-out and the company had an explosion both of which exposed its

underperforming properties, bloated cost structure, poorly negotiated escrow

agreements and lack of financial planning and controls."  GA.590-91.  Small

explained that their strategy moving forward was "to renegotiate escrow

agreements and surety coverage to release cash that can be used to

decommission negative cash flowing fields, further reduce the cost structure,

drill low/high return . . . and . . . acquire under-reserved fields."  *Id.*

Nordlicht responded to Small the same day:

16

Happy to discuss this week and come to final arrangement. This is also the week I need to figure out how *to restructure and raise money to pay back 110 million of preferred [equity in Black Elk] which if unsuccessful, w[oul]d be the end of the fund [(PPVA)]. This "liquidity" crunch [at PPVA] was caused by our mismanagement – yours[,] David [Levy] and I – of the black elk position* so I will multitask and also address your concerns but forgive me if I am a little distracted. I have been up until 3am for the last two weeks working through this issue.

GA.590 (emphasis added).

On April 16, 2014, after Nordlicht received an email regarding problems with Black Elk's oil production, he wrote to Small, Levy, Hoffman and Shulse: "This is starting to become major issue. When will production get back up?" GA.596. One month later, on May 20, 2014, Shulse wrote to Nordlicht, Small, and Levy:

I am working on a revised cash forecast, but not good news from Houston . . . Oil check is going to be $9.2 million instead of the $12.0 million I was expecting . . . [.]

There are not enough bonds on the short term horizon to cover this kind of deficit . . . We will have royalties, hedges, payroll, insurance, rent and other "have" to pays that will not be covered by the current or future oil check[.]

*We will need to discuss some sort of bridge with Platinum and then seriously consider the options in front of us around the Talos/Renaissance transaction . . . the Fieldwood/Sandridge offer . . . and any other short term liquidity events we can make happen . . . $6 million is a shortfall we can[']t make up[.]*

GA.614-15 (emphasis added) (ellipses in original). Nordlicht responded, copying Black Elk in-house counsel Marizza Pichè, and chastising Shulse for failing to

17

label his email as "atty client privilege." GA.614. Shulse responded that he was

not sure "why a business issue such as cash flow would need to be covered by

attorney client privilege?" *Id.*

On June 16, 2014, Nordlicht expressed grave concerns about PPVA's

liquidity to PPVA President Uri Landesman:

> I think we need to revamp the strategy on PPVA and figure out what to
> do. *It can't go on like this or practically, we [(PPVA)] will need to wind down.*
> This is not a rhetoric thing, it's just not possible to manage net outflows of
> this magnitude. *I think we can overcome this but this is code red, we can't go on*
> *with status quo.*

GA.628 (emphasis added). Landesman replied: "We are pushing hard,

illiquidity a bigger hurdle than energy concentration . . . . Need

monetization/liquidity events in the fund; I know you realize this and are doing

your best." *Id.* Nordlicht responded: "We are getting some liquidity from black

elk – though not the equity. . . . Am hesitant to put myself in position of using

that for reds [(redemptions)]. We just need to short term go crazy, get everyone

focused, and long term try to come up with marketing pitch where we can raise

even when we are illiquid." *Id.*

On July 2, 2014, Shulse wrote to Small, Levy, Nordlicht, and Hoffman:

"We [Black Elk] are officially out of money next week . . . . We had a lot of

[Accounts Payable] obligations to keep production from shutting in last week . . .

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

I am doing everything humanly possible to keep this ship moving forward[.]

Just letting everyone know where things stand." GA.632.

 Around this same time, Black Elk began pursuing a significant sale of

assets to Renaissance Offshore, LLC (the "Renaissance Sale"). Black Elk

ultimately entered into a Purchase and Sale Agreement with Renaissance on July

10, 2014, and the sale was expected to close in August 2014.

### D. Black Elk and Platinum's Attempts to Amend the Indenture

#### 1. The Failed Private Consent Solicitation

In early 2014, Nordlicht, Levy, and others endeavored to amend the Black

Elk Indenture through a private consent solicitation process. Late in 2013 or

early in 2014, a group of Black Elk bondholders who held at least 25% of the

Black Elk bonds began to threaten Black Elk with a default based on Black Elk

exceeding the capital expenditure limits set forth in Section 4.21 of the Indenture.

Nordlicht, faced with the prospect of these bondholders filing for default, sought

to gain control over at least 50% of the principal amount of the Black Elk bonds

to override any default action and adopt certain amendments to the Indenture.

In particular, Platinum sought to amend, *inter alia*, Sections 4.09 and 4.21 of the

Indenture to address Black Elk's capital expenditure covenant and its ability to

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

incur additional debt.   The proposed amendments did not then include any

changes to the provision governing the use of asset sale proceeds (Section 4.10).

On February 6, 2014, Nordlicht wrote to Black Elk CEO John Hoffman with

a copy to in-house counsel Pichè:

> John - FYI - am close to buying 20 million bonds from msd.[3]  It will at that point be easy task to buy additional 25 if bondholders don't behave and we can change covenants at any time by flipping our bonds to friendlies who will [d]o right by the company.

GA.581 (footnote added).  On March 3, 2014, Nordlicht updated Black Elk's CFO,

Jeffrey Shulse, as well as Small, Pichè, Hoffman, and Levy:  "Their [(the

bondholders threatening default)] group is falling apart.  Msd just sold their

position.  They still have 25 percent but likely we will have 50 percent in friendly

hands relatively quickly in which case this is all academic."  GA.584.

On March 5, 2014, Rob Shearer of BakerHostetler – outside counsel to

Black Elk – emailed Shulse:  "For purposes of calculating whether the requisite

consent has been obtained, . . . indenture securities owned by an obligor . . . or by

any person directly or indirectly controlling or controlled by or under direct or

indirect common control with any such obligor" must be excluded under section

316(a) of the Trust Indenture Act ("TIA").  GA.587 (emphasis omitted).  Shulse

---

[3] "MSD" was a holder of Black Elk bonds that had threatened a default.  **GA.435**.

then forwarded Shearer's email quoting section 316(a) of the TIA to Nordlicht, Levy and others, stating: "We need to be mindful of this provision when assuming we control the bonds or not." *Id.* Nordlicht responded: "I see u accidentally forgot to include Marizza and label this attorney client privilege. I have corrected . . . . But when we say we have friendly holders we will be fully compliant with this provision." *Id.*

As a part of the private consent solicitation process to amend the Indenture, on May 6, 2014, three of the Platinum funds – PPVA, PPCO, and PPLO, which collectively held about $93 million in Black Elk bonds (or about 62% of the issued bonds) – submitted consents in favor of the proposed amendments to the Indenture. The consents disclosed that PPVA held $50,308,000 in bonds, PPLO held $10,046,000 in bonds, and PPCO held $32,917,000 in bonds. These consents were distributed to counsel, including Shearer.

Shearer testified that, at the time, he did not raise any concerns that Nordlicht's actions in "flipping bonds to friendly companies" might violate the Affiliate Rule. SA.173. He further testified that he could not recall any discussions where he told anyone at Black Elk that it was improper for Platinum

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

to flip bonds to friendly companies in order to amend the Indenture.  Shearer

also testified, however, that neither he, the trustee's counsel, nor the other

lawyers at BakerHostetler working on the private consent solicitation knew that

the Platinum entities were voting their bonds until after they received the

consents.  Shearer nevertheless also testified that neither he nor any of the

lawyers working on the transaction raised any concerns about Platinum voting

their bonds after they received the consents.  BakerHostetler drafted, signed, and

submitted to the trustee a legal opinion indicating that the firm had reviewed the

Indenture and that all conditions necessary for its amendment had been met.

Shearer explained at trial that the lawyers working on the transaction had not

been focused on the Affiliate Rule at the time of the private consent solicitation

process and had erred in overlooking it.

In June 2014, Shearer notified Shulse that the trustee for the Black Elk

bondholders was "not comfortable that the consents were properly obtained,"

and was insisting that a public solicitation process be used.  GA.796.  In

particular, in a June 2, 2014 email, Shearer wrote to Shulse:

> They are insisting that we run a new consent solicitation process.  Among
> other things, they pointed out that when you run a more customary
> process, DTC [(Depository Trust Company)] will freeze trading of the
> bonds held by holders who consent to the proposed amendments so that

22

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

> they cannot be traded until the second supplemental indenture is signed.
> Without that, they are not comfortable that the consents were properly
> obtained.  I think they are uncomfortable with other aspects of the process,
> but that one by itself is enough to cause them to require us to start over.

*Id.*

Later that day, Shulse forwarded to Nordlicht the public consent

solicitation documents he received from Shearer, and Nordlicht replied to

Shulse, Levy, and Small:  "David [Levy] – u needn't explain to me what the hell is

going on and why we are wasting time on this."  GA.625-26.  Shulse replied to

all:  "The short answer is the trustee refused to sign unless we did the solicitation

process . . . they don't trust our consents are valid because we have received a

default notice in the past 60 days and we have the behind the scenes process with

various dates on our consents . . . ."  *Id.*  Nordlicht asked what was the "quickest

way to end [the] process," and Shulse replied that "[t]he quickest way is to do the

formal solicitation . . . get our 51% in order . . . vote it through the DTC / BNY

[(Bank of New York)] agents and end it . . . ."  GA.625.  Nordlicht replied to Levy,

Small, and Shulse:  "There is a disconnect here.  No more talking to lawyers.

David [Levy], u f'd this one up bad for no reason.  We will have one pager signed

by 51% of bondholders, no trustee necessary.  It's fine.  We don't need any

process.  Bondholders are being taken out, this is all moot."  *Id.*

The private consent process was ultimately terminated.

23

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

> 2. *The Public Consent Solicitation Process and the Amendment of the Asset Sales Provision*

> a) *The Consent Solicitation's Proposed Amendments*

After Nordlicht and Levy failed in their attempt to amend the Indenture through the private consent solicitation process, they began to move forward with a public process (the "Consent Solicitation").

On June 23, 2014, Small emailed Shearer an earlier draft of the proposed amendments to the Indenture and asked him to "eliminate all of the existing amendments in the attached" except those pertaining to the elimination of the capital expenditure covenant (Section 4.21).  GA.797.  Small also requested that Shearer add an amendment allowing Black Elk to "use proceeds from Asset Sales under section 4.10 to make an offer at par for outstanding bonds which offer will be open for 10 business days and any remaining proceeds following the 10 day offer period may be used to repurchase preferred equity of the company."  *Id.* The proposed amendment to Section 4.10 thus allowed for a fifth use of asset proceeds beyond the four enumerated uses originally specified in the Indenture: it permitted Black Elk to use the proceeds of an asset sale to purchase at par any Black Elk bonds that Black Elk bondholders elected to tender and then to use any remaining asset sale proceeds to "repurchase or redeem preferred equity of

24

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

[Black Elk]."  GA.832.  Black Elk bondholders had three options in responding to

the Consent Solicitation:  (1) tender their bonds at par (thereby consenting to the

proposed amendments); (2) consent to the proposed amendments without

tendering, thereby continuing to own their bonds; or (3) neither tender nor

consent.

The Renaissance Sale was the specific asset sale that would provide

proceeds in connection with the Consent Solicitation.  The amendment of the

asset sales provision would therefore permit Black Elk – which Platinum was

actively managing – to pay Platinum and other Black Elk preferred equity

holders with funds obtained from the Renaissance Sale.

b) *Platinum Transfers Black Elk Bonds to Beechwood to
Manipulate the Consent Solicitation Vote*

On April 8, 2014 – more than three months before the Consent Solicitation

Statement was distributed to the Black Elk bondholders – Levy, Nordlicht, and

Small were assessing the Black Elk bonds that they controlled at Platinum's

hedge funds (PPVA, PPCO and PPLO) and the Beechwood entities (BAM and,

later, BBIL), which were summarized in one consolidated table.  Small wrote to

Platinum trader Nicholas Marzella, copying Levy, with the subject "Black Elk

bonds":  "Nick, can you send the holder and amount of bonds that are with each

25

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

broker." GA.609. Marzella replied to Levy and Small by sending the following

table, which showed that various Platinum and Beechwood entities held a total

of $98,730,500 of the $150 million of outstanding Black Elk bonds:

| | |
|---|---|
| 22,870,000.00 | PPCO NMRA |
| 10,046,500.00 | PPCO NMRA |
| | |
| 24,987,000.00 | PPVA NMRA |
| 25,321,000.00 | PPVA CS |
| | |
| 10,146,000.00 | PPLO CS |
| | |
| 5,360,000.00 | BAM |
| | |
| 98,730,500.00 | |

GA.609-10.

