```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------  X
                                                            :
    UNITED STATES OF AMERICA,                               :
                                                            :   **ORDER**
                     - against -                            :
                                                            :   16-CR-640 (BMC)
    MARK NORDLICHT,                                         :
    DAVID LEVY, and                                         :
    DANIEL SMALL,                                           :
                                                            :
                              Defendants.                   :
                                                            :
----------------------------------------------------------  X
```

**COGAN**, District Judge.

Defendants David Levy, Mark Nordlicht, and Daniel Small filed separate motions to unseal the grand jury minutes that led to their indictment in this case. The parties' familiarity with the facts is assumed.

Mr. Levy and Mr. Nordlicht argue these minutes are necessary to demonstrate that the government constructively amended the indictment during their trial. Mr. Small believes the grand jury was misled into finding that (1) the votes of PPLO and PPCO were counted as part of a scheme to deprive Black Elk bondholders of the company's most lucrative assets; and (2) the press release concerning this vote was deceptive. Mr. Small also seeks these minutes to determine how the Government convinced the grand jury that Black Elk and other assets were improperly valued when, ultimately, the Court "found that the valuation of Platinum's assets was proper," and the jury was instructed to "accept that as fact."

For the reasons discussed below, the motions are denied.

## I. Applicable Law

The government is usually required to keep matters occurring in grand jury proceedings secret. See Fed. R. Crim. P. 6(e)(2). However, disclosure otherwise prohibited by Rule 6(e)(2) may be made when so ordered by a court in a judicial proceeding. See Fed. R. Crim. P. 6(e)(3)(C)(i). A party seeking disclosure of federal grand jury material must demonstrate a particularized need. See Douglas Oil v. Petrol Stops Northwest, 441 U.S. 211, 217 (1979). This requires a movant to show "that (a) the material sought is needed to avoid a possible injustice, (b) the need for disclosure is greater than the need for secrecy, and (c) the request is structured to cover only material so needed." Cullen v. Margiotta, 811 F.2d 698, 715 (2d Cir. 1987).

These requirements are not easily met. "A defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the Grand Jury's substantial interest in secrecy. United States v. Gibson, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); see also United States v. Sells Eng'g, Inc., 463 U.S. 418 (1983). As a result, requests for wholesale disclosures are generally denied. See, e.g., United States v. Procter & Gamble, 356 U.S. 677, 683 (1958); Baker v. United States Steel Corp., 492 F.2d 1074, 1079 (2d Cir. 1974).

## I. Constructive Amendment During Trial

Mr. Levy and Mr. Nordlicht argue the indictment's allegation that they "caused PPCO, PPLO, BAM, and BBIL to consent to the proposed amendments to the indenture" was proven false at trial. They point to Mr. Shearer's testimony that the PPLO and PPCO votes were not counted in favor of the indenture and the fact that they, therefore, did not control a majority vote. Mr. Levy and Mr. Nordlicht believe these facts forced the government to improperly seek a

conviction on grounds that were not in the indictment. But this is an improper reading of the indictment and an erroneous narrowing of the relevant law.

A constructive amendment of an indictment occurs when evidence at trial and the jury instructions "so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. Lisyansky, 806 F.3d 706, 712 (2d Cir. 2015). Thus, a constructive amendment must change an essential element of the offense. See United States v. LaSpina, 299 F.3d 165, 181 (2d Cir. 2002). "When a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003). The "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment." United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983). "[S]ignificant flexibility in proof [is allowed], provided that the defendant was given notice of the 'core of criminality' to be proven at trial." United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992).

Applying this standard to Mr. Levy and Mr. Nordlicht's alleged scheme demonstrates that the government did not constructively amend the indictment's charges. Although the PPLO and PPCO's votes were not counted, Platinum secretly controlled BAM and BBIL. Those companies' bonds constituted a majority of the votes successfully cast in favor of the indenture. As the Second Circuit observed:

> Shearer determined that the Consent Solicitation had passed based on the following votes: $37,017,000 held by the Beechwood funds (which had consented and not tendered); $600,000 of bonds held by unidentified bondholders (which had also consented and not tendered); and $11,333,000 of bonds held by unidentified bondholders (which had tendered and thus consented). Over 99% of the bonds that voted to consent but not tender were controlled by Platinum and Beechwood, which was Platinum-affiliated and controlled. The Consent Solicitation would not have passed without the Beechwood-held bonds that voted

3

to consent.

United States v. Landesman, 17 F.4th 298, 316 (2d Cir. 2021).  Moreover, once the indenture passed, the indictment alleges Mr. Levy and Mr. Nordlicht ensured PPLO and PPCO's votes were counted in the subsequent press release.  This document stated that $110,565,000, or approximately 73.71%, of the outstanding bonds consented to the new indenture – implying that the vote's result was more overwhelming than it was.

This falls squarely within the scope of the fraud the government alleged in its indictment.  Specifically, the indictment states that the defendants "engaged in a scheme to defraud third-party holders . . . of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over [the bonds]."  Thus, whether PPLO and PPCO's votes were counted or whether Mr. Levy and Mr. Nordlicht controlled a majority of the votes was not central to the charged fraud.  The government only sought to convict the defendants on the grounds that they hid their control over a substantial number of bonds and had those bonds improperly vote for the new indenture.