Around this time, Nordlicht also asked Wallach and another Beechwood

employee, David Shirreffs, to obtain the third-party market pricing for the Black

Elk bonds and to include them on their profit and loss statements going forward,

so that they could monitor the price of the Black Elk bonds on a daily basis. They

subsequently added the Black Elk bonds to their profit and loss statements for

tracking purposes and kept Nordlicht apprised of the price. During April and

May 2014, Nordlicht inquired several times regarding the price of Black Elk

bonds and whether BAM and BBIL had the capacity to purchase those bonds.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

Between April 8, 2014, and July 7, 2014, Nordlicht directed that over $30 million of Black Elk bonds be sold from Platinum's funds to Beechwood.  On May 13, 2014, Nordlicht instructed Wallach to purchase $8 million worth of Black Elk bonds on BAM's behalf, and instructed Marzella to sell $4 million of Black Elk bonds each from Platinum accounts at Credit Suisse and Nomura.  On June 23, 2014 – the same day that Small wrote an email to Shearer, with a copy to Levy, initiating the public consent solicitation process – Nordlicht asked Wallach how many Black Elk bonds Beechwood owned and Wallach informed him that the principal value was $13,360,000.  Later that day, Nordlicht emailed Marzella, copying Wallach and Shirreffs, instructing him to sell $10 million worth of Black Elk bonds from PPVA Nomura to BBIL Nomura.  On July 1, 2014, Nordlicht emailed Marzella, copying Wallach, directing him to sell another $7 million in Black Elk bonds from PPVA Nomura to BBIL.  On July 7, 2014, Nordlicht instructed Marzella to sell $6.7 million of Black Elk bonds from Platinum to Beechwood ($3.35 million from PPCO and $3.35 million from PPLO).

Levy was kept aware of the sales of Black Elk bonds from Platinum's hedge funds to Beechwood.  For example, on July 2, 2014, Marzella sent a table to Small reflecting Black Elk bond holdings.  Small responded to Marzella: "Nick,

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

can you update the below for recent BAM purchases.  Also[,] can you confirm

with [Credit Suisse] how much would show up as of today that is owned by the

PPVA and PPLO."  GA.634.  After Marzella made these changes, Small sent the

updated table to Nordlicht and Levy, saying:  "We need to decide on a record

date for the consent.  Below is a summary of the positions held by PPBE and

BAM."  *Id.*  In addition, on July 23, 2014, Manela sent Levy a list of investments

that Beechwood held related to Platinum and wrote:  "Let[']s discuss."  GA.748-

49.  One of the listed Beechwood investments was $31,051,000 in "Black Elk

Energy Public Debt 13.75%," with the comment:  "Purchased 3,335,000 each from

PPCO and PPLO and 24,381,000 from PPVA."  GA.749.

> c) *The Defendants Do Not Disclose the Black Elk Bonds Held by
> PPCO, PPLO, or Beechwood*

On July 3, 2014, about two weeks before the Consent Solicitation was

distributed to the Black Elk bondholders, Small asked Black Elk attorneys

Shearer and Brittany Sakowitz to confirm "that under the TIA [(Trust Indenture

Act)] if $5MM of the bonds were owned by an affiliate then in order for the

consent to be approved a majority of $145MM (greater than $72.5MM) would

need to consent rather than greater than $75MM."  GA.636.  Sakowitz replied:

> Correct.  Securities owned by the obligor or by any person directly or
> indirectly controlling or controlled by or under direct or indirect common

28

> control with the obligor must be disregarded for purposes of calculating the vote required to approve the proposal.  (Trust Indenture Act, Section 316(a)).

*Id.*  Small then forwarded this exchange to Nordlicht and Levy, stating:  "See below regarding the majority consent calculation."  *Id.*  And on July 7, 2014, Small again emailed Nordlicht and Levy, stating that "[t]he company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority. . . .  Let's discuss asap . . . ."  GA.641.

On July 8, 2014, Manela emailed to Levy and Small a table listing the amount of Black Elk bonds Platinum's hedge funds and Beechwood held.  The latest number of Black Elk bonds that PPVA, PPCO, PPLO, BAM, and BBIL held totaled approximately $98 million.

On July 9, 2014, Small wrote to Shearer and Sakowitz, among others:  "$18,321,000 bonds are controlled by PPVA and should be disclosed and excluded from the calculation."  GA.703.  On July 13, 2014, Small again reiterated to Shearer and Sakowitz that $18,321,000 bonds are "controlled by and should be disclosed and excluded from the calculation."  GA.705.

The Offer to Purchase and Consent Solicitation Statement was circulated to the Black Elk bondholders on July 16, 2014.  The Consent Solicitation Statement

provided that, for the proposed amendments to pass, tenders or consents needed

to be received from "at least a majority in aggregate principal amount of all the

outstanding Notes [approximately $150 million] (disregarding any Notes held by

affiliates of the Company)."  GA.816.  In other words, once all Black Elk bonds

held by affiliates of Black Elk were removed from consideration, the proposed

amendments would pass only if more than half of the remaining Black Elk

bondholders tendered their bonds or consented to the proposed amendments.

The Consent Solicitation further provided that, as of July 16, 2014:

> [PPVA] and its affiliates, which own approximately 85% of our
> outstanding voting membership interests, own approximately $18,321,000
> principal amount of the outstanding Notes.  Otherwise, neither we, nor
> any person directly or indirectly controlled by or under direct or indirect
> common control with us, nor, to our knowledge, any person directly or
> indirectly controlling us, held any Notes.

GA.819.  Shearer testified that, in preparing the Consent Solicitation, he relied on

Small's representations as to the amount of Platinum-owned bonds.  At trial, this

language in the Solicitation Consent was central to the government's allegations

of fraud.

### d)  The Defendants Vote Beechwood and Platinum's Black Elk Bonds to Ensure that the Amendments Would Pass

Bruno testified that, after the Consent Solicitation Statement was sent, he

participated in a Black Elk management meeting with Shulse, Levy, and

Hoffman where they discussed the status of the Consent Solicitation.  At that

meeting, according to Bruno, Shulse indicated that they had not yet heard

anything and Hoffman commented that he did not think anyone in their right

mind would do it and said, "[Y]ou're not going to hear anything."  GA.243-45.

Levy was visibly agitated in response, and Bruno overheard Levy say to Shulse:

"It's covered."  GA.245.

Consistent with Levy's representation to Shulse, Levy, Nordlicht, and

Small collaborated to ensure that Platinum and Beechwood voted their bonds so

that the amendments would pass.  On July 28, 2014, Beechwood employee

Samuel Adler wrote to Wilmington Trust, with a copy to Levy, stating that the

Black Elk bonds held by BAM and BBIL were voting "consent without

tendering."  GA.750.  The same day, Adler wrote to Nomura, with a blind copy to

Levy, also stating that the Black Elk bonds held by BAM and BBIL were voting

"consent without tendering."  GA.753.

On July 29, 2014, at 9:29 a.m., Nordlicht wrote to himself with the subject

heading, "To do today":  "Black elk – 1 – need budget for post renaissance

properties.  We need immediate p and a [(plugging and abandonment)] plan.  *We*

*need plan as to how to distribute money to the right places (preferred, preferred,*

*preferred*)."  GA.757 (emphasis added).  That afternoon, Nordlicht wrote to Small

with a copy to Levy:  "[H]ow is partial close renaissance talks going?"  GA.759.

Small replied to Nordlicht and Levy:  "CEO of Renaissance on vacation.  Jeff

[Shulse] texted him last night and this morning . . . and if balance doesn't close

we can unwind deal and keep deposit if it is Renaissance's fault.  We are waiting

for a response."  GA.758.  Nordlicht replied to Small and Levy: "David [Levy] – I

have Beechwood at 36,422,400 in terms of ownership of bee [(Black Elk)] bonds.

Dan – Do u know respective funds?"  *Id*.  Small responded to Nordlicht and Levy

by sending a table of Black Elk's bond holdings.

　　The table Small sent to Nordlicht and Levy provided a breakdown of how

many Black Elk bonds were owned by each of the Platinum and Beechwood

entities.  The table listed the "BlackElk Bond Holders" as PPCO Nomura

($29,582,000), PPVA Credit Suisse ($18,321,000), PPLO Credit Suisse

($13,711,000), BAM Wilmington Trust ($13,360,000), and BBIL Wilmington Trust

($23,657,000), for a total of $98,631,000.  GA.764.  The table also provided a

calculation of the aggregate principal amount of bonds that were needed to

consent to ensure that the amendments passed, assuming that only PPVA Credit

Suisse's $18,321,000 in bonds were ineligible to vote.  In particular, the table

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

listed the total outstanding Black Elk bonds ($150,000,000), subtracted PPVA's

holdings ($18,321,000) from that number to get $131,679,000, and then listed

$65,839,500 (half of $131,679,000) — i.e., the number of bonds necessary to pass

the Consent Solicitation, assuming that the bonds held by PPCO, PPVA, PPLO,

BAM, and BBIL would not be disclosed as affiliates and would be voted.  *Id.*

On August 1, 2014, after the votes were cast, Shearer emailed Small a draft

Officer's Certificate, setting forth the $18,321,000 worth of bonds that Small had

disclosed as controlled by Platinum.  On August 13, 2014, Shearer followed up,

asking Small to review and complete the certificate so that Black Elk could issue

a press release.  Shortly thereafter, Small emailed Nordlicht and Levy with the

subject heading "Officer Certificate," seeking their approval for his email

response to Shearer.  GA.770.  Small wrote:  "See attached wording and let me

know if you are ok.  Below is a table that shows under all three scenarios there is

50% approval." *Id.*  These three scenarios included counting (1) all $110 million

consenting votes ($11.4 million tendered bonds plus the $98.6 million Platinum-

controlled bonds that voted to consent only); (2) all consenting votes except the

approximately $18 million PPVA-owned bonds; and (3) all consenting votes

except the approximately $18 million PPVA-owned bonds and the

approximately $43 million PPCO- and PPLO-owned bonds (which Small classified as "PPVA and Possible Affil").  *Id.*  None of these three scenarios disclosed that the Black Elk bonds that Beechwood owned were bonds that should be excluded.  *Id.*  At 8:51 a.m. the next day, August 14, 2014, Small resent his email to Nordlicht and Levy, writing:  "Trustee wants to see this this morning in order to finalize results of tender/consent which ended last night.  U ok with language?"  *Id.*  Nordlicht responded to Small and Levy:  "K."  *Id.*

Later that day, at 12:36 p.m., Small sent the Officer's Certificate to Shearer with a copy to Shulse.  Small wrote:  "Rob, see attached officer's certificate and below analysis which is also set forth on the attached spreadsheet.  Let me know if you have any comments and we will have executed."  GA.772-73.  The email contained a table outlining the same three scenarios Small had shared with Nordlicht and Levy, except that Small referred to the PPCO- and PPLO-owned bonds as "Not Deemed Affil."  GA.772.

Shearer testified that, after receiving this email, he had a telephone conversation with Shulse and Small because he had questions regarding the newly disclosed information.  In response to Shearer's questions, Small indicated that there was a different group of bonds held by entities that Platinum had

relationships with and that they could be considered affiliates, but that he did

not think that they were affiliates like PPVA was.  In light of the lack of clear

information regarding these entities and their relationship to PPVA and Black

Elk, Shearer could not conclude that the PPCO- and PPLO-owned bonds were

eligible to be counted.  Shearer therefore decided to exclude the PPCO- and

PPLO-owned bonds from the consent calculation in the Officer's Certificate.

Despite the exclusion from the consent calculation of the bonds held by

PPVA, PPLO, and PPCO, the amendments to the Indenture ultimately passed.

As a result of the exclusion of the Platinum fund-held bonds, $61 million ($18.3

million PPVA-held bonds, plus $43 million PPLO- and PPCO-held bonds) worth

of the $150 million outstanding bonds were ineligible to vote, leaving only $89

million worth of the bonds that were eligible.  In order to receive a majority, only

$44.5 million worth of the bonds needed to consent to the amendments.  Shearer

determined that the Consent Solicitation had passed based on the following

votes:  $37,017,000 held by the Beechwood funds (which had consented and not

tendered); $600,000 of bonds held by unidentified bondholders (which had also

consented and not tendered); and $11,333,000 of bonds held by unidentified

bondholders (which had tendered and thus consented).  Over 99% of the bonds

that voted to consent but not tender were controlled by Platinum and

Beechwood, which was Platinum-affiliated and controlled.  The Consent

Solicitation would not have passed without the Beechwood-held bonds that

voted to consent.  *See* GA.541-43.

> *e)  Black Elk Uses the Proceeds from the Renaissance Sale to Pay the Preferred Equity Holders*

Three days after the Consent Solicitation vote closed, on August 16, 2014,

Manela emailed Levy, asking "did Black Elk sale [i.e., the Renaissance Sale] go

thru yesterday??"  Levy responded seven minutes later:  "Sale closed.  135 mln

Cash will be in the account at black elk Monday am."  GA.779.

On the morning of August 18, 2014, PPVA CFO Joseph SanFilippo sent an

email to Nordlicht, copying Levy and Manela, with the subject heading "Series E

as of August 18."  GA.780.  The email contained a list of the Black Elk preferred

equity holders, which included PPVA, PPLO, PPCO, and PPVA Black Elk Equity

LLC.

On August 18, 2014, Shearer advised that Texas law might prohibit

distribution of the proceeds of the Renaissance Sale.  He wrote to Shulse and

Black Elk General Counsel Stephen Fuerst advising them to review Texas

Business Organizations Code section 101.206.  The statute prohibits a limited

liability company from making distributions to its members if such a distribution would render the company insolvent.  Tex. Bus. Org. § 101.206.