## II. PPLO and PPCO's Votes

To show that the government may have erroneously convinced the grand jury that PPLO and PPCO's votes were improperly counted, Mr. Small points to three statements: (1) paragraph 85 of the Indictment which provides "[the defendants] caused PPCO, PPLO, BAM and BBIL to consent to the proposed amendments to the indenture agreement but not tender their BE Bonds;" (2) at the time of the Indictment's unsealing the government stated "the defendants made sure only $ 18.3 million of their bond holdings were barred from voting, and that the rest, [ ] some $ 80 plus million bond holdings, cast their vote in favor of Platinum taking the proceeds;" and

4

(3) the government's claim in its opening statement at trial that "[t]he result was guaranteed from the start . . . because the defendants actually voted all of those bonds that they hid away in companies they secretly controlled." These statements do not support Mr. Small's analysis.

First, paragraph 85 of the Indictment does not discuss which bonds voted. It only supports a conclusion that the entities controlled by Mr. Small and his co-defendants consented to the proposed amendments to the indenture agreement and did not tender the BE Bonds. Although this section of the Indictment does not specify which of the defendant-controlled entities were part of the vote, it also does not claim that the defendants successfully had PPCO and PPLO's votes counted. The indictment only states that the new indenture passed, in part, because entities the defendants secretly controlled voted unlawfully to support it. This does not suggest the government prejudiced the defendants by convincing the grand jury that certain entities' votes were counted when, in reality, the government knew that was not the case.

This same paragraph also contains a statement from one of Mr. Small's co-conspirators that the defendants "finished the week with consents at 67%, so the new indenture passed!" Mr. Small states that this number misled the jury because it contains the PPCO and PPLO bonds, which were not counted. But the accuracy of the previous co-defendant's statement is irrelevant. The statement exists only to show what Mr. Small and his previous co-defendants believed at the time – that they had successfully passed a new indenture by obfuscating the ownership of certain voting shares. Thus, the statement's only value comes from the insight it provides into the defendants' state of mind.

Second, the government's statements at the press conference, where it unsealed the indictment, do not suggest that it misled the grand jury. The government has evidence suggesting that the defendants attempted to have PPCO and PPLO vote in favor of the new

indenture agreement, while only disclosing that $18.3 million of the defendants' bonds could not vote. See Landesman, 17 F.4th at 315–16. Thus, the government also correctly said that more than $80 million of bond holdings voted in favor of Platinum taking the proceeds. This statement to the press does not require the additional qualification that Mr. Shearer declined to count the PPCO and PPLO votes after they were cast because the defendants' alleged intent was to have those votes counted. See id.

Lastly, the government's incorrect statement at the opening of trial concerning defendants' secretly controlling a majority of the votes does not evince an improper charge. Even if the PPCO and the PPLO votes were not counted, Mr. Small still allegedly worked with his previous co-defendants to ensure that the new bond indenture would pass. He did this by allegedly transferring voting shares from PPAV to BAM and BBIL – companies the defendants were alleged to have secretly controlled. Ultimately, the majority of the bonds that ended up voting in favor of the new indenture were allegedly owned by entities controlled by or closely associated with Platinum. See id.

### III.     The Press Release

Alternatively, Mr. Small argues that the government's indictment incorrectly implies that the post-indenture press release deceptively stated that $110,565,000, or approximately 73.71%, of the outstanding bonds agreed to the Consent Solicitation. But nothing in the indictment suggests that the defendants' press release was inaccurate on its face. Rather, the Indictment posits that these factually accurate numbers functioned to create an illusion that an overwhelming number of bondholders agreed to the Consent Solicitation's terms, when in reality $ 98,631,000 of those bonds were owned by defendant-controlled entities.

### IV. Platinum's Asset Evaluation

Mr. Small also believes that this Court should permit him to review the grand jury minutes because the grand jury indicted his previous co-defendants for fraudulently evaluating their funds' assets, but this Court found there was insufficient evidence to support a conviction. Without more, this argument is insufficient to meet the high bar required to permit the review of grand jury minutes. Rather than being "litter[ed] . . . with false claims of fraudulent asset valuation," the indictment discusses how Mr. Small's previous co-defendants consistently increased the value of assets that were notoriously difficult to price. This evidence was paired with communications suggesting that Platinum was placed under substantial withdrawal stress from investors and had a significant incentive to overprice its assets to attract more capital.

Mr. Small provides no information or evidence that any fact alleged in the indictment was false or lacked corroboration. Rather, he equates the Court's conclusion that no reasonable jury could find the defendants manipulated Platinum's assets beyond a reasonable doubt with the probable cause standard which permits a grand jury to issue an indictment. Although the former is one of the most stringent fact-finding standards, see Barnes v. United States, 412 U.S. 837, 846 (1973), the latter is far more permissive, see United States v. Mechanik, 475 U.S. 66, 70 (1986). Without any evidence that the government improperly misled the grand jury, Mr. Small's attempt to exploit the difference between the findings of the grand jury and this Court is unavailing.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
      March 4, 2022