Shulse forwarded Shearer's email to Nordlicht, Small, Levy, and Samuel Salfati and stated:  "Advice of counsel . . . we need to be mindful of this in our planning."  GA.781.  At 4:23 pm that same day, Nordlicht forwarded Shulse's email to Levy, changing the subject heading of the email to "urgent" and writing: "David – get these wires out!!!!! Call him right now please!!!!"  *Id.*  Twenty minutes later, at 4:43 p.m. on August 18, 2014, Small wrote to Shulse with a copy to Salfati — who had recently joined Small on the three-person Black Elk Board of Directors — with the subject heading "Wires":  "Jeff, on behalf of Sam Salfati and myself constituting a majority of the board of managers you are hereby authorized to wire $70MM in partial payment of Preferred E units."  GA.783.

Between August 18 and August 21, 2014, Black Elk transferred proceeds from the Renaissance Sale to the defendants and the Platinum-related entities. Black Elk transferred:  (1) on August 18, 2014, approximately $32.5 million to PPVA's "Black Elk" Sterling account and $15.3 million to PPVA's Sterling account; (2) on August 20, 2014, $24.6 million to PPCO's Capital One account; and (3) on August 21, 2014, $5 million to PPLO's Sterling account.  In addition,

on August 21, 2014, PPCO transferred – through various accounts –

approximately $7.7 million to Mark Nordlicht's parents, Jules and Barbara

Nordlicht, including approximately $500,000 to the Jules and Barbara Nordlicht

Family Foundation; $256,679 to Levy; $102,672 to Small; and approximately $1

million to the Huberfeld Family Foundation.

　After the Platinum entities received the proceeds from the Renaissance

Sale, Levy informed Platinum CFO Daniel Mandelbaum that Platinum would

not be providing any more financing to Black Elk.  In light of Black Elk's

outstanding bills, Mandelbaum asked Levy if Black Elk would be declaring

bankruptcy.  Levy indicated that Black Elk had to wait twelve months to declare

bankruptcy to avoid the risk that the proceeds from the Renaissance Sale could

be clawed back during the bankruptcy proceedings.  A year later, in August

2015, Black Elk's creditors initiated an involuntary bankruptcy proceeding

against the company.

### Procedural History

On December 14, 2016, a grand jury returned an eight-count indictment in

the United States District Court for the Eastern District of New York against

seven individuals, including Nordlicht and Levy, relating to their alleged

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

participation in two fraudulent schemes – one of which was the Black Elk

Scheme.  Count Six (conspiracy to commit securities fraud), Count Seven

(conspiracy to commit wire fraud), and Count Eight (securities fraud) all related

to the Black Elk Scheme.

      Trial began on April 23, 2019, before Judge Cogan.  On July 9, 2019, the

jury returned its verdict, acquitting Nordlicht and Levy on Counts One through

Five,[4] and convicting them on Counts Six through Eight.  Following the verdict,

Nordlicht and Levy both moved for judgments of acquittal pursuant to Federal

Rule of Criminal Procedure 29, and, in the alternative, for new trials pursuant to

Federal Rule of Criminal Procedure 33.

      On September 27, 2019, the district court issued an opinion and order

granting Levy's motion for a judgment of acquittal, and conditionally granting

his motion for a new trial "in the event that the judgment of acquittal is later

---

[4] Counts One through Five related to a different alleged scheme involving the Platinum entities.  The indictment alleged, *inter alia*, that Platinum fraudulently overvalued its investment assets in order to attract new investors and obtain unearned management fees from its investors; that the overvaluation led to a liquidity crisis that Platinum concealed from its investors; and that the defendants made material misrepresentations and omissions to current and prospective investors to keep the scheme from being exposed.  In connection with this alleged scheme, Levy and Nordlicht were charged with conspiracy to commit securities fraud and investment adviser fraud (Count One); conspiracy to commit wire fraud (Count Two); two counts of securities fraud (Counts Three and Four); and investment adviser fraud (Count Five).

vacated or reversed." *United States v. Nordlicht*, No. 16-cr-00640 (BMC), 2019 WL

4736957, at *18 (E.D.N.Y. Sept. 27, 2019).  The district court denied Nordlicht's

motion for a judgment of acquittal but granted his motion for a new trial.  *Id.* at

*9-14, 16-18.

      In granting Levy's motion for a judgment of acquittal, the court concluded

that "[e]ven making reasonable inferences in favor of the Government, and

deferring to the role of the jury in weighing evidence and assessing credibility,

the Government failed to meet its burden of proving beyond a reasonable doubt

that Levy had criminal intent." *Id.* at *14.  The district court explained that the

evidence "f[ell] into the following categories: testimony from Bruno and

Mandelbaum; evidence that Levy was involved in processing wire transfers after

the Renaissance [S]ale; and evidence that Levy received emails about Black Elk

bonds and the consent solicitation." *Id.*  The district court considered each

category of evidence and found it either "too speculative" or insufficient to

sustain a guilty verdict.  *Id.* at *14-16.  The district court emphasized that there

was nothing inherently unlawful about structuring a transaction to avoid a claw-

back or "processing wire transfers, which are a routine aspect of transactions like

the Renaissance [S]ale." *Id.* at *15.  Similarly, the district court reasoned that the

emails on which Levy was copied had limited probative value because "even assuming Levy read these emails, the[y] . . . merely show that Levy knew or should have known that Beechwood held Black Elk bonds." *Id.* Lastly, the court found that the government had "adduced no evidence that Levy: considered Beechwood to be an affiliate of Platinum; played any role in shifting Black Elk bonds to Beechwood; or played any role in Beechwood voting its bonds." *Id.* The district court also emphasized witness testimony that Levy had been present during a meeting where individuals discussed how Beechwood was not a Platinum affiliate. *Id.* The district court therefore concluded that there was insufficient evidence of Levy's criminal intent. *Id.* at *15-16.

The district court also conditionally granted Levy's motion for a new trial. *Id.* at *18. The court stated that, for the same reasons it granted Levy's Rule 29 motion, "the jury's guilty verdict was a manifest injustice because there was insufficient evidence that Levy possessed criminal intent." *Id.*

With respect to Nordlicht's motion for a judgment of acquittal, the district court concluded that "when viewed in the light most favorable to the Government, the Government adduced sufficient evidence . . . to make a judgment of acquittal under Rule 29 inappropriate." *Id.* at *9. The court reasoned

41

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

that there was sufficient evidence for the jury to conclude that:  Nordlicht knew

about the Affiliate Rule; Beechwood was an affiliate under the Indenture and

that Nordlicht knew or should have known that Beechwood was an affiliate; and

that the defendants' disclosures regarding the amount of affiliate-held bonds

were material misrepresentations.  *Id.* at *9-14.

As to Nordlicht's motion for a new trial, however, the district court

concluded that "[a]lthough the Government adduced sufficient evidence for a

judgment of acquittal to be unwarranted, letting the verdict stand against

Nordlicht would be a manifest injustice."  *Id.* at *16.  The court reasoned that

while the evidence suggested that Nordlicht knew about the Affiliate Rule, "he

and Beechwood went to great lengths to comply with [it]."  *Id.*  The court also

found that even if the jury could fairly conclude that the Beechwood entities

were affiliates, there was "insufficient evidence that Nordlicht was on notice of

their affiliate status."  *Id.* at *17.  The court also concluded that it would be a

manifest injustice to sustain Nordlicht's conviction based on his failure to

disclose that PPCO and PPLO were affiliates, because "[u]nder all of the facts and

circumstances of the case, Black Elk provided Shearer with sufficient information

that the jury could not fairly conclude that Nordlicht intended to conceal PPCO's

and PPLO's affiliate status from Shearer." *Id.* at *18.

The government timely appealed.

## DISCUSSION

### I.    Standard of Review

"We review *de novo* a district court's grant of a Rule 29 motion based on a

finding that the trial evidence was insufficient to support the jury's verdict,

applying the same standard the district court applies in review of the evidence."

*United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).

"We review a district court's grant of a new trial for abuse of discretion."

*United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012); *see also United States v.

Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) ("[Rule 33] 'confers broad discretion

upon a trial court to set aside a jury verdict and order a new trial to avert a

perceived miscarriage of justice.'" (quoting *United States v. Sanchez*, 969 F.2d 1409,

1413 (2d Cir. 1992)).   A district court "abuses its discretion when its decision rests

on an error of law or a clearly erroneous factual finding, or when its decision . . .

cannot be located within the range of permissible decisions." *Truman*, 688 F.3d at

141 (ellipsis in original) (quoting *United States v. Gonzalez*, 647 F.3d 41, 57 (2d Cir.

2011)).  It does not, however, "abuse[] [its] discretion simply because [it] has

made a different decision than we would have made in the first instance."  *United*

*States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (quoting *United States v.*

*Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001)).

## II.  Levy's Rule 29 Motion

### A.  *Legal Standard*

Federal Rule of Criminal Procedure 29 provides that "[i]f the jury has

returned a guilty verdict, the court may set aside the verdict and enter an

acquittal."  Fed. R. Crim. P. 29(c)(2).

"[A] defendant challenging the sufficiency of the evidence 'bears a heavy

burden.'"  *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United*

*States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  We "must determine whether

upon the evidence, giving full play to the right of the jury to determine

credibility, weigh the evidence, and draw justifiable inferences of fact, a

reasonable mind might fairly conclude guilt beyond a reasonable doubt."  *United*

*States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *United States v. Mariani*,

725 F.2d 862, 865 (2d Cir. 1984)).  In so doing, we "view the evidence presented in

the light most favorable to the government[,]" and "[a]ll permissible inferences

must be drawn in the government's favor." *United States v. Guadagna*, 183 F.3d

122, 129 (2d Cir. 1999).  Moreover, "the evidence must be viewed in its totality, 'as

each fact may gain color from others,'" *United States v. Cassese*, 428 F.3d 92, 98-99

(2d Cir. 2005) (internal citations omitted), and "the Government need not negate

every theory of innocence," *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir.

2008) (internal quotation marks omitted).  "[I]f the court concludes that either of

the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the

court] must let the jury decide the matter." *Autuori*, 212 F.3d at 114  (alterations

in original) (internal quotation marks omitted).  The verdict "must [therefore] be

upheld if '*any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.'" *Guadagna*, 183 F.3d at 130 (emphasis in

original) (quoting *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987)).

A court must "defer to the jury's determination of the weight of the

evidence and the credibility of the witnesses, and to the jury's choice of the

competing inferences that can be drawn from the evidence." *Klein*, 913 F.3d at 78

(quoting *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006)).  This "high degree

of deference we afford to a jury verdict is 'especially important when reviewing a

conviction of conspiracy.'" *United States v. Anderson*, 747 F.3d 51, 72-73 (2d Cir.

2014) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).  "This is

so because a conspiracy by its very nature is a secretive operation, and it is a rare

case where all aspects of a conspiracy can be laid bare in court with the precision

of a surgeon's scalpel."  *Id.* at 73 (internal quotation marks omitted).  The

"agreement [to participate in the conspiracy] may be inferred from the facts and

circumstances of the case[,]" and "[b]oth the existence of the conspiracy and the

defendant's participation in it with the requisite criminal intent may be

established through circumstantial evidence."  *United States v. Wexler*, 522 F.3d

194, 207-08 (2d Cir. 2008) (internal quotation marks omitted).  Moreover,

"[s]eemingly innocent acts taken individually may indicate complicity when

viewed collectively and with reference to the circumstances in general."  *Mariani*,

725 F.2d at 865-66.

     The jury's inferences, however, must be reasonable.  "[S]pecious inferences

[should] not [be] indulged, because it would not satisfy the Constitution to have

a jury determine that the defendant is *probably* guilty."  *United States v. Valle*, 807

F.3d 508, 515 (2d Cir. 2015) (emphasis in original) (quoting *United States v.

Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)); *see also United States v. D'Amato*, 39 F.3d

1249, 1256 (2d Cir. 1994) ("[A] conviction based on speculation and surmise alone

cannot stand."). "An inference is not a suspicion or a guess. It is a reasoned,

logical decision to conclude that a disputed fact exists on the basis of another fact

that is known to exist." *Pauling*, 924 F.3d at 656 (internal quotation marks

omitted). "Impermissible speculation, on the other hand, is 'a complete absence

of probative facts to support the conclusion reached.'" *Id.* (quoting *Lavender v.

Kurn*, 327 U.S. 645, 653 (1946)).

 "Where a fact to be proved is also an element of the offense . . . it is not

enough that the inferences in the government's favor are permissible," but rather,

the court "must also be satisfied that the inferences are sufficiently supported to

permit a rational juror to find that the element, like all elements, is established

beyond a reasonable doubt." *Id.* at 657 (internal quotation marks and alteration

omitted); *see also D'Amato*, 39 F.3d at 1256 ("[T]he government must introduce

sufficient evidence to allow the jury to reasonably infer that each essential

element of the crime charged has been proven beyond a reasonable doubt.").

"Direct evidence is not required; '[i]n fact, the government is entitled to prove its

case solely through circumstantial evidence, provided, of course, that the

government still demonstrates each element of the charged offense beyond a

reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (alteration in original) (quoting

*United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)).  "If the evidence

viewed in the light most favorable to the prosecution gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence, then a

reasonable jury must necessarily entertain a reasonable doubt."  *United States v.

Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008) (alteration omitted) (quoting *United States

v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

> B.  *A Rational Jury Could Have Concluded that Levy Participated in the Black
>     Elk Scheme with Criminal Intent*

Counts Six, Seven, and Eight, on which Levy was convicted, charged him

with, respectively, conspiracy to commit securities fraud, conspiracy to commit

wire fraud, securities fraud, and aiding and abetting securities fraud.  The district

court granted Levy's motion for a judgment of acquittal because it concluded

that, even viewing the evidence in the light most favorable to the government,

the government failed to prove beyond a reasonable doubt that Levy acted with

criminal intent.  The district court also concluded that there was insufficient

evidence to establish "that Levy was a member of a conspiracy," as "evidence of

his alleged co-conspirators' intent [did] not constitute evidence of Levy's intent."

*Nordlicht*, 2019 WL 4736957, at *15 n.4.

To establish intent for purposes of the substantive securities fraud charge,

the government was required to prove that Levy "acted willfully and knowingly

and with the intent to defraud." *United States v. Rosen*, 409 F.3d 535, 549 (2d Cir.

2005).  For purposes of aiding and abetting liability, the government was

required to prove that "[the defendant] willfully and knowingly associate[d]

himself in some way with the crime, and [sought] by some act to help make the

crime succeed." *United States v. Prado*, 815 F.3d 93, 100 (2d Cir. 2016); *see*

*Rosemond v. United States*, 572 U.S. 65, 76 (2014) ("[A] person aids and abets a

crime when (in addition to taking the requisite act) he intends to facilitate that

offense's commission.").  To sustain the conspiracy charge, the government was

required to prove that Levy "willfully and knowingly became a member of the

conspiracy, with intent to further its illegal purposes – that is, with the intent to

commit the object of the charged conspiracy." *Archer*, 977 F.3d at 190 (internal

quotation marks omitted).  In other words, "the government was required to

show that [Levy] had 'at least the degree of criminal intent necessary for the

substantive offense itself,' but was not required to show that he 'knew all of the

details of the conspiracy, so long as he knew its general nature and extent.'" *Id.*

(internal citations omitted).  And lastly, "[t]o sustain a conviction for . . .

conspiracy to commit . . . wire fraud, the government must prove that [Levy]

acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim." *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007).

The government argues that the district court erred in granting Levy's motion for a judgment of acquittal because the court failed to consider all the relevant evidence in context and improperly relied on isolated pieces of evidence.  For the reasons explained below, we agree.  We conclude that a rational jury could reasonably infer from the circumstantial evidence presented at trial that Levy was a member of the charged conspiracy and acted with the requisite intent.

### 1.  *The Scope and Purpose of the Black Elk Scheme*

Criminal intent "may be proven entirely through circumstantial evidence." *United States v. Romano*, 794 F.3d 317, 335 (2d Cir. 2015).  "When the necessary result of the [defendant]'s scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *Id.* (alteration in original) (quoting *D'Amato*, 39 F.3d at 1257).

At trial, the government adduced evidence that: the Black Elk scheme benefitted Platinum investors to the detriment of the Black Elk bondholders; the

outcome of the vote was inconsistent with the actions of a rational bondholder;

and the Consent Solicitation would not have passed without the votes of

Beechwood, a Black Elk affiliate.  Prior to the Consent Solicitation, Black Elk was

headed towards bankruptcy, and PPVA – which had heavily invested in Black

Elk – was in the midst of a liquidity crisis.  The Consent Solicitation Statement's

proposed amendments allowed Black Elk to pay Black Elk's preferred equity

holders – which consisted of a significant number of Platinum-controlled entities

and associates, including PPVA – with proceeds from the Renaissance Sale

before paying the Black Elk bondholders.

Black Elk bondholders could respond to the Consent Solicitation in one of

three ways: (1) tender their bonds at par (thereby consenting to the proposed

amendments); (2) consent to the proposed amendments without tendering,

thereby continuing to own their bonds; or (3) neither tender nor consent.

Government witnesses Todd Pulvino and Dixon Yee – bondholders who lost

money as a result of the Black Elk scheme – testified that the "consent only"

option in the Consent Solicitation Statement (the option to consent to the

amendments without tendering the bonds) was not a rational choice for a

bondholder to select.  Pulvino explained that it made no financial sense for a

bondholder to consent and retain his or her bonds because the bondholder would be giving up protections and allowing the preferred equity holders to have priority over the bondholders' interests without getting anything in exchange for giving up those protections.   Yee similarly testified that it would have been "kind of stupid" for a bondholder to agree to the changes without tendering his or her bonds, because the bondholder would be giving up his or her rights without getting anything in return.   GA.289-90.

Yet, the consent-only option received the majority of votes.   Notably, that majority comprised $37 million worth of bonds held by Beechwood, which voted to consent but declined to tender.   In addition to the $37 million of Beechwood-held bonds that voted to consent but not tender, approximately $43 million of the PPCO- and PPLO-held bonds voted to consent but not tender.   Aside from the bonds owned by the Platinum-related entities, only $600,000 in bonds voted to consent but declined to tender.   Thus, of all the bonds that voted to consent but not tender, over 99% were controlled by Platinum and Beechwood, which was Platinum-affiliated and controlled.   And ultimately, the Consent Solicitation was only able to pass because the Beechwood-held bonds voted to consent.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

As the district court did not dispute, *Nordlicht*, 2019 WL 4736957, at *10-14,

this evidence could have led a rational jury to conclude beyond a reasonable

doubt that the scheme was fraudulent and that those involved in it acted with

criminal intent to defraud the bondholders.

### 2. *Levy's Involvement and Role in the Black Elk Scheme*

Having determined that the government presented sufficient evidence

from which a rational jury could conclude beyond a reasonable doubt that the

goal of the Black Elk scheme was to defraud bondholders, we consider whether

there was sufficient evidence from which a rational jury could have concluded

beyond a reasonable doubt that Levy willfully participated in the Black Elk

scheme with criminal intent.  We conclude that there was.

The evidence adduced at trial established that Levy was aware of Black

Elk's dire financial straits and that a Black Elk bankruptcy would have negative

ramifications for PPVA.  As a portfolio manager at Platinum and later, as

Beechwood's CIO, Levy oversaw PPVA's investments in Black Elk and knew that

PPVA was heavily invested in the company.  Even after Levy left Platinum to

become CIO of Beechwood, he continued to work for Platinum to manage

PPVA's investment in Black Elk.  Levy continued to participate in meetings with

53

Black Elk management and received updates regarding Black Elk's financial

status.  For example, Levy knew that there were major problems with Black Elk's

oil production and that Black Elk was struggling to pay its bills.  Levy also

participated in a Black Elk management meeting at which the prospect of Black

Elk filing for bankruptcy was discussed.

At that meeting, Levy said:  "We cannot do that.  It's a lot of money to

lose." GA.238.  Although motive is not an element of the crimes charged, it is

probative of whether the defendant acted with criminal intent.  Here, Levy's

knowledge of Black Elk's impending bankruptcy and its negative ramifications

for PPVA provided Levy with a motive to seek to amend the Indenture to ensure

that the proceeds of the Renaissance Sale would go to the preferred equity

holders, which included the Platinum-related entities.

The evidence presented at trial also established that Levy was notified of

the Affiliate Rule on several occasions.  On March 5, 2014, in connection with the

private consent solicitation process, Shulse forwarded an email from Shearer to

Nordlicht, Levy, Small, and Hoffman, commenting, "We need to be mindful of

this provision when assuming we control the bonds or not . . . ." GA.587.  The

email from Shearer indicated that under section 316(a) of the TIA, "securities

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

owned by any obligor . . . or by any person directly or indirectly controlling or

controlled by or under direct or indirect common control with any such obligor"

must be excluded from the consent calculation. *Id.* (emphasis omitted). On July

3, 2014, Small forwarded an email exchange with Black Elk attorneys Shearer and

Sakowitz to Nordlicht and Levy. Sakowitz, citing section 316(a) of the TIA,

confirmed that "[s]ecurities owned by the obligor or by any person directly or

indirectly controlling or controlled by or under direct or indirect common control

with the obligor must be disregarded for purposes of calculating the vote

required to approve the proposal." GA.636. And on July 7, 2014, Small again

emailed Nordlicht and Levy, explaining that "[t]he company must disclose how

many bonds are owned by affiliates in order to establish the requisite number to

constitute a majority." GA.641.

Levy was also involved in the private consent solicitation process. He was

copied on correspondence relating to the consents that were submitted as a part

of the private consent solicitation process, supporting an inference that Levy was

involved in Black Elk's initial efforts to amend the Indenture. This inference is

further supported by the fact that, after the private consent solicitation process

failed, Nordlicht demanded that Levy explain "what the hell is going on."

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

GA.625-26. After Shulse explained that the trustee wanted to move forward with a public consent solicitation process because of concerns about the way in which the consents had been obtained, Nordlicht blamed Levy: "David, u f'd this one up bad for no reason. We will have one pager signed by 51% of bondholders, no trustee necessary. It's fine. We don't need any process. Bondholders are being taken out, this is all moot." GA.625. This evidence establishes that Levy was: aware of Black Elk's efforts to amend the Indenture; actively involved in the private consent solicitation process; aware that they might have to proceed with a public consent solicitation process because of concerns about the way in which the consents were obtained; and aware of Nordlicht's desire to circumvent the bondholders in order to ensure that Black Elk's proposed amendments to the Indenture quickly passed.

The evidence further appears to demonstrate that Levy remained involved in Black Elk's efforts to amend the Indenture through the public consent solicitation process after the private process failed. On June 23, 2014, for example, Small emailed Shearer Black Elk's proposed amendments to the Indenture – which included modification of the asset sale proceeds provision to allow Black Elk to pay the preferred equity holders before the bondholders – and

copied Levy.  And in a July 7, 2014 email, Small forwarded a draft of the Consent

Solicitation Statement to Nordlicht and Levy, explaining that they would have to

disclose how many bonds were owned by affiliates for purposes of calculating

whether a majority of the bondholders had consented to the proposed

amendments to the Indenture.  Small stated:  "Let's discuss asap in order to

finalize and launch by Thursday."  GA.641.  Two days later, on July 9, 2014, Small

wrote to Shearer and Sakowitz, disclosing only that the $18.3 million bonds

controlled by PPVA should be excluded from the consent calculation.  This email

correspondence supports an inference that Levy was involved in the preparation

of the Consent Solicitation Statement and the determination to disclose only the

$18.3 million of PPVA-controlled bonds to Shearer.

In addition, viewed in the light most favorable to the government, the

evidence supports an inference that Levy was aware of Beechwood's role in the

Black Elk scheme and was actively involved in that scheme.  By early 2014, Levy

was CIO of Beechwood.  Naftali Manela – who was CFO of PPCO through late

2014 – testified that, as CIO at Beechwood, Levy made the "final decision on

which investments were made."  GA.205-06.  And although there were no

writings reflecting Levy himself directing Beechwood's purchase of Black Elk

bonds, he was aware of Beechwood's purchases of a significant number of Black

Elk bonds from Platinum, supporting an inference that he, as Beechwood's CIO,

had signed off on those transactions.

In April 2014, for example, Platinum trader Nicholas Marzella emailed

Small and Levy a breakdown of the Black Elk bonds held by PPVA, PPCO,

PPLO, and Beechwood, respectively.  As of April 2014, Beechwood held only $5

million in Black Elk bonds.  Later, on July 2, 2014, Small forwarded Nordlicht

and Levy a summary of Platinum and Beechwood's Black Elk bond holdings,

which indicated that Beechwood now owned around $30 million worth of bonds.

And on July 23, 2014, Manela emailed Levy a chart entitled "Beechwood

Investment related to Platinum."  GA.749.  These investments included

$31,051,000 in "Black Elk Energy Public Debt 13.75%," with the comment:

"Purchased 3,335,000 each from PPCO and PPLO and 24,381,000 from PPVA."

GA.749.  While there was no direct evidence that Levy "played any role in

shifting Black Elk bonds to Beechwood," *Nordlicht*, 2019 WL 4736957, at *15,

circumstantial evidence from which the jury could draw rational inferences is

sufficient.  *See Wexler*, 522 F.3d at 207-08; *Lorenzo*, 534 F.3d at 159.  The district

court therefore was mistaken when it found that the government "adduced *no*

evidence" of Levy's role in transferring Black Elk bonds to Beechwood.  *Nordlicht*,

2019 WL 4736957, at *15 (emphasis added).  Levy's dual role working at

Beechwood and Platinum, coupled with his position as Beechwood's CIO and

the email correspondence demonstrating that he was apprised of Beechwood's

purchases of Black Elk bonds, supports an inference that he understood

Beechwood's role in the Black Elk scheme, was a part of the conspiracy, and was

acting in furtherance of the conspiracy as Beechwood's CIO.

Levy's involvement in the Black Elk scheme is further corroborated by the

circumstantial evidence suggesting that he was responsible for directing the

voting of Beechwood's Black Elk bonds.  On July 28, 2014, Beechwood employee

Samuel Adler wrote to Wilmington Trust, with a copy to Levy, stating that the

Black Elk bonds held by BAM and BBIL were voting "consent without

tendering."  GA.750.  The same day, Adler, with a blind copy to Levy, wrote to

Nomura also stating that the Black Elk bonds held by BAM and BBIL were

voting "consent without tendering."  GA.753.  Adler's open and blind copies to

Levy, respectively, considered together with the evidence establishing that Levy

was simultaneously working on Platinum's Black Elk investment while acting as

Beechwood's CIO and that he was actively monitoring Beechwood's investment

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

in Black Elk, supports an inference that Adler was voting Beechwood's Black Elk

bonds "consent without tendering" based on instructions given to him by Levy.

Circumstantial evidence also supports an inference that Levy was aware,

and was actively working to ensure, that Platinum controlled a sufficient number

of bonds to ensure that the amendments would pass.  On June 29, 2014, during

the pendency of the public consent solicitation process, Nordlicht wrote to Small

and Levy:  "David [Levy]—I have Beechwood at 36,422,400 in terms of

ownership of [Black Elk] bonds.  Dan—Do u know respective funds?"  GA.758.

In response to that message, Small responded to Nordlicht and Levy and sent the

following table:

| BlackElk Bond Holders | | | | | |
|---|---|---|---|---|---|
| | Nomura | Credit Suisse | Wilmington Trust | Total | |
| PPCO | 29,582,000 | | | 29,582,000 | |
| PPVA | | 18,321,000 | | 18,321,000 | |
| PPLO | | 13,711,000 | | 13,711,000 | |
| BAM | | | 13,360,000 | 13,360,000 | |
| BBIL | | | 23,657,000 | 23,657,000 | |
| Total | | | | 98,631,000 | |
| | | | | | |
| | | | | 80,310,000 | 150,000,000 |
| | | | | | 131,679,000 |
| | | | | | 65,839,500.0 |

GA.764.

The table shows the Black Elk bonds collectively held by Beechwood and

Platinum and sets forth the vote analysis that underlies the Black Elk Scheme.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

First, in the second column from the right, under the "Total" heading, the chart subtracts the $18,321,000 in PPVA-held bonds that were disclosed in the Consent Solicitation Statement and excluded from the vote, resulting in $80,310,000 bonds held by Platinum and Beechwood.  The calculation in the far-right column subtracts the same $18,321,000 in excluded PPVA-held bonds from the total number of outstanding bonds (150,000,000), yielding $131,679,000.  The chart then divides the latter figure in half, yielding $65,839,500 – the number of "yes" votes needed in order for the Consent Solicitation to pass.  The district court minimized this email evidence, concluding that it merely "show[s] that Levy knew or should have known that Beechwood held Black Elk bonds." *Nordlicht*, 2019 WL 4736957, at *15.  But it also illustrates that Levy knew that Platinum and Beechwood controlled enough of the bonds to determine the outcome of the vote.  Moreover, the fact that the table only excludes the $18.3 million bonds held by PPVA supports an inference that Levy knew the PPCO-, PPLO-, and Beechwood-held bonds had been concealed from Shearer and the bondholders and were being voted to ensure that the amendment would pass.

The government did not present this evidence to the jury in isolation.  As noted above, email correspondence illustrates that in July 2014, Small consulted

61

with Nordlicht and Levy about which bonds to disclose to Shearer for purposes

of the Consent Solicitation Statement.  There was also trial testimony that during

the public consent solicitation process, Black Elk CEO John Hoffman was

skeptical about the notion that Black Elk bondholders would consent to the

amendments to the Indenture.  In response, Levy said to Shulse:  "It's covered."

GA.245.  And on August 14, 2014, immediately following the bondholders' vote,

Small wrote to Nordlicht, copying Levy, to ask for their approval of the language

to send to Shearer regarding the consent calculation for the Officer's Certificate.

Small's proposed language identified the $18.3 million in PPVA bonds as

"affiliated," and for the first time also flagged the PPCO- and PPLO-controlled

bonds as "[p]ossible [a]ffil[iates]" to be excluded from the final vote count.

GA.770.  Small emphasized that regardless of whether they chose to then disclose

the PPCO- and PPLO-controlled bonds, Black Elk had received a majority vote

due to the votes cast by Beechwood.  The jury could reasonably infer from the

context and timing of Levy's comment to Shulse, considered together with the

voluminous email evidence presented, that Levy knew that the PPCO, PPLO,

and Beechwood-held bonds had not been disclosed to Shearer or the

bondholders; knew that the PPCO-, PPLO-, and Beechwood-held bonds were

voted to ensure that the amendments to the Indenture would pass; and was

deeply involved in the Black Elk Scheme.

Levy's role in disbursing the proceeds of the Black Elk Scheme, coupled

with his efforts to ensure that these proceeds were protected from a claw-back in

Black Elk's bankruptcy proceedings, provides further circumstantial evidence of

Levy's knowledge of, involvement in, and intent to further the objectives of the

Black Elk Scheme.  On August 18, 2014, Shearer advised Shulse that Texas law

might prohibit the distribution of the proceeds of the Renaissance Sale if that

distribution would render Black Elk insolvent.  Shulse forwarded this email to

Nordlicht, Small, and Levy, writing:  "Advice of counsel . . . we need to be

mindful of this in our planning."  GA.781.  Immediately thereafter, Nordlicht

forwarded this email to Levy, changing the subject heading to "urgent" and

instructing Levy to "get these wires out!!!!!  Call him right now please!!!!"  *Id.*

Twenty minutes later, Small wrote to Shulse with a copy to Salfati — who had

just joined Small on the three-person Black Elk Board of Directors — authorizing

a wire transfer of $70 million "in partial payment" to Black Elk's preferred equity

holders.  GA.783.  Nordlicht's email to Levy, combined with the rapid sequence

of events, supports a permissible inference that Levy subsequently spoke to

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

Small and directed him to initiate the wire transfer of the proceeds from the

Renaissance Sale.  The fact that Nordlicht did not have to explain to Levy what

needed to be done, or why it needed to be done with such urgency, suggests that

Levy was aware of and supported the object of the fraud.  Moreover, Nordlicht

and Levy's willingness to disburse the proceeds of the Renaissance Sale rapidly,

notwithstanding the possible legal risks, supports a finding that both Nordlicht

and Levy were willing to circumvent governing legal restrictions to ensure that

the proceeds from the Renaissance Sale were paid to Black Elk's preferred equity

holders.

Furthermore, after the proceeds from the Renaissance Sale were

distributed, Levy had a conversation with Platinum CFO Daniel Mandelbaum

regarding the timeline of Black Elk's bankruptcy.  Levy indicated that, to prevent

the proceeds from the Renaissance Sale from being clawed back during the

bankruptcy proceedings, Black Elk would not declare boankruptcy for a year.

This provides further support for the government's theory of the case because it

illustrates that Levy apparently understood the importance to Platinum of

securing the proceeds from the Renaissance Sale and was taking steps in

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

furtherance of the Black Elk Scheme to ensure that this money would be

protected.

The district court discounted the evidence of Levy's involvement in

disbursing the Renaissance Sale proceeds and delaying Black Elk's bankruptcy,

reasoning that there could have been innocent explanations for these acts.

*Nordlicht*, 2019 WL 4736957, at *14-15.  The district court explained that "[t]here is

nothing unlawful about processing wire transfers, which are a routine aspect of

transactions like the Renaissance [S]ale." *Id.* at *15.  Similarly, in dismissing the

evidence that Levy sought to avoid a bankruptcy claw-back, the district court

explained that "businesses may legitimately consider the risk of a claw-back

when deciding when to conduct a certain transaction." *Id.* at *14.  But the

government did not contend that the wire transfer or Levy's efforts to avoid a

claw-back were inherently inculpatory standing alone.  Rather, the government

argued that this evidence, considered in context alongside the other evidence

establishing Levy's knowledge of, and involvement in, the Black Elk Scheme,

could have given rise to a rational inference of Levy's intent to defraud the

bondholders.  *See Mariani*, 725 F.2d at 865-66 ("Seemingly innocent acts taken

individually may indicate complicity when viewed collectively and with

65

reference to the circumstances in general.").  The district court's analysis suggests

that it erroneously viewed the evidence in isolation, weighed the evidence, and

drew inferences against the government.  *See United States v. Tocco*, 135 F.3d 116,

123 (2d Cir. 1998) (cautioning that courts must "defer to the jury's resolution of

witness credibility and, where there is conflicting testimony, to its selection

between competing inferences").

Viewing the evidence as a whole and in the light most favorable to the

government, we conclude that a rational jury could have found, beyond a

reasonable doubt, that Levy participated in the Black Elk Scheme with criminal

intent.

3.  *The Exculpatory Evidence Cited by Levy Does Not Support the District Court's Decision*

Levy argues that despite the foregoing, there is insufficient evidence to

support a conclusion that he acted with criminal intent because there was no

evidence that he understood that Beechwood was an affiliate and other evidence

in the record showed that he lacked the requisite criminal intent.  In particular,

Levy contends that he was told that Beechwood and Platinum were not affiliates,

and that he was informed by the lawyers during the private consent solicitation

process that Platinum was permitted to vote all of its Black Elk bonds. Levy's

arguments are without merit.

As an initial matter, we find no evidence to support Levy's assertion that

he was told during the private consent solicitation process that Platinum was

permitted to vote the bonds held by PPVA, PPCO, and PPLO, nor do we find

evidence that the lawyers involved in the transaction knew and approved of

Platinum voting these bonds. To the contrary, Shearer testified that he did not

know that the Platinum entities were voting their bonds, and that he did not

believe the trustee's counsel or anyone else at BakerHostetler knew either.

Shearer explained that the lawyers involved in the private consent solicitation

process did not learn that Platinum was voting the Black Elk bonds held by

PPVA, PPCO, and PPLO until after Platinum voted them and transmitted the

consents to counsel for purposes of demonstrating that a majority of the

bondholders had consented to the proposed amendments. And we find no

evidence in the record that Levy or Nordlicht provided any information to the

lawyers regarding PPVA, PPCO, or PPLO's relationship with Black Elk or their

possible status as affiliates, nor do we find evidence that any of the lawyers

working on the private consent solicitation provided Levy with legal advice

regarding whether these entities qualified as affiliates. While it is true that neither Shearer nor anyone else at BakerHostetler raised any concerns about PPVA, PPCO, or PPLO voting their Black Elk bonds after they received the consents, Shearer testified that they had not focused on the Affiliate Rule at the time and had mistakenly overlooked it. Moreover, Levy was aware that the trustee ultimately terminated the private consent solicitation process in light of concerns about the way in which the consents were obtained.

By contrast, in connection with the public consent solicitation process, Shearer and the other lawyers working on the transaction recognized that the Affiliate Rule applied and informed Black Elk that affiliates could not vote their bonds. And Small repeatedly notified Levy and Nordlicht, on July 3 and 7, 2014, that Black Elk was required to disclose how many bonds were owned by affiliates. Levy was therefore aware of the Affiliate Rule and Black Elk's obligation to disclose any bonds owned by affiliates—which included the Platinum and Beechwood entities.

Notwithstanding this legal advice, we are not aware of any evidence in the record that Levy, Nordlicht, or Small disclosed the PPLO-, PPCO-, or Beechwood-owned bonds to Shearer prior to the dissemination of the Consent

Solicitation, or sought Shearer's – or any other attorney's – advice regarding

whether PPCO, PPLO, or Beechwood qualified as affiliates and should therefore

be excluded from the consent calculation.  Levy argues that, because none of the

lawyers objected to PPVA, PPLO, or PPCO voting their Black Elk bonds during

the private consent solicitation process, he had no reason to believe that Platinum

could not vote the PPVA-, PPLO-, or PPCO-owned bonds.  But the private

consent solicitation process ultimately failed, and Levy was subsequently made

aware on several occasions that bonds under direct or indirect common control

with Black Elk had to be excluded from the consent calculation.  Moreover, the

fact that – after discussion with Levy and Nordlicht – Small ultimately disclosed

the $18.3 million PPVA-owned bonds to Shearer undercuts Levy's argument that

he believed, based on the private consent solicitation process, that the Platinum

entities could lawfully vote their bonds.  Additionally, Small's August 13, 2014

email to Levy and Nordlicht – after the Consent Solicitation had passed –

referred to the PPCO- and PPLO-held bonds as "Possible Affil" to be excluded

from the consent calculation, and asked for Levy and Nordlicht's permission to

disclose these bonds to Shearer now that they knew they had acquired sufficient

votes to pass the amendments using solely the Beechwood-held bonds.  Notably,

69

the approximately $37 million of Beechwood-held bonds were included in Small's email as consent votes to be counted, not excluded. The email evidence supports an inference that Levy understood the Platinum-controlled bonds, including those owned by PPCO, PPLO, and Beechwood, likely qualified as affiliates, and that they had concealed this information to ensure the amendments would pass.

There was also sufficient circumstantial evidence to support the conclusion that Levy knew Platinum controlled Beechwood. Most notably, Levy was working for Platinum on the Black Elk investment and assisting with the public consent solicitation process while he was working as Beechwood's CIO. As CIO, Levy controlled and exercised final authority over Beechwood's investment decisions. When Beechwood was first created, for example, Nordlicht and Levy jointly decided which investments would be purchased and transferred from Platinum to Beechwood, and Beechwood invested in many portfolio companies and securities in which Platinum was already invested, including Black Elk. Levy knew that Nordlicht was keeping tabs on how many Black Elk bonds were owned by Beechwood, was kept aware of Beechwood's purchases of Black Elk bonds from Platinum, and was actively monitoring the number of Beechwood-,

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

PPVA-, PPCO-, and PPLO-held bonds to ensure that Platinum secured a

sufficient number of votes to pass the amendments.  In addition, Nordlicht gave

Levy instructions while he was working at Beechwood, and Levy was aware that

Nordlicht also directed and received reports from other Beechwood employees.

As mentioned above, there was also evidence supporting an inference that Levy

directed Beechwood's voting of Black Elk's bonds while he was simultaneously

CIO of Beechwood and working for Platinum on Black Elk, and that Beechwood

employees deferred to Levy and Nordlicht when voting Beechwood's Black Elk

bonds.  This evidence, viewed collectively, provides an ample basis to conclude

that Levy understood that Black Elk and Beechwood were under the common

control of Platinum and that Beechwood therefore likely qualified as an affiliate.

Levy points out that he was involved in a conversation with Feuer and

Taylor where they indicated that Beechwood was not an affiliate of Platinum.  In

particular, on cross-examination, Manela testified that Feuer and Taylor were

very concerned about ensuring that Beechwood and Platinum were not "the

technical word affiliates," and that Feuer told Manela that he was working to

ensure that Beechwood was not a Platinum affiliate.  SA.55, GA.220.  Manela

agreed that "Beechwood had lawyers reviewing everything about the structure

71

of Beechwood so it would not be an affiliate of Platinum." SA.55. Manela also

recalled "multiple conversations" with Feuer and Taylor where they discussed

Beechwood's affiliate status, and specifically recalled that Levy was present at

one of those meetings. GA.220. According to Manela, Feuer and Taylor told him

and Levy that Beechwood was not a Platinum affiliate. Manela, however, could

not recall what went into the definition of "affiliate" or what the term "affiliate"

meant in the context of that conversation. SA.60. Manela was not privy to, and

did not testify to, the specifics of any of the legal advice that Feuer and Taylor

purportedly received regarding Beechwood's affiliate status. And it is unclear

what, if any, facts Beechwood's lawyers were provided to determine whether

Beechwood was an affiliate of Platinum.

In light of the substantial evidence indicating that Levy knew that

Platinum exercised control over Beechwood (and that Levy, in fact, played a

pivotal role in the exercise of such control), a jury could have rationally

discounted Manela's vague recollection of Feuer and Taylor's conversation with

him and Levy regarding Beechwood's status as a Platinum affiliate, particularly

since there was no evidence that Feuer and Taylor were referring to Beechwood's

status as an affiliate within the meaning of the Indenture. Viewing the evidence

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

as a whole, a rational jury could have concluded (as this jury apparently did) that

Levy understood that Platinum controlled Beechwood and that Beechwood

likely qualified as an affiliate for purposes of the Indenture.

We conclude that the district court erred in granting Levy's Rule 29

motion.

## III.    The Rule 33 Motions

### A. Legal Standard

Rule 33 provides that, "[u]pon the defendant's motion, the court may

vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a).  "Although a trial court has broader discretion to grant a

new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal

pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence

must be assumed, that discretion should be exercised sparingly" and only in the

most extraordinary circumstances.  *Sanchez*, 969 F.2d at 1414 (internal citation

omitted); *see also Ferguson*, 246 F.3d at 134.  "In evaluating a Rule 33 motion, the

court must 'examine the entire case, take into account all facts and circumstances,

and make an objective evaluation,' keeping in mind that the 'ultimate test' for

such a motion is 'whether letting a guilty verdict stand would be a manifest

injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).

District courts have a duty to assure "that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict," *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414), and "a district court may [therefore] grant a new trial if the evidence does not support the verdict," *Archer*, 977 F.3d at 187. While the district court "may weigh the evidence and credibility of witnesses," *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008), it must take care "not to usurp the role of the jury," *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005). And we have long recognized that courts should "generally . . . defer to the jury's resolution of conflicting evidence and assessment of witness credibility." *Ferguson*, 246 F.3d at 133. It is accordingly only in exceptional circumstances, where there is "a real concern that an innocent person may have been convicted," that a court "may intrude upon the jury function of credibility assessment" and grant a Rule 33 motion. *United States v. McCourty*, 562 F.3d 458, 475-76 (2d Cir. 2009) (internal quotation marks omitted).

Although we have not defined exactly what constitutes an "extraordinary circumstance" sufficient to warrant Rule 33 relief, we recently provided further

guidance: "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Archer*, 977 F.3d at 188 (internal quotation marks omitted); *see Sanchez*, 969 F.2d at 1415 ("It surely cannot be said in this case that the evidence 'preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" (alteration omitted) (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985))).

We note that the district court did not have the benefit of our decision in *Archer* when it granted Levy and Nordlicht's Rule 33 motions. Under the "preponderates heavily" standard, which was first articulated in *Sanchez* and later applied in *Archer*, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Archer*, 977 F.3d at 188 (internal quotation marks omitted). "To the contrary, absent a situation in which," for example, "the evidence was 'patently incredible or defie[d] physical realities,' . . . where an evidentiary or instructional error compromised the reliability of the verdict," *id.* (internal citation omitted) (quoting *Ferguson*, 246 F.3d at 134), or where the government's case depends

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

upon strained inferences drawn from uncorroborated testimony, "a district court

must 'defer to the jury's resolution of conflicting evidence.'" *Id.* (quoting

*McCourty*, 562 F.3d at 475-76); *see also Ferguson*, 246 F.3d at 136-37 (affirming

district court's grant of Rule 33 motion where, among other things, there was no

evidence that the defendant participated in the gang's activities and the only

evidence supporting his gang membership was the speculative testimony of one

of the government's witnesses).  Of course, in *Archer* we provided the clearest

examples of when it would be appropriate to grant a Rule 33 motion, but they

were merely examples, and not an exhaustive list.  Moreover, in applying the

"preponderates heavily" standard, a district court "must be careful to consider

any reliable trial evidence as a whole, rather than on a piecemeal basis."  *Archer*,

977 F.3d at 189; *see also Sanchez*, 969 F.2d at 1414 (explaining that when

considering whether sufficient evidence "supports the jury's finding that th[e]

defendant is guilty beyond a reasonable doubt," the district court must

objectively "examine the totality of the case," taking "[a]ll the facts and

circumstances" into account (internal quotation marks omitted)).

   B.  *Levy's Motion for a New Trial*

   The district court conditionally granted Levy's motion for a new trial for

76

the same reasons it granted Levy's motion for a judgment of acquittal, explaining

that "the jury's guilty verdict was a manifest injustice because there was

insufficient evidence that Levy possessed criminal intent." *Nordlicht*, 2019 WL

4736957, at *18. The government contends that there is no legal basis upon which

to affirm the district court's decision granting Levy a new trial because, if we

agree that the district court erred in granting Levy's Rule 29 motion, our rejection

of the district court's reasoning in the Rule 29 context must necessarily extend to

the Rule 33 motion. We disagree.

While both the Rule 29 and Rule 33 analyses in this context require an

assessment of evidentiary sufficiency, they have different governing legal

standards. As explained, the Rule 33 inquiry requires an objective evaluation of

the evidence and an assessment of whether the evidence preponderates heavily

against the verdict. Accordingly, a Rule 33 motion may properly be granted

even where a Rule 29 motion is denied.

We conclude, however, that application of the "preponderates heavily"

standard does not warrant a new trial here. In light of the wealth of evidence,

circumstantial and otherwise, detailed above, there was ample basis for the jury

to conclude that Levy acted with the requisite criminal intent. We therefore

Nos. 19-3207-cr/19-3209-cr
*United States of America v. Levy*

conclude that the district court erred in granting Levy a new trial.

### C.  *Nordlicht's Motion for a New Trial*

In ruling on Nordlicht's Rule 33 motion, the district court noted that "[t]he heart of the Government's case against Nordlicht is that he knew – but concealed from the bondholders – that, under the Affiliate Rule, bonds held by BAM, BBIL, PPCO, and PPLO should be excluded from the consent solicitation." *Nordlicht*, 2019 WL 4736957, at *16.  The district court concluded that it would be a manifest injustice to let the verdict stand because (1) "although Nordlicht knew about the affiliate rule, he and Beechwood went to great lengths to comply with [it]"; (2) there was "insufficient evidence that Nordlicht was on notice of [Beechwood's] affiliate status"; and (3) there was "insufficient evidence that the affiliate status of PPCO and PPLO was . . . concealed from BakerHostetler" or "that Nordlicht intended to conceal PPCO's and PPLO's affiliate status from Shearer." *Id.* at *16-18.

Applying the "preponderates heavily" standard here, we conclude that letting the verdict stand as to Nordlicht would not result in manifest injustice. The district court's factual findings in connection with Nordlicht's Rule 29 motion, as well as the ample record evidence illustrating Nordlicht's knowledge

and intent, undermine the district court's conclusions in the Rule 33 context and

demonstrate that the evidence did not preponderate heavily against the verdict.

The district court therefore abused its discretion in granting Nordlicht's motion

for a new trial.

### 1.   *Nordlicht Did Not Endeavor to Comply with the Affiliate Rule*

The district court concluded, based on a March 2014 email in which

Nordlicht stated that he would be "fully compliant with the affiliate rule," that

Nordlicht actually "went to great lengths to comply with the affiliate rule."

*Nordlicht*, 2019 WL 4736957, at *16.  In particular, in connection with the private

consent solicitation process, Shearer emailed Shulse, explaining that, in

calculating consent, bonds owned "by any person directly or indirectly

controlling or controlled by or under direct or indirect common control with any

such obligor" must be excluded.  GA.587.  Shulse forwarded this email to

Nordlicht, Levy, and others, stating:  "We need to be mindful of this provision

when assuming we control the bonds or not."  *Id.*  Nordlicht responded:  "I see u

accidentally forgot to include Marizza and label this attorney client privilege.  I

have corrected . . . . But when we say we have friendly holders we will be fully

compliant with this provision."  *Id.*  While Nordlicht's email could be subject to

innocuous interpretations, the jury was entitled to conclude that it was, in fact, a self-serving exculpatory statement that was intended to conceal, rather than reveal, his intentions.  Nordlicht did not identify his "friendly holders" or explain why they were not considered "affiliates"; he did not ask any questions or seek further advice regarding the application of the Affiliate Rule; and he reprimanded Shulse for failing to label the email "attorney client privilege" and then changed the subject heading to "Atty client privilege" in what a rational jury could have concluded was an effort to shield this email from discovery.  Indeed, as the district court noted in denying Nordlicht's Rule 29 motion, the jury could have reasonably concluded that under the circumstances, Nordlicht's email "indicated a desire to create a favorable paper trail, rather than a good faith desire to comply with the affiliate rule." *Nordlicht*, 2019 WL 4736957, at \*9; *id.* at \*16 (acknowledging that Nordlicht may have been "dissembling" to create a "favorable paper trail").  It was not, we think, the province of the district court to grant a new trial "simply because it believes other inferences and conclusions are more reasonable." *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1160 (8th Cir. 1999); *see also Archer*, 977 F.3d at 188.

　　Moreover, the trial evidence as a whole undercuts any notion that

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

Nordlicht was acting in good faith to comply with the Affiliate Rule.  For

example, after the private consent solicitation process was terminated based on

concerns about the manner in which the consents had been obtained, Nordlicht

expressed disdain for the rules and urged Shulse, Small, and Levy to cut out the

lawyers and circumvent the bondholders.  Nordlicht wrote:  "No more talking to

lawyers. . . . We will have one pager signed by 51% of bondholders, no trustee

necessary.  It's fine.  We don't need any process.  Bondholders are being taken

out, this is all moot."  GA.625.  Similarly, once the amendments to the Indenture

passed, Nordlicht was apprised that distribution of the proceeds from the

Renaissance Sale might violate Texas law.  Instead of seeking further guidance

from Black Elk's lawyers, Nordlicht immediately emailed Levy, directing him to

"get th[o]se wires out!!!!!"  GA.781.  This email evidence, viewed collectively,

supports an inference that Nordlicht intended to secure the passage of the

amendments to the Indenture, regardless of whether he violated any laws or

harmed the bondholders in the process.

In addition, Nordlicht had a habit of labeling sensitive emails relating to

Black Elk's impending bankruptcy "attorney client privilege" even when they did

not involve advice of counsel.  Specifically, on May 20, 2013, Shulse emailed

Nordlicht, Small, and Levy about Black Elk's precarious financial situation and

the need to generate liquidity through asset sales.  Nordlicht responded, with a

copy to Pichè, Black Elk's in-house counsel, calling Shulse "hysterical" and

reprimanding him for failing to label his email "atty client privilege."  GA.614.

Nordlicht also changed the subject heading of the email to "atty client privilege."

*Id.*  As Shulse noted, it is not clear why "a business issue such as cash flow would

need to be covered by attorney client privilege."  *Id.*  This email exchange further

supports the inference that Nordlicht likely knew he was engaged in wrongful

conduct and was seeking to cover his tracks.

Taken together, these emails can reasonably be interpreted to demonstrate

that Nordlicht did not intend to comply with the Affiliate Rule (or, for that

matter, any other legal restriction preventing the distribution of the proceeds

from the Renaissance Sale to the preferred equity holders).  And viewed in

context, there was ample support for a jury to conclude that Nordlicht's March

2014 email was simply a part of a cover-up to conceal the fraud perpetrated

against the bondholders.

> 2. *Sufficient Evidence Supports the Conclusion that Beechwood Was
> an Affiliate and that Nordlicht Was on Notice of its Affiliate Status*

The district court also concluded that it would be a manifest injustice to let

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

the verdict stand, because – even assuming that the Beechwood entities (BBIL

and BAM) were considered Platinum entities and therefore Black Elk affiliates

under the Affiliate Rule – there was insufficient evidence that Nordlicht was on

notice of the Beechwood entities' affiliate status. *Nordlicht*, 2019 WL 4736957, at

*17.  Nordlicht contends that the district court did not abuse its discretion in

granting his motion for a new trial because (1) the record does not support the

conclusion that Beechwood was an affiliate; and (2) the district court correctly

concluded that Nordlicht did not believe Beechwood was an affiliate.  We

disagree.

Under the terms of the Indenture, in determining whether there is consent

to any proposed amendment, bonds held "by the Permitted Holders, the Issuers

or any Guarantor, or by any Person directly or indirectly controlling or

controlled by or under direct or indirect common control with the Permitted

Holders, the Issuers or any Guarantor, will be considered as though not

outstanding." GA.888.  In other words, Black Elk – as the issuer – as well as

entities that controlled, or were under common control with, Black Elk, were not

entitled to have their votes counted in determining whether a majority of bonds

consented to any proposed amendment.  The Indenture defined the terms

"affiliate" and "control" as follows:

> "*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control. For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

GA.861 (emphasis in original). These definitions of affiliate and control mirror those found in the TIA. *See* 17 C.F.R. § 260.0-2(b) ("The term 'affiliate' means a person controlling, controlled by, or under common control with, another person."); *id.* § 260.0-2(f) ("The term 'control' means the power to direct the management and policies of a person, directly or through one or more intermediaries, whether through the ownership of voting securities, by contract, or otherwise.").

It is undisputed that Platinum, through PPVA, controlled Black Elk, because PPVA owned 85% of the common equity of Black Elk. Accordingly, as the parties note, the relevant question is whether Beechwood was also under the common control of Platinum, such that it constituted an affiliate of Black Elk.

Whether Beechwood was under Platinum's control, in turn, depends on whether Platinum could in effect direct Beechwood's management and policies.

Here, as the district court found in denying Nordlicht's Rule 29 motion, there was sufficient evidence to support the jury's conclusion that Beechwood was under the common control of Platinum and therefore was a Black Elk affiliate. *See Nordlicht*, 2019 WL 4736957, at *11. The government presented evidence that Nordlicht founded Beechwood with the same partners with whom he founded Platinum (Huberfeld and Bodner), as well as two additional investors – Mark Feuer and Scott Taylor. Upon the creation of Beechwood, Nordlicht filled several critical positions at Beechwood with Platinum employees. Levy (who had served as a portfolio manager at Platinum and had been heavily involved in managing Platinum's investments in Black Elk) joined Beechwood as its CIO and worked at Beechwood while continuing his work related to Black Elk at Platinum. Naftali Manela (who had served as Chief Financial Officer of PPCO from 2008 through 2014, and Chief Operating Officer of Platinum from late 2014 through 2015) was asked in early 2014 to assist in "set[ting] up [Beechwood's] reporting," determining how much money could be invested by Beechwood into Platinum, and assessing how those investments in

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

Platinum could be made.  GA.198-201.  Will Slota – another Platinum employee –

also worked at Beechwood, and Huberfeld acted as an advisor to Beechwood.

And Beechwood investment manager Wallach, whom Nordlicht had assisted in

obtaining a position at Beechwood, followed Nordlicht's instructions regarding

the tracking and purchase of Black Elk bonds.[5]  Nordlicht also occasionally

worked out of Beechwood's offices to take phone calls and participate in

meetings.

Moreover, pursuant to an email from Huberfeld outlining Beechwood's

corporate terms, the "Nordlicht group" was responsible for "run[ning] the

investment allocation side" of Beechwood, while the "Feuer group w[ould] run

the insurance end."  GA.582.  Similarly, Manela testified that Feuer and Taylor

---

[5] Nordlicht relies on Wallach's testimony for the proposition that Nordlicht merely held an advisory role at Beechwood and did not have the authority to direct Wallach to buy a particular position.  But Wallach's statements on cross-examination were inconsistent with his direct testimony and contemporaneous email communications with Nordlicht, which demonstrate that, on multiple occasions, Nordlicht directed Wallach to purchase Black Elk bonds from the Platinum funds, and that Wallach deferred to Nordlicht regarding how to vote Beechwood's Black Elk bonds.  Wallach also testified that he frequently communicated with Nordlicht about his work at Beechwood, and that Nordlicht told Wallach how much money Wallach and his partner could invest on behalf of BAM.  In light of the documentary evidence and testimony suggesting that Nordlicht exercised significant control over Wallach and Beechwood, the jury was entitled to weigh Wallach's testimony and discount Wallach's statements that contradicted the documentary and other evidence presented at trial.

were running the "insurance side" of the business, while Levy was "running the

investment side [of the business]" and making the decisions regarding the

"private equity type investments."  Supp. GA.04-06.  After Beechwood was

founded, Nordlicht and Levy directed Beechwood's investments into portfolio

companies and securities in which Platinum had already invested, and

transferred certain investments from Platinum to Beechwood to benefit

Platinum.  And Nordlicht had sufficient control over Beechwood to be able to

direct the trading of over $37 million in Black Elk bonds from the Platinum funds

to Beechwood over a three-month period prior to the public consent solicitation

process.

Nordlicht himself acknowledged that Platinum exercised control over

Beechwood.  In a May 22, 2014 email chain, Nordlicht wrote to Peter Muehlsiegl

– a potential business partner – regarding investment opportunities:  "Get me

good risk adjusted opportunity!!  I feel like I sh[oul]d do some more due

diligence on co before I answer rate. . . . On this one I w[oul]d do whole piece *by*

*splitting up between our fund [PPVA] and our reinsurance mandate [(Beechwood)] so*

*it's [P]latinum or designees*."  GA.620 (emphasis added).  After Muehlsiegl notified

Nordlicht of a potential investment, Nordlicht wrote to him:  "Do you mind if I

have my pm [(portfolio manager)] who handles specifics on these kind of trades,

Bernie Hutman call u?  Obviously it's large amount, don't want to miss anything.

*The issue is besides Platinum we have reinsurance mandate and I'd like to split it among*

*entities, though all controlled by us.*"  GA.618 (emphasis added).  Later in the email

chain, Nordlicht wrote to Hutman:  "If it helps we sh[oul]d be b asset manager

[(BAM)] as opposed to [P]latinum on these things."  GA.617.  Nordlicht's email

correspondence confirms that Platinum exercised significant control over

Beechwood's investment decisions.  Viewed collectively with the other record

evidence, there appears to have been ample evidence from which the jury could

conclude that Platinum had "the power to direct or cause the direction of the

management or policies of" Beechwood and that therefore Beechwood and Black

Elk were under the common control of Platinum.  Accordingly, the evidence

does not preponderate heavily against a finding that Beechwood was an

affiliate.[6]

---

[6] The civil cases cited by Nordlicht do not compel a different result.  Unlike in *Waldman
ex rel. Elliott Waldman Pension Tr. v. Riedinger*, 423 F.3d 145, 151-52 (2d Cir. 2005), where
there was no evidence that Riedinger actually exercised control over any of the relevant
entities and his actions were subject to veto, there is no evidence that Nordlicht's
decisions were subject to veto by anyone, either pursuant to Beechwood's corporate
terms or in practice, and there is significant evidence in the record supporting the
conclusion that Platinum had the power to cause the direction of Beechwood's

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

In addition, based on all the foregoing evidence, there was sufficient

evidence for the jury to conclude that Nordlicht knew Beechwood was an

affiliate of Black Elk.  Indeed, as the district court noted in connection with

Nordlicht's Rule 29 motion, there was ample evidence "to suggest that Nordlicht

knew about the affiliate rule" and did not have a "good faith desire to comply

with" it.  *Nordlicht*, 2019 WL 4736957, at *9.  As reflected in the May 2014 email

chain, Nordlicht recognized that Platinum exercised control over Beechwood and

that Beechwood's relationship to Platinum could potentially implicate the

Affiliate Rule.  Nordlicht could have disclosed Beechwood's relationship with

Platinum to Shearer and sought legal advice.  But instead, "Nordlicht and his

-----

management and policies.  Similarly, in contrast to *Rothstein v. AIG*, 837 F.3d 195, 207-09
(2d Cir. 2016), where we found that AIG lacked control over several employee benefit
plans because the Employee Retirement Income Security Act of 1974 ("ERISA") imposed
stringent limitations on AIG's authority to manage the plans, here there was no
complicated regulatory scheme that restricted Platinum's ability to control Beechwood.
In *Grail Semiconductor, Inc. v. Stern*, No. 2:13-cv-03687-SJO-AGR, 2014 WL 12647935, at
*4-5 (C.D. Cal. Feb. 27, 2014), the court merely denied a motion for summary judgment
because it concluded that there were material disputes of fact as to the defendant's
affiliate status for purposes of section 4(1) of the Securities Act; the court there made no
determination as to what was necessary to qualify for affiliate status.  Moreover, *Grail*
did not involve a company, like Platinum, whose executives (here, Nordlicht and Levy)
ran a core part of the alleged affiliate company's business, controlled the alleged affiliate
company's investment decisions, and controlled the way in which the alleged affiliate
company voted in connection with its investments.  And lastly, *Emerson v. Mut. Fund
Series Tr.*, 393 F. Supp. 3d 220 (E.D.N.Y. 2019), did not discuss in what circumstances an
entity may qualify as an "affiliate" and therefore has no relevance here.

colleagues played their cards close to their vests by providing limited and

potentially contradictory information to Shearer about PPCO and PPLO while

concealing the extent of Beechwood's ties to Platinum." *Id.* at *10.  The district

court discounted the May 2014 email exchange, concluding that "[t]here is no

reason to believe Nordlicht meant 'controlled' in the technical sense of 'control'

under the TIA or the bond indenture," and noted that there "would have been

nothing unlawful about Nordlicht simply attempting to persuade individuals at

Beechwood to vote in a certain manner" just like any stakeholder in the consent

solicitation.  *Id.* at *17.  But it was reasonable for the jury to conclude that, in light

of Nordlicht's express statements recognizing that Platinum controlled

Beechwood, Nordlicht understood that Beechwood likely qualified as an affiliate.

While the language in the May 2014 email "could be subject to both legitimate

and nefarious interpretations, the jury did not misinterpret[] the email[] in

concluding the latter."  *Archer*, 977 F.3d at 191 (first alteration in original)

(internal quotation marks omitted).

This conclusion is buttressed by the wealth of other circumstantial

evidence supporting an inference that Nordlicht knew Beechwood was an

affiliate and intended to use Beechwood to defraud the Black Elk bondholders.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

As discussed above, Nordlicht was notified of the Affiliate Rule on several

occasions.  Nordlicht expressed disdain for amending the indenture through any

formal process and directed his co-conspirators not to talk to the lawyers

working on the transaction.  Nordlicht went out of his way to label

communications with his alleged co-conspirators regarding the Affiliate Rule,

Black Elk, and the Renaissance Sale "attorney client privilege" in what the jury

could have reasonably concluded was an effort to cover his tracks.  As one of the

founders of both Platinum and Beechwood, Nordlicht actively monitored the

number of Black Elk bonds collectively and individually held by the Platinum

and Beechwood entities, and exercised control over Beechwood's investments,

including in Black Elk.  And Nordlicht decided to inform Shearer of the affiliate

status of the two other Platinum entities – PPCO and PPLO – only after

confirming that the amendments would pass with just Beechwood's votes.  The

trial evidence, taken together, does not preponderate heavily against the

conclusion that Nordlicht knew Beechwood was an affiliate and acted with

criminal intent in concealing this information from the bondholders.

> 3.  *Nordlicht Concealed Platinum's Ownership of Black Elk Bonds*

The district court further concluded that it would be a manifest injustice to

91

sustain Nordlicht's conviction because it found that there was insufficient

evidence for the jury to conclude that Platinum intended to conceal PPCO and

PPLO's affiliate status from Shearer. *Nordlicht*, 2019 WL 4736957, at *17. In

reaching this conclusion, the district court noted that (1) in or around May 2014,

when Black Elk submitted its consents in connection with the private consent

solicitation process, Shearer was made aware that PPCO, PPLO, and PPVA

collectively owned about $100 million of the Black Elk bonds; (2) a

BakerHostetler memorandum, dated July 1, 2014, indicated that approximately

$90 million of Black Elk bonds were owned by companies that were "friendly" to

Platinum; and (3) Small informed Shearer on August 14, 2014 about PPLO's and

PPCO's bonds. *Id.* We have, however, several problems with the district court's

analysis.

First, even if the district court were correct that the evidence demonstrates

that Nordlicht never intended to conceal PPCO and PPLO's affiliate status from

Shearer (which we conclude it is not), there is, as we have discussed, substantial

circumstantial evidence from which a jury could conclude that Nordlicht

understood that Beechwood was an affiliate and intended to conceal its affiliate

status from the bondholders in order to ensure that the proceeds from the

Renaissance Sale would go to the preferred equity holders.  Because

Beechwood's Black Elk bonds were independently sufficient to fraudulently

secure the passage of the amendments to the Indenture, any disclosures made by

Nordlicht regarding the PPCO- and PPLO-held Black Elk bonds do not

undermine the jury's verdict or lead us to conclude that the evidence

preponderates heavily against the verdict.

Moreover, the purported disclosures upon which the district court relied

do not preponderate heavily against the conclusion that Nordlicht acted with

criminal intent.  The May 2014 disclosure related solely to the private consent

solicitation process and occurred three months prior to the public consent

solicitation process.  This alleged disclosure was not made by Nordlicht in the

course of a discussion with Shearer about the Affiliate Rule.   Instead, it simply

consisted of an email sent to Shearer and Shulse – from outside counsel, not

Nordlicht – towards the end of the private consent solicitation process for the

purpose of demonstrating that the consents Black Elk had received "constitute[d]

a majority of the outstanding [n]otes."  SA.1402-08.  To that end, the email

disclosed the number of bonds held by PPVA, PPCO, and PPLO at that time and

indicated that those bondholders had consented to the proposed amendments.

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

*See id.*  There is no evidence of which we are aware that after being notified of

the Affiliate Rule in March 2014, Nordlicht disclosed the PPCO- or PPLO-held

bonds as having a relationship with Platinum and Black Elk that could render

them affiliates.  Nor is there any evidence that Nordlicht solicited guidance from

Shearer regarding PPCO or PPLO's affiliate status.  The email also disclosed the

Platinum entities' bond holdings as of May 2014, and Platinum transferred many

of these bonds to Beechwood after this date.  The May 2014 disclosure therefore

did not accurately reflect the number of PPCO- and PPLO-held bonds prior to

the public consent solicitation process.

In addition, in connection with the later public consent solicitation process,

Shearer asked Small on several occasions to verify Platinum's and its affiliates'

ownership of Black Elk bonds, and – after consulting with Nordlicht and Levy –

Small repeatedly told Shearer that only PPVA's $18.3 million bonds should be

disclosed and excluded from the calculation.  Nordlicht was aware of how many

Black Elk bonds PPCO and PPLO owned, and Small's email disclosure of the

PPCO- and PPLO-owned bonds to Shearer only after the Consent Solicitation

had passed – when they knew they had enough votes to secure the passage of

the amendments based on the Beechwood-held bonds – supports an inference

94

that Nordlicht understood that PPCO and PPLO would likely be deemed

affiliates and chose not to disclose them.  This inference is further corroborated

by the email evidence that Nordlicht discouraged involving the lawyers and

expressed a desire to circumvent the bondholders.

The BakerHostetler memo upon which the district court relied also does

not render the verdict a manifest injustice.  The memo was not admitted into

evidence and is therefore not a part of the record; the district court excluded it as

hearsay.  On cross-examination, Shearer testified that after the public consent

solicitation process terminated, he later learned of an internal BakerHostetler

memo (dated July 1, 2014) that disclosed that Platinum, along with companies

friendly to it, owned $90 million of Black Elk bonds.  That information, however,

was not disclosed to Shearer at the time of the public consent solicitation process.

Moreover, there is no evidence in the record that Nordlicht provided the

information that formed the basis for this memo, that this memo was completed

at Nordlicht's request, or that the memo opined on the affiliate status of any of

the Platinum-related entities.  Nor is there any evidence that Nordlicht received

or relied on any such memo in formulating his views about the Affiliate Rule.  It

is unclear how a memo unrelated to Nordlicht, undisclosed (at the time) to

Shearer and sent to lawyers who were not working on the public consent

solicitation process negates Nordlicht's intent to conceal the PPCO- and PPLO-

owned bonds, particularly where, as here, Nordlicht affirmatively concealed

information related to PPCO, PPLO, and Beechwood in response to Shearer's

inquiries related to the Affiliate Rule.  While we agree with the district court that

"BakerHostetler attorneys could have communicated better internally . . . and

externally" and that Shearer could have been more proactive in "spot[ting] and

explor[ing] a significant legal issue," *Nordlicht*, 2019 WL 4736957, at *18, we do

not agree, in light of the record evidence as a whole, that Shearer's perhaps less-

than-exemplary legal work in this instance preponderates heavily against a

finding that Nordlicht harbored criminal intent.

We find the district court's reliance on Small's August 14, 2014 email to

Shearer disclosing the PPLO- and PPCO-owned bonds also to be misplaced.  At

this point, the public consent solicitation process had closed and Nordlicht and

Levy had successfully obtained the votes necessary to secure the passage of the

amendments to the Indenture notwithstanding the PPCO- and PPLO-owned

bonds.  Moreover, Small's email gave no indication that Platinum also controlled

the bonds held by Beechwood.  The jury was entitled to infer that Small's email –

sent after the transaction closed and Platinum had secured a sufficient number of

votes to ensure the amendments' passage – was simply an effort to cover their

tracks, rather than an act in good faith.  Viewing the evidence as a whole, a

reasonable jury could have concluded, we think, that Nordlicht acted with the

intent to conceal the PPCO- and PPLO-owned bonds from Shearer.  "[T]he mere

fact that competing inferences existed does not compel a finding that the

evidence preponderated heavily against the verdict."  *Archer*, 977 F.3d at 195.

4.  *Nordlicht's Alternative Grounds for Affirming the District Court's Decision Are Unpersuasive*

On appeal, Nordlicht raises several additional bases for affirming the

district court's decision.  First, Nordlicht argues that a new trial is warranted

because the government asked the jury to convict on a theory of "affiliate" that

has no basis in law.  Second, Nordlicht contends that the record does not support

the inference that the $18.3 million bond disclosure in the Consent Solicitation

was material.  Lastly, Nordlicht argues that the evidence weighed

overwhelmingly against the conclusion that he had criminal intent.  For all the

reasons set forth above, the evidence does not preponderate against the

conclusion that Nordlicht had criminal intent.  We therefore turn to Nordlicht's

first two arguments, which we also conclude lack merit.[7]

>    a)  *The Government Did Not Improperly Argue the Affiliate Rule*

Nordlicht argues that letting the verdict stand would result in manifest

injustice because "the government openly encouraged the jury to apply a version

of the affiliate rule that was entirely unmoored from the applicable legal

definition."  Nordlicht Br. at 51.  Nordlicht points out that the government

argued and elicited testimony from Shearer and Dixon Yee, a Black Elk

bondholder, that the purpose of the Indenture's Affiliate Rule was to ensure that

"affiliated" bondholders who were not looking out for the best interests of the

bondholders could not vote in the consent solicitation process.  *Id.*  Nordlicht also

faults the government for urging the jury – during its closing argument – to use

---

[7]  The government argues that we should not reach Nordlicht's alternative grounds for
affirmance because an appellate court may not affirm "the grant of a new trial under
Rule 33 on a basis other than that identified by the district court."  But as the
government itself acknowledges, we have long held that "we may affirm on any basis
for which there is sufficient support in the record, including grounds not relied on by
the [d]istrict [c]ourt."  *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 183 n.10 (2d Cir. 2019)
(quoting *Ferran v. Town of Nassau*, 471 F.3d 363, 365 (2d Cir. 2006)).  We therefore reject
the government's argument.

common sense in evaluating the evidence of control.  We find Nordlicht's

arguments to be unpersuasive.

As the district court noted in rejecting Nordlicht's challenges to the

government's summation in connection with his Rule 29 motion, in addition to

urging the jury to use their "common sense," the government "also informed

jurors that they 'will have the definition of affiliate' and 'should ask for it, it is in

the indenture, but it is the power to control.'"  *Nordlicht*, 2019 WL 4736957, at *12;

*see also* GA.568.  The government further told the jury that "control" was "defined

in the indenture, Government's Exhibit 9507, page seven."  GA.525.  As the

district court explained:  "There is nothing improper about the Government

directing the jury to use the proper standard but also reminding the jury not to

leave its common sense at the door."  *Nordlicht*, 2019 WL 4736957, at *12.

Nor was the government's argument or witness testimony regarding the

purpose of the Affiliate Rule and the TIA so prejudicial that it would be a

manifest injustice to let the verdict stand.  The government's evidence concerning

the Affiliate Rule was based on the text of the Indenture, the Consent Solicitation,

and the TIA.  Shearer testified that the TIA seeks

> to make sure the bondholders who are voting[] are looking out for the best
> interest of the bondholders, not looking out for the best interest of Black

> Elk.  So if Black Elk held bonds, you wouldn't count those bonds in a vote.  In other words, Black Elk couldn't vote its own bonds to amend the indenture to help itself and, by the same token, entities that controlled Black Elk and held bonds, you couldn't vote those bonds either. . . .  [A]nybody that was under a common control with Black Elk, would be picked up by th[e Affiliate] [R]ule.

GA.432–33.  Yee testified that "affiliated" or "interested" bondholders were not permitted to vote in the consent solicitation process.  SA.119–20.  Similarly, the government argued in summation that "the whole point" of the Affiliate Rule is that a person who is "an insider who's voting for their own separate interests and not the bondholders' interest" cannot be counted.  GA.525.  There was nothing improper about this line of testimony or argument.  It merely conveyed the obvious fact that, under the Black Elk Indenture, affiliated bondholders who are looking out for the interests of Black Elk, instead of the larger interests of the Black Elk bondholders, are not permitted to vote on something that alters the rights of all the bondholders.

> b)  *The Defendants' Fraudulent Disclosures and Omissions Were Material*

Nordlicht also argues that the government failed to prove that the misrepresentation in the Consent Solicitation that PPVA and its affiliates held $18.3 million Black Elk bonds was material, because the evidence does not

establish that a reasonable investor would find it important in making an investment decision.  We disagree.

Whether a given omission or misrepresentation is material "is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'"  *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).  To fulfill the materiality requirement, the defendant must show "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted); *see also Litvak*, 808 F.3d at 175 (finding that a misrepresentation is material "where there is a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." (ellipsis in original) (internal quotation marks omitted)).

Here, there was ample evidence to support the conclusion that the defendants' misrepresentation in the Consent Solicitation Statement was material.  The Consent Solicitation Statement provided that the proposed amendments would pass only if a majority of the outstanding bonds, excluding

Nos. 19-3207-cr/19-3209-cr

*United States of America v. Levy*

any bonds affiliated with Black Elk, voted in favor of the amendments.  Yet the

defendants and their co-conspirators disclosed only the $18.3 million bonds

owned by PPVA and otherwise indicated that "neither we, nor any person

directly or indirectly controlled by or under direct or indirect common control

with us, nor, to our knowledge, any person directly or indirectly controlling us,

held any Notes."  GA.819.  By misrepresenting the number of bonds held by

affiliates under common control with Black Elk, the defendants misled the

bondholders into thinking that the outcome of the public consent solicitation

process would be a product of a legitimate vote when, in fact, it was

predetermined based on the votes of the PPCO-, PPLO-, and Beechwood-held

bonds, over which Platinum exercised control.

The number of affiliated bonds was "material to [the] bondholders because

it altered the calculus of consent."  *Nordlicht*, 2019 WL 4736957, at *12.  As the

district court explained in rejecting Nordlicht's argument in connection with his

Rule 29 motion:

> The bondholders knew the total number of bonds involved in the vote –
> $150 million.  If no bonds were held by Platinum affiliates, then the
> consent solicitation would only pass if the bondholders representing over
> $75 million in bonds voted in favor of it.
>
> But the more bonds held by Platinum affiliates, the lower the threshold for

102

the consent solicitation to pass since fewer bondholders have to vote in favor of the amendment for it to pass.  If the bondholders who opposed the amendment but thought it would fail had known that PPCO, PPLO, BAM, or BBIL – in addition to PPVA – were Platinum affiliates, they would have inferred that the amendment would be more likely to pass.  The probability that the amendment would pass mattered to Black Elk bondholders because of the stakes of the amendment:  the bondholders gave up their rights to get paid before the preferred equity holders from the Renaissance [S]ale.  If the bondholders who opposed the amendment knew the amendment was more likely to pass, they would then be more likely to tender their bonds in the consent solicitation if they decided it would not be worth investing in Black Elk in light of the amended indenture.

*Id.*

This conclusion is buttressed by testimony from victim bondholders who explained at trial that accurate information regarding the number of bonds controlled by Platinum would have been important to them in deciding whether to tender their bonds.  Yee, for example, testified that he would have found that information to be important.  Pulvino, another Black Elk bondholder, similarly testified that the number of affiliated bondholders "had a lot of significance . . . because [he] w[as] trying to figure out the probability that the consents would pass" and that probability increased based on the number of affiliated bonds that were excluded from the vote.  GA.487-88.  Pulvino reasoned that if only $18.3 million bonds were affiliates "that meant there were 132 million [bonds] left

outstanding, 150 million minus the 18," and therefore, in order to get a majority vote, Black Elk would need "66 million bonds to vote in favor" of the amendments. *Id.*  Based on this calculus, Pulvino concluded that "that was too many bonds to convince to remove the restricted covenants on the bonds" and he therefore thought that the likelihood of the amendments' passage was slim. GA.488-89.  If, instead, he had known that a much larger number of bonds were affiliates and would therefore be excluded from the vote, the probability of the amendments' passage would have increased and he "would have thought more about tendering [his] notes" because he "wouldn't have wanted to hold th[o]se notes without the protective covenants that were in place."  GA.501-02.

The trial evidence as to materiality leads us to conclude that the evidence does not preponderate heavily against the verdict.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit.  For the reasons explained above, we VACATE the district court's order and judgment and REMAND for further proceedings consistent with this opinion.