**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| - against - | ) |
| | ) |
| MARK NORDLICHT, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

CASE NO.: 1:16-cr-00640-BMC

ECF Case

**SENTENCING MEMORANDUM**
**<u>SUBMITTED ON BEHALF OF DEFENDANT DAVID LEVY</u>**

# TABLE OF CONTENTS

**Page**

I.      RELEVANT SENTENCING CONSIDERATIONS..............................................................1

II.     THE OFFENSE CONDUCT ...................................................................................3

III.    OFFENDER CHARACTERISTICS ........................................................................5

IV.     OFFENSE LEVEL COMPUTATION ......................................................................6

        A.      Mr. Levy's Base Offense Level is 7 ...............................................6

        B.      There Was No "Loss" .......................................................................6

                1.      Only a Minority of Bondholders Can Be Considered as
                        Potential Victims.............................................................................7

                2.      The Amendment to the Indenture Did Not Cause Any Loss to
                        Any Bondholders .............................................................................8

                3.      Even After the Disclosure of the Passage of the Amendment,
                        the Two Bondholder-Witnesses Chose Not to Sell Their Bonds...............11

                4.      The Reasons for the Subsequent Decline in the Bond Price Had
                        Nothing to do With the Offense of Conviction...........................................16

        C.      The Alternative "Gain" Calculation is Improper ....................................18

                1.      Because There was no "Loss," an Alternative "Gain"
                        Calculation is Improper....................................................................18

                2.      Even if Using "Gain" was Proper, the "Gain" Calculation is
                        Erroneous ......................................................................................19

        D.      The Two-Point Enhancement for Ten or More Victims Does Not
                Apply......................................................................................................22

        E.      Mr. Levy Should Receive a Reduction in His Offense Level Based on
                His Minimal Role....................................................................................23

        F.      The Appropriate Advisory Guidelines Calculation ................................24

V.     A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE......................24

     A.     Mr. Levy's Personal History and Characteristics ....................................25

     B.     The Need for the Sentence Imposed – Mr. Levy Has Already Been
            Punished Severely.................................................................................37

     C.     The Purposes of Deterrence Have Been Served ....................................40

     D.     There Is No Need to Protect the Public from Mr. Levy..........................41

     E.     Mr. Levy Does Not Need Treatment .....................................................41

     F.     The Kinds of Sentences Available.........................................................42

     G.     The Need to Avoid Unwarranted Sentencing Disparities.......................43

     H.     The Need to Provide Restitution............................................................44

CONCLUSION..............................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Basic v. Levinson*,
    485 U.S. 224 (1988)................................................................14

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)................................................................14

*Gall v. United States*,
    552 U.S. 38 (2007)..................................................................1

*GAMCO Invs., Inc. v. Vivendi, S.A.*,
    927 F. Supp. 2d 88 (S.D.N.Y. 2013),
    *aff'd sub nom. GAMCO Invs., Inc. v. Vivendi Universal, S.A.*,
    838 F.3d 214 (2d Cir. 2016).....................................................14

*In re Henry Schein, Inc. Sec. Litig.*,
    No. 18-CV-01428 (MKB),
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ..............................14

*Kimbrough v. United States*,
    552 U.S. 85 (2007)...............................................................2, 24

*Pepper v. United States*,
    562 U.S. 476 (2011)................................................................24

*Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*,
    552 U.S. 158 ........................................................................14

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006),
    *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008) ...................................25

*United States v. Booker*,
    543 U.S. 220 (2005)................................................................1

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)...................................................1, 2

*United States v. Ebbers*,
    458 F.3d 110 (2d Cir. 2006)..................................................14, 16

*United States v. Haddock*,
  12 F.3d 950 (10th Cir. 1993) .................................................................18

*United States v. Levy*,
  No. 19- 3207-cr (L) (2d Cir. Nov. 5, 2021) .....................................43

*United States v. Miller*,
  588 F.3d 560 (8th Cir. 2009) .............................................................18

*United States v. Offill*,
  666 F.3d 168 (4th Cir. 2011) .............................................................19

*United States v. Olis*,
  429 F.3d 540 (5th Cir. 2005) .............................................................10

*United States v. Romano*,
  794 F.3d 317 (2d Cir. 2015).............................................................18

*United States v. Rutkoske*,
  506 F.3d 170 (2d Cir. 2007)........................................................10, 16

*United States v. Skys*,
  637 F.3d 146 (2d Cir. 2011).............................................................22

*United States v. Stein*,
  846 F.3d 1135 (11th Cir. 2017) .......................................................14

*USA v. Hussain*,
  No. 16-CR-00462-CRB-1,
  2019 WL 1995764 (N.D. Cal. May 6, 2019),
  *aff'd sub nom. United States v. Hussain*,
  818 Fed. Appx. 765 (9th Cir. 2020) ...............................................20

## STATUTES

18 U.S.C. § 3553(a) ..................................................................... *passim*

U.S.S.G. § 2B1.1 ......................................................................... *passim*

U.S.S.G. § 3B1.2 .................................................................................24

U.S.S.G. § 5B.............................................................................24, 42

U.S.S.G. § 5F1.2 .................................................................................42

U.S.S.G. § 5F1.3 .................................................................................42

David Levy respectfully submits this memorandum and accompanying exhibits, including letters of support, to assist the Court in determining the appropriate sentence to impose at the July 13, 2022 sentencing hearing. For the following reasons, we respectfully submit that a non-custodial sentence is both consistent with the applicable sentencing guidelines and appropriate to serve the purposes of sentencing.[1]

## I.     RELEVANT SENTENCING CONSIDERATIONS

The Court's task is to identify a reasonable sentence that is sufficient but no greater than necessary to promote respect for the law, adequately punish the crime, and deter others. *See* 18 U.S.C. § 3553(a).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court made clear that the Sentencing Guidelines are in fact just that – guidelines – and that courts are not required to impose sentences within the range dictated by the Guidelines. Rather, the Guidelines range is only one of a number of factors the district court is required to take into account when imposing a sentence. *See United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (*Booker* "rendered the Guidelines 'effectively advisory' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns.") (quoting *Booker*, 543 U.S. at 245 (Breyer, J., Rehnquist, C.J., O'Connor & Kennedy, JJ., dissenting in part)); *see also Gall v. United States*, 552 U.S. 38, 48-51 & n.6 (2007) (the sentencing judge must "make an

_____

[1] Mr. Levy submitted his corrections and objections to the Probation Department's draft Presentence Investigation Report (the "PSR") on June 15, 2022, copying the government. As of the date of this submission, we have not heard further from the Probation Department, and have not received anything from the government either in response to the draft PSR or our corrections and objections thereto.

individualized assessment based on the facts presented," and has "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'") (quoting 18 U.S.C. § 3553(a)(1)).  In the instant case, a non-custodial sentence falls within the range of possible sentences called for under the Guidelines when appropriately calculated, as discussed further below.

The full list of factors a district judge must consider in rendering a sentence is set forth in 18 U.S.C. § 3553(a).  In addition to the applicable Guidelines range, included among the factors enumerated in Section 3553(a) are the history and characteristics of the defendant, the nature of the offense, whether the contemplated punishment would serve the purposes of sentencing such as deterrence, public safety and rehabilitation, the kinds of sentences available, and the need to avoid unwarranted sentence disparities.  Taking into account all of the Section 3553(a) factors, a district judge is to "'impose a sentence sufficient, but ***not greater than necessary,***' to accomplish the goals of sentencing[.]"  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)) (emphasis added); *see also Cavera*, 550 F.3d at 189 ("A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors . . . .  In this way, the district court reaches an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing.") (quoting 18 U.S.C. § 3553(a) (citations & footnote omitted)). Here, a sentence of probation and community service is narrowly tailored to achieve the purposes of sentencing as outlined by the Guidelines.

## II. THE OFFENSE CONDUCT

On May 17, 2022, the Probation Department released its PSR for David Levy. Below are corrections and objections to the PSR relating to Mr. Levy's conduct, each of which was submitted to the Probation Department:

PSR ¶ 9. The principal founders of Beechwood were Mark Feuer and Scott Taylor.

PSR ¶ 10. Mark Nordlicht was not responsible for Beechwood's investment strategy.

PSR ¶ 13. Daniel Small did not work under David Levy. Mr. Small was a managing director of Black Elk, and the percentage of any profit share received from Black Elk was divided 2/3 for Mr. Small and 1/3 for Mr. Levy.

PSR ¶ 14. The explosion in 2012 caused financial difficulties for Black Elk. By 2014, however, the prospects for Black Elk had vastly improved and it was receiving new capital and exploring new drilling opportunities.

PSR ¶ 15. Various of Black Elk's oil properties generated positive cash flow in 2014.

PSR ¶ 16. Of the $150 million Black Elk bonds issued and outstanding at the time of the public consent solicitation, $11,433,000 consented to the amendment to the Indenture and tendered their bonds, and another $600,000 consented to the amendment without tendering. (Neither of these groups includes the Platinum entities or Beechwood). As such, it is misleading to state that the change to the consent solicitation "made no sense financially for the BE Bondholders."

PSR ¶ 21. The private consent solicitation was run by lawyers at three different law firms. Those lawyers did not take issue with Platinum voting its bonds to change the Indenture. The lawyers then forwarded the executed votes that they had gathered to individuals at Platinum, and to Mr. Levy.

PSR ¶ 22. The Black Elk Trustee was uncomfortable with the private consent process because there was no effective "strike" date to assure a proper count of the votes as of a specific ownership date. The discomfort had nothing to do with Platinum having voted the bonds it owned or the propriety of those votes.

PSR ¶ 23. David Levy was not responsible for taking the lead on the public consent solicitation, and any such assertion is not supported by the evidence. Indeed, this Court, in its Rule 29 decision, noted that there was no evidence that David Levy was meaningfully involved in the process at all. (*See* ECF No. 800 at 30 ("[T]he Government has adduced no evidence that Levy: considered Beechwood to be an affiliate of Platinum;

3

played any role in shifting Black Elk bonds to Beechwood; or played any role in Beechwood voting its bonds.")).

PSR ¶ 26.  The principal founders of Beechwood were Mark Feuer and Scott Taylor.

PSR ¶ 27.  The fact that David Levy continued to work at Platinum while he was at Beechwood was not hidden from anyone; in fact, his dual role was disclosed to the SEC (*see* DX-2574-1), and Attorney Shearer admitted that Levy corresponded with both his Platinum and Beechwood email addresses (*see* Ex. 1 (trial transcript excerpts) at Tr. 5119).

PSR ¶ 29.  Murray Huberfeld did not work at either Platinum or Beechwood in 2014.

PSR ¶ 30.  The referenced email was written one year before Beechwood was actually formed, and no evidence was presented that this was the structure of Beechwood once it was formed.  To the contrary, evidence was presented showing both ownership in Beechwood, and voting rights in Beechwood after it was formed in 2014, which were entirely different from this March 2013 email. (*See* Ex. 2 (DX-3076)).

PSR ¶ 38.  While Mr. Levy received some emails, there was no evidence that he read those emails, responded to those emails, or acted on those emails.  Therefore, to say that he was "communicating" with others is not accurate.

PSR ¶ 41.  Mr. Levy made no such request.

PSR ¶ 45.  Mr.  Levy was not "deeply involved" in the public consent solicitation, and any assertion that he was is not supported by the evidence.  Indeed, this Court, in its Rule 29 decision, noted that there was no evidence that David Levy was meaningfully involved in that process at all.  (*See* ECF No. 800 at 30).

PSR ¶ 50.  There is no evidence that Mr. Levy sent Attorney Shearer anything.

PSR ¶ 52.  As discussed below in the "Loss" section (*infra* Section IV.B), Mr. Levy did not cause any money to be transferred to him or any other defendant, and in fact, none of the proceeds of the Renaissance sale were sent by Black Elk to Mr. Levy or any other defendant or co-conspirator.  We also object to the word "extract" insofar as it suggests that money was somehow stolen.  Black Elk's payments to the preferred equity holders were those Black Elk was lawfully obligated to make to those equity holders.

PSR ¶ 53.  Nothing was concealed from the lawyers at BakerHostetler.  In an internal memo amongst various Baker partners in July 2014, BakerHosteteler noted that Platinum and entities "friendly" to it controlled approximately $90 million of the Black Elk bonds; this included the Beechwood bonds.  Moreover, Mr. Shearer testified that he discussed the other Platinum bonds with Mr. Small before the public consent solicitation closed and therefore knew about the other Platinum-owned bonds in time to stop the Indenture from

being amended had there been any material issue. (*See* Ex. 1 at Tr. 5110:6-18, 5124:8-5125:1, 5126:4-8).

PSR ¶ 59.  Black Elk did not transfer any proceeds from the Renaissance asset sale to any defendant or to any co-conspirator.

PSR ¶ 64.  There were not ten or more victims who sustained any loss, as discussed below.

PSR ¶ 73.  There were not ten or more victims who sustained any loss, as discussed below.

## III.    OFFENDER CHARACTERISTICS

Below are corrections and objections to the PSR relating to the offender characteristics

for Mr. Levy, each of which was submitted to the Probation Department:

PSR ¶ 91.  Mr. Levy's wife does not earn $1 million annually.  Her earnings over the past four years have averaged approximately $500,000.

PSR ¶ 103.  Mr. Levy has not been self-employed from 2017 to the present earning $1,200,000 per year.  From 2017 to 2020, Mr. Levy was unemployed and was not earning anything.  In 2021, he worked on a transaction that generated income to him of approximately $1.2 million.  In 2022, he was again unemployed and has not earned anything.

PSR ¶ 104.  In 2015 and 2016, Mr. Levy deferred his salary at Platinum in order to allow investors to be paid first.  As a result, he received no salary in those years.  (*See* Ex. 1 at Tr. 5910:9-5913:10).

PSR ¶ 106.  There are several errors in the listing of assets and liabilities:

- Riverside Pictures has a current value of approximately $2.2 million.

- Mr. Levy has no interest in MSG Holdings.  These are investments owned by his wife and by his dependents (from his wife).

- Mr. Levy has no interest in the residence at 121 Seafield Point.  The house is owned by his wife.

- The loan to the museum was a loan by his wife of her property.

- The jewelry is owned by his wife.

- Based on the above, Mr. Levy has **assets** as follows:

    o Chase checking:   Approximately  $   500,000

    o IRA:              Approximately  $   350,000

    o Etrade:           Approximately  $    50,000

    o **Total:**          **Approximately $   900,000**

- As for **liabilities,** the mortgage is an obligation of his wife, not him.

- The rent for the family apartment is $10,000 per month, not $18,500.

- The American Express obligation belongs to his wife, not him.

- The legal fees owed to Wilson Sonsini now exceed $6.3 million.

- He has $0 monthly income.

- *As a result, Mr. Levy has total assets of $900,000 and liabilities exceeding $6.3 million.*

PSR ¶ 110.  Mr. Levy does not have available assets to pay a fine.  He already owes far more than his assets can cover.  Mr. Levy is also a defendant in several civil actions seeking money damages from him.  Those include the parallel SEC enforcement action, a bankruptcy action in Houston relating to Black Elk, and two civil cases pending in the Southern District of New York.

## IV.   OFFENSE LEVEL COMPUTATION

### A.   Mr. Levy's Base Offense Level is 7

Section 2B1.1 of the Sentencing Guidelines applies to securities fraud.  Pursuant to that section, Mr. Levy's offense level is 7.  PSR ¶¶ 64, 71.

### B.   There Was No "Loss"

We agree with the Probation Department that external factors outside the control of the defendants – such as the historic drop in oil and gas prices – substantially impacted the market

for and value of the Black Elk bonds after the change to the Indenture.  *See* PSR ¶ 62.[2]  We

disagree, however, that it is difficult to calculate "loss" in this matter as there was ***no loss***, as

explained below.

          1.      <u>Only a Minority of Bondholders Can Be Considered as Potential Victims</u>

As noted in Paragraph 62 of the PSR, as of the time of the Black Elk consent solicitation

in July 2014, $150 million in Black Elk bonds were issued and outstanding.  Certain of the

bondholders indisputably fall outside the scope of "victims" for any loss analysis.  Roughly two-

thirds of these bonds were owned by PPVA, other Platinum entities, or Beechwood – these

entities cannot simultaneously be considered victims and instruments of the fraud, as the PSR

recognizes.  *See* PSR ¶ 62.  Another significant group of bondholders, who held roughly

$11,433,000 in bonds, voted to tender their bonds.  They were paid in full, experienced no loss,

and therefore cannot be victims.  Finally, an additional group of bondholders, holding $600,000

in bonds, voted not to tender, but to amend the Indenture, *i.e.*, they independently voted to amend

the Indenture and make the Renaissance asset sale proceeds available to the preferred

shareholders, the same outcome that the government claimed to be the object of the conspiracy.

Those bondholders cannot be viewed as victims as they supported amending of the Indenture.

--------

[2] The PSR never concludes that there was, in fact, a loss.  Paragraph 62 "acknowledges the difficulty in assessing loss in this case" and then notes that "when loss cannot be reasonably determined, gain is used as an alternative measure of loss" and cites Application Note 3(B) of U.S.S.G. § 2B1.1.  PSR ¶ 62.  As explained later, a "gain" calculation is only appropriate if a loss has occurred.

Collectively, then, the bondholders who could have experienced a loss held $38,735,000 of Black Elk bonds.[3] The math is set forth below:

|     |                                                                          |                |
| --- | ------------------------------------------------------------------------ | -------------- |
| a)  | PPVA:                                                                    | $ 18,321,000   |
| b)  | Other Platinum entities:                                                 | $ 43,329,000   |
| c)  | Beechwood:                                                               | $ 37,582,000   |
| d)  | Those who tendered (and were paid):                                      | $ 11,433,000   |
| e)  | Those who voted to change the Indenture but who did not elect to tender: | $   600,000    |
| **TOTAL:**          |                                                    | **$ 111,265,000** |
| **Remaining bonds:** |                                                   | **$  38,735,000** |

## 2.    The Amendment to the Indenture Did Not Cause Any Loss to Any Bondholders

The government's theory of the case was that Mr. Levy and others conspired to use undisclosed affiliated bonds to improperly change the Black Elk Indenture so that preferred equity holders could be paid ahead of bondholders, thereby causing harm to the bondholders. Putting aside this Court's prior finding that "[e]ven making reasonable inferences in favor of the Government, and deferring to the role of the jury in weighing evidence and assessing credibility, the Government failed to meet its burden of proving beyond a reasonable doubt that Levy had

---

[3] This simple math is sufficient to rebut the government's argument that the Defendants' conduct caused, "conservatively," $70,000,000 in losses. *See* PSR ¶ 60. The independent bondholders who, by taking no action, effectively voted against the amendment represented $38,735,000 of the outstanding bonds. Accordingly, only those unaffiliated bondholders who chose not to tender or approve the change to the Indenture could have been potentially injured by Defendants' conduct.

criminal intent" (ECF No. 800 at 27-28) and accepting the Second Circuit's decision that certain inferences could properly be drawn from the evidence the government presented, it is plain that the change to the Indenture did not cause any loss to any of the non-affiliated bondholders who elected not to tender.

At trial, the government called two bondholder witnesses (Dixon Yee and Todd Pulvino), each of whom worked for a "vulture" fund that was in the business of buying distressed debt. The two funds were referred to at the trial as CNH and Phoenix. In July 2014, CNH held $7.1 million in Black Elk bonds, and Phoenix held $7 million of Black Elk bonds.

The Black Elk bonds, at the time of the consent solicitation, were trading at $97.835. *See* Ex. 3 (Bloomberg list of historical Black Elk bond prices). As part of the consent solicitation, Black Elk bondholders were offered $100, which was a premium to the then-current market price.

The witnesses from CNH and Phoenix both testified that they expected the Indenture vote to fail because, in their view, Black Elk bondholders would not have an economic interest in allowing preferred equity holders to be paid ahead of them. As such, CNH and Phoenix did not tender and accept payment of $100. *See* Ex. 1 at Tr. 3832:21-3833:8 (Yee); 5214:12-17 (Pulvino). However, had they known that affiliated votes would be counted, then they "would have thought more about tendering [the] notes," as Mr. Pulvino explained, because they "wouldn't have wanted to hold those notes without the protective covenants that were in place." Ex. 1 at Tr. 5223:2-17. In other words, the two witnesses claimed that they had been deceived into declining to tender because they believed the bondholders would vote against the amendment, and had they known affiliated votes would be counted, they might have tendered.

On August 14, 2014, Black Elk publicly announced through a press release that the consent solicitation had been approved by a majority of the bondholders and that the Indenture had been amended. The bondholder-witnesses both testified that they saw the press release at or around the time it was issued. *See, e.g.*, Ex. 1 at Tr. 3833:9-17 (Yee); 5211:20-5212:1 (Pulvino). Accordingly, as of mid-August, the bondholders, including these investor-witnesses, had learned that the "protective covenants" were no longer in place and that Black Elk could make payments to the preferred shareholders ahead of the bondholders.

If the government's theory that the fraudulent change to the Indenture resulted in harm to the value of the bonds, then the market price for the bonds should have dropped on the date the investors and the market learned the amendment had been approved. *See, e.g.*, *United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007) (noting that "'there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines' and that the portion of a price decline caused by other factors must be excluded from the loss calculation.") (quoting *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005); citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005)). But there was no negative impact on the market for Black Elk bonds at all following the press release. On July 10, 2014, with the consent solicitation pending, the bonds were trading at $97.835. On August 19, right *after* the press release, the bonds were trading at $99.937. And on August 22, 2014, the following week, the bonds continued to trade up to $100.2666. *See* Ex. 3. In other words, after the Indenture was amended and with the market fully aware of the change allowing preferred equity holders to be paid ahead of bondholders, Black Elk bonds were trading higher and even

*above par*.[4]  Therefore, even accepting the testimony of the bondholder witnesses that they might

have tendered if they knew that affiliated bonds were going to vote to change the Indenture,

those bondholders could still have sold their bonds *after* they knew all the relevant facts and still

realized par (or higher).  As a result, the bondholders did not suffer any loss on account of the

representation that affiliated bondholders would *not* vote in connection with the amendment

proposition.

> 3.  Even After the Disclosure of the Passage of the Amendment, the Two
> Bondholder-Witnesses Chose Not to Sell Their Bonds

So what did these sophisticated investors then do?  They could have chosen to sell their

Black Elk bonds for $100, a price more than two dollars higher than before the consent

solicitation was sent out to Black Elk bondholders, and the same or even higher than what they

would have received had they tendered.  And had these investors decided to sell their Black Elk

bonds after they learned the Indenture had been amended – that is, after the conduct they both

said made no economic sense – then neither Phoenix nor CNH would have incurred any loss.

Instead, these bondholders elected *not* to sell their respective Black Elk bonds.  In fact,

even if the consent solicitation had said the following:  "*The bonds owned by the Platinum

entities will be excluded from the vote, but the bonds owned by Beechwood, which Platinum

controls, will be counted and will likely cause the consent solicitation to pass,*" these

bondholders would have done nothing different at all, as evidenced by their decision ***not to sell***

---

[4] The trading data establishes that some number of Black Elk bondholders sold their bonds after the Indenture was changed and received at or above par for those bonds.  These bondholders clearly did not suffer any loss, and would need to be excluded from any "loss" calculation.

their bonds after the press release was issued, and after they believed that the vote must have somehow been corrupted.

Of course, these sophisticated investors had sound economic reasons for not selling their bonds either in the tender or after the Indenture was changed. The bonds were paying an extremely high interest rate of 13.75%, and Black Elk had not missed a single interest payment to date. Moreover, independent third-party valuation firms had confirmed both before and after the consent solicitation that Black Elk had more than sufficient assets to meet its obligations to each of its bondholders, its preferred equity holders, and its common equity holders:

- The third-party valuation in the quarter immediately **_before_** the consent solicitation concluded that Black Elk had equity value in the range of $168-201 million **_after deducting_** the value of the $150 million in bonds and the $104 million in preferred equity. *See* Ex. 4 (excerpt of 1-DX-5214, Sterling valuation for the quarter ending June 30, 2014) at Sterling 000004125.

- The third-party valuation for the quarter immediately **_after_** the change to the Indenture (and after oil prices had started their precipitous decline) concluded that Black Elk had equity value in the range of $49-74 million **_after deducting_** the value of the remaining $138 million in bonds and the remaining $8 million in preferred equity. *See* Ex. 5 (excerpt of 1-DX-5215, Sterling valuation for the quarter ending September 30, 2014) at EDNY-PP-SW1-002398880.[5]

Even the market had independently determined that the change to the Indenture did not cause any decline in the value of Black Elk bonds as it valued the Black Elk bonds after the Indenture change at par or even above par. *See* Ex. 3.

---

[5] Your Honor instructed the jury that Platinum's valuations were proper and correct. *See* Ex. 1 at Tr. 7101:9-18 ("Ladies and Gentlemen of the Jury, you have heard testimony and seen exhibits about Platinum's valuation of its assets. Judge Cogan has found that the valuation of Platinum's assets was proper and you must accept that as a fact. Therefore, fraudulent valuations cannot serve as a basis to convict any defendant."). Based on the Court's instruction to the jury, the defendants could not have been able to foresee any inability on the part of Black Elk to make payment in full on each of its securities.

Most definitive of all (if there remained any lingering doubt that the change to the Indenture did not cause any diminution in the value of the Black Elk bonds), one need look no further than the fact that Phoenix went ahead and ***purchased $3 million more bonds immediately after it learned the Indenture had been changed.*** *See* Ex. 1 at Tr. 3956:4-9 ("Q: Can we agree, sir, that you were so shocked and flabbergasted that this consent solicitation passed that within just a couple of days you were buying more Black Elk bonds?  Can we agree on that?  A: Yes.").[6]

Thus, after this supposed "fraud" was completed, and after all relevant information was then made known to investors and to the market, Black Elk bondholders, who could have still sold their bonds and received par or higher, decided to keep their bonds.  Unlike a pump and dump scheme, where the price of shares drop precipitously upon the disclosure of the relevant facts and investors are left with worthless securities that they cannot sell, here, the value of the Black Elk bonds did not drop at all, precisely because the market and the valuation companies could see that, absent some unforeseen circumstance, Black Elk had more than sufficient assets to meet all of its obligations to its investors.

The lesson of these two sophisticated investors, CNH and Phoenix, is that had they been aware of all relevant information at the time of the consent solicitation, they would have done nothing different at all from what they did, as evidenced by their decision not to sell after they saw the press release and knew that the Indenture had been changed.  In possession of all material information, they decided that they wanted to keep their Black Elk bonds (and in

---

[6] These $3 million in bonds were sold after the Indenture had been changed, and were sold above par, thereby making clear that the holder(s) of these bonds also did not suffer any loss.

Phoenix's case, buy even more). In other words, these bondholder investors did not rely upon and were not impacted by any alleged deceptive act by the defendants. *See In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428 (MKB), 2019 WL 8638851, at *27 (E.D.N.Y. Sept. 27, 2019) (citing *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 810 (2011); *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.,* 552 U.S. 158, 159 2007)); *GAMCO Invs., Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 99 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016) ("*Basic* states that: '[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.'") (quoting *Basic v. Levinson,* 485 U.S. 224, 248 (1988)); *see also United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (finding that loss causation principles in civil fraud cases apply in the criminal sentencing context while noting that "[t]he loss must be the result of the fraud" and may be proven by evidence of express reliance on misrepresentations or reliance on integrity of existing market); *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) ("The parties agree that the government must show that the investors relied on Mr. Stein's fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. § 2B1.1.").

Based on the above, these bondholder investors sustained no Guidelines "loss."[7]

As for the remaining $24 million in unaffiliated and untendered Black Elk bonds, they were situated no differently than the bondholder witnesses that were called from CNH and Phoenix. These unidentified bondholders could have sold their bonds after the press release was

---

[7] As noted in the PSR, one of these investors actually made a profit of over $4 million from its Black Elk investments. *See* PSR ¶ 61.

issued and all material facts were known, thereby avoiding any loss. And we know that some in fact did just that, as there was a market for Black Elk bonds both during and after the consent solicitation, and sales were consummated at or above par (including to Phoenix). But beyond that, the government presented no evidence at all as to who they were, what they knew or did not know, what they did or did not do after the change to the Indenture was publicly announced, or what their motivations might have been in guiding any their respective trading decisions.[8] Accordingly, there is no evidentiary basis for treating them any differently than Messrs. Yee and Pulvino, who each made the independent decision to continue to hold their respective bonds after the Indenture was changed.

---

[8] We also note that the PSR suggest in several places, *see, e.g.,* Paragraphs 16 and 23, that the purported "scheme" here was to pay preferred equity holders rather than to use the proceeds from the Renaissance sale to repay bondholders. It is important to note, however, that the Black Elk bondholders were never ***entitled*** to the proceeds of the asset sale; they had no right to demand payment and had no entitlement to the Renaissance sale proceeds. Rather, pursuant to the Indenture, even in its pre-amended form, Black Elk was permitted to use the asset sale proceeds for other purposes and had every lawful right not to give the bondholders even one penny. Section 4.10(b) of the Indenture established the permissible uses of proceeds from an asset sale (prior to the amendment to the Indenture), and the Company was permitted to choose "at its option" not to repay indebtedness, but instead: (1) to acquire all or substantially all of the assets of another oil and gas company; (2) to acquire a majority of the voting stock of another oil and gas company; or (3) to make capital expenditures or purchase long-term assets. *See* Ex. 6 (GX-9507) at BH-BEFILE0013935. Even the government's witnesses confirmed that the bondholders were not entitled to the proceeds of the asset sale. *See* Ex. 1 at Tr. 3936:9-14, 3920:25-3921:8 (Yee testifying that "before any change to the indenture . . . the bondholders were not legally entitled to any of the proceeds from the Renaissance sale . . . ."); 4978:15-25 (Shearer testimony: "Q: They don't have to pay the bondholders, correct? A: Correct."). Accordingly, any suggestion that the bondholders were deprived of payments they were entitled to from the asset sale proceeds is erroneous.

4.      The Reasons for the Subsequent Decline in the Bond Price Had Nothing
to do With the Offense of Conviction

The only reason that Black Elk did not subsequently meet its obligations in full to its bondholders is that there ensued historic and unforeseeable drops in the prices for oil and gas that started in the months immediately ***after*** the Indenture was amended. As the Probation Department has already noted, these historic drops were not foreseeable to the defendants, *see* PSR ¶ 62, and therefore cannot be a basis for determining "loss" for Guidelines purposes.

Controlling case law from the Second Circuit confirms this view. *See Rutkoske*, 506 F.3d at 179-80 (remanding due to district court's "basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in NetBet share price") (citing *Ebbers*, 458 F.3d at 128 ("Many factors causing a decline in a company's performance may become publicly known around the time of the fraud and be one cause in the difference in price between X-day and Y-day. . . . For example, the dot-com bubble burst and its likely negative future effect on WorldCom's business was public knowledge. The effect of that knowledge would be a downward pressure on share price not attributable to the defendant. Losses from causes other than the fraud must be excluded from the loss calculation.")).

That it was the drop in oil and gas prices that caused the diminution in the value of the Black Elk bonds (and not the change to the Indenture) can easily be confirmed from two sources: (i) the impact on the price of Black Elk bonds after the change to the Indenture was publicly announced – where there was no change; and (ii) the impact the declining oil and gas market had on the price of Black Elk bonds and other comparable oil and gas companies – a dramatic and

uniform change – as set forth in the chart below.  As is evident, the impact of the historic price

drops was acutely felt at all such companies.[9]



In conclusion, the government came forward with evidence as to two bondholder

witnesses, and those witnesses, fully informed of all relevant facts, elected not to sell their bonds,

which would have obviated any loss.  That external market forces, which had nothing to do with

Black Elk or the defendants, then led to a sharp decline in the value of Black Elk bonds cannot

be properly attributed to the conduct of the defendants.  As a result, there was no Guidelines

"loss" sustained by any Black Elk bondholder.

---

[9] The price of oil at the time the Indenture was changed in August 2014 was $103.59.  The price of oil at the time of the Black Elk bankruptcy filing in August 2015 was $42.87.

**C.    The Alternative "Gain" Calculation is Improper**

   1.    Because There was no "Loss," an Alternative "Gain" Calculation is Improper

The Probation Department at Paragraph 62 of the PSR "acknowledge[d] the difficulty in assessing loss in this case, when external, market-related forces are out of the defendants' control or ability to foresee."  In the face of these challenges, the Probation Department availed itself of Application Note 3(B) of Section 2B1.1, which provides that "the gain that resulted from the offense [may be used] as an alternative measure of loss but only if there is a loss [that] reasonably cannot be determined."  *See also United States v. Romano*, 794 F.3d 317, 339 (2d Cir. 2015) ("[W]e interpret the authorization for a sentencing court to use gain for 'the determination of loss under subsection (b)(1),' Guidelines § 2B1.1 Application Note 3, to be premised solely on actual loss: Gain can be resorted to 'only if there is a loss.'"); *United States v. Miller*, 588 F.3d 560, 567 (8th Cir. 2009) ("Where there is no actual loss and no intended loss, the Guidelines do not permit the substitution of the 'gain' measure for loss."); *United States v. Haddock*, 12 F.3d 950, 960 (10th Cir. 1993) ("The defendant's gain may be used only as an 'alternative estimate' of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims.").  As discussed below, the Probation Department's determination to use "gain" as a proxy for "loss" was incorrect.

Following the change to the Indenture, the unaffiliated bondholders had all the relevant information and made their own investment decisions.  Subsequent historic drops in oil and gas prices may have affected the profitability of those investments, but as explained above, the defendants cannot be held responsible for external market forces, since they are not the insurers of the bondholders; the defendants made no guarantees about the prices of oil and gas, and the

bondholder-witnesses at trial admitted that they considered changes in oil and gas prices as a risk factor that could impact both the value of the bonds and Black Elk's ability to meet its future obligations to investors. *See* Ex. 1 at Tr. 5271:10-16 (Pulvino); 3916:14-3917:11(Yee). Indeed, the consent solicitation itself contained various risk disclosures relating to the Black Elk bonds. *See* Ex. 7 (GX-8406); Ex. 1 at Tr. 3928:12-3933:21 (Yee); Tr. 5254:1-5255:7 (Pulvino). As there was no Guidelines "loss" here, using "gain" as a proxy for "loss" is expressly disallowed.

2.    Even if Using "Gain" was Proper, the "Gain" Calculation is Erroneous

Even if the Probation Department was justified in using "gain" as a proxy for "loss," the gain calculation set forth in the PSR is plainly incorrect. The Probation Department calculated a "gain" amount by aggregating amounts received by the Defendants and supposed co-conspirators. *See* PSR Paragraph 62. In this way, the Probation Department included (i) $256,679 to Levy; (ii) $102,672 to Small; (iii) $7,187,005 to Jules Nordlicht; (iv) $513,357 to the Jules/Barbara Nordlicht Foundation; and (v) $1,026,677 to the Huberfeld Family Foundation.

Although the law does permit the gains of co-conspirators to be included for Guidelines' purposes, *see United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011) (collecting cases), the government did not present ***any*** evidence that Jules Nordlicht, the Jules/Barbara Nordlicht Foundation, or the Huberfeld Family Foundation were co-conspirators in the Black Elk "scheme." Indeed, there was no evidence presented of any kind that Jules Nordlicht or either of these foundations played the slightest role with respect to changing the Black Elk Indenture. Accordingly, the amounts received by Jules Nordlicht and the Foundations may not be included as part of "gain" based on these individuals or entities being alleged co-conspirators. *See id.* (noting that "Application Note 3(B) to U.S.S.G. § 2B1.1 states that a court 'shall use the gain

that resulted from *the offense*,'" which "refers to the *conspiracy*," and as such, the only gains that can be attributed to the defendants are reasonably foreseeable gains "of the conspiracy") (emphases added in original); *see also USA v. Hussain*, No. 16-CR-00462-CRB-1, 2019 WL 1995764, at *14 n.9 (N.D. Cal. May 6, 2019) (concluding that "the 'gain resulting from the offense' is the gain realized by the defendant and some other culpable individual acting in concert with the defendant, not just all the gain that flowed from the offense conduct to people unconnected to the criminal scheme."), *aff'd sub nom. United States v. Hussain*, 818 Fed. Appx. 765 (9th Cir. 2020) (hereinafter "*Hussain*").

The PSR's alternative basis for including these amounts appears to be that Jules Nordlicht and Murray Huberfeld were family members of the defendants. But we are not aware of any legal authority – either in the Guidelines or in caselaw – that "gain" received by investors who happen to be family members of a defendant may properly be included as a "gain" for purposes of calculating an alternative basis for "loss" under the Guidelines. *See, e.g.*, *Hussain*, 2019 WL 1995764, at *14 n.9.

Moreover, neither the Jules/Barbara Nordlicht Foundation nor the Huberfeld Family Foundation are in fact relatives of the defendants. These are charitable foundations for which no family member of a defendant received ***any*** of the proceeds of those repayments. Accordingly, the factual premise underlying the inclusion of those amounts is simply wrong.

The PSR also makes repeated reference to the Defendants causing Black Elk to make payments to themselves and their co-conspirators. *See, e.g.* PSR ¶¶ 52, 59. But these statements are also erroneous. Black Elk did not distribute even one penny of the Renaissance asset sale proceeds to any Defendant or to any alleged co-conspirator. Rather, Black Elk used proceeds of

the asset sale to extinguish the preferred equity that was paying interest at 20%. But no Defendant or alleged conspirator was a holder of preferred equity. David Levy, Daniel Small, Jules Nordlicht and the Foundations were investors in an investment vehicle named PPBE – Platinum Partners Black Elk. By the time of the consent solicitation, however, that Fund owned Black Elk *bonds, not preferred equity.* As a result, when the proceeds from the Renaissance sale were distributed to preferred equity holders, none of those proceeds were distributed to the defendants or any of the other investors in PPBE. While some of the proceeds were distributed to PPCO – as that Fund owned Black Elk preferred equity – and while PPCO thereafter used certain of its assets to wind down the PPBE Fund by repaying each of the investors to that Fund, Black Elk did not pay one penny of the Renaissance asset sale proceeds to any Defendant, to any family member of a Defendant, or to any alleged co-conspirator purportedly involved in the Black Elk "scheme."

In addition, the purported "gain" calculation seems to improperly equate repayment of Black Elk's legal obligations to one class of its investors as some kind of theft of assets. It is critical to remember that the funds distributed to preferred equity holders were legally *owed* by Black Elk to those preferred equity holders, and the repayment of those equity holders caused a dollar-for-dollar reduction in Black Elk's obligations to its investors. No one here received funds to which they did not otherwise have a legal claim, and the repayment on the preferred equity was made at a time when Black Elk had more than sufficient assets to cover all of its equity and debt instruments.

Finally, the suggestion that David Levy himself realized a "gain" is also demonstrably wrong. As an investor in PPBE, David Levy owned an investment in a fund that owned *Black*

***Elk bonds***.  If no change to the Indenture had been made and Black Elk had used the asset sale proceeds to repay the bondholders (as the government suggested Black Elk should have done), Mr. Levy would have received the identical $256,000 payment that he received when PPCO decided to wind down the PPBE fund and repay that fund's investors.  As such, the distribution to Mr. Levy cannot amount to a "gain" to Mr. Levy as a result of the "scheme," as he would have obtained the identical repayment in the absence of any purported "scheme."

Based on the above, there was no Guidelines "loss," and the 18-point enhancement in Paragraph 72 of the PSR should be eliminated.

### D.    The Two-Point Enhancement for Ten or More Victims Does Not Apply

In Paragraph 73 of the PSR, the Probation Department added two points to Mr. Levy's offense level as "the offense involved 10 or more victims."  The Guidelines define a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1, Application Note 1 Definitions.  This enhancement does not apply.

First, as explained above, there was no loss here.  It was the historic drop in oil and gas prices that caused Black Elk's inability to meet its obligations to its investors, and that drop was not foreseeable to the defendants.  "'[V]ictims,' within the meaning of subsection (b)(2), are only those persons or entities who sustained 'actual loss determined' by the court 'under subsection (b)(1).'"  *United States v. Skys*, 637 F.3d 146, 153 (2d Cir. 2011) (remanding to determine whether targeted financial institutions suffered losses and could be considered victims under (b)(2)(A)) (citation omitted).  "Actual loss" is defined under the Guidelines as "the reasonably foreseeable pecuniary harm that resulted from the offense."  Commentary to § 2B1.1(b)(1).  On this basis alone, the enhancement plainly is not applicable.

Second, as also explained above, the government presented evidence from only two bondholder witnesses, and neither of them sustained any loss that was proximately or foreseeably caused by a change to the indenture. The government presented no evidence as to the identity of any other bondholder and no evidence as to what any other such bondholder may or may not have done in response to the change to the Black Elk indenture.

Third, the Probation Department's determination to use "gain" in place of "loss" negates the enhancement proposed by Probation. As there is no identifiable victim that sustained any actual loss as a result of the change to the Indenture, there cannot be more than ten such victims.

Accordingly, the two-point enhancement for ten or more "victims" is not appropriate.

### E.     Mr. Levy Should Receive a Reduction in His Offense Level Based on His Minimal Role

The Court is very familiar with the facts of this case, having sat through a lengthy trial in an indisputably complex matter. With respect to the nature and circumstances of the offense as it relates to Mr. Levy, the Court was able to observe firsthand the extremely limited nature of Mr. Levy's conduct when it came to the change to the Black Elk Indenture. *See, e.g.*, ECF No. 800 at 30-32 ("[T]he Government has adduced no evidence that Levy: considered Beechwood to be an affiliate of Platinum; played any role in shifting Black Elk bonds to Beechwood; or played any role in Beechwood voting its bonds. . . . [T]he evidence of intent the Government adduced is not sufficient to sustain Levy's conviction even an under an aiding and abetting theory.").

While we had hoped that Your Honor's careful review of the factual record had ended the case when the Court granted Mr. Levy's Rule 29 and Rule 33 motions, and while we were extremely disappointed and alarmed with the Second Circuit's decision to allow the types of inferences from emails to be drawn as described in that decision – particularly where there was a

complete absence of evidence that Mr. Levy read those emails, responded to them, or acted upon them – we must accept the Second Circuit's decision, subject only to our pending petition for certiorari to the Supreme Court. But it would not be inconsistent for the Court to adhere to the Second Circuit's decision yet still abide by its strongly held view that Mr. Levy's role, when it came to the Black Elk Indenture change, was at most, extremely limited. Accordingly, pursuant to Guidelines Section 3B1.2, and based on the Court's evaluation of Mr. Levy's conduct relating to the Black Elk scheme, we submit that Mr. Levy is entitled to a mitigating role reduction of four levels.

### F. The Appropriate Advisory Guidelines Calculation

Based on the above, Mr. Levy's Total Offense Level is 3. As noted in the PSR, Mr. Levy has no prior criminal history, and therefore is in Criminal History Category I. Based upon a Total Offense Level of 3 and a Criminal History Category of I, the applicable advisory Guidelines Range is 0-6 months. This places Mr. Levy within Zone A of the Guidelines Sentencing Table, for which probation is an authorized Guidelines sentence under Guidelines Section 5B1.1.[10]

## V. A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE

As the Court is well-aware, a criminal sentence must be "sufficient, but not greater than necessary" to meet the objectives of sentencing. 18 U.S.C. § 3553(a); *Kimbrough*, 552 U.S. at 111. In crafting a sentence, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011). Applying these standards – and regardless of

---

[10] Even without an adjustment for his minimal or minor role in the offense of conviction, Mr. Levy would still fall within Zone A.

the applicable Guidelines range – anything other than a non-custodial sentence would be "greater than necessary" to achieve the objectives of sentencing.

### A.    Mr. Levy's Personal History and Characteristics

18 U.S.C. § 3553(a)(1)—which requires courts to consider "the history and characteristics of the defendant"—weighs particularly heavy among the sentencing factors.

As noted by Judge Rakoff:

> surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd,* 301 Fed. Appx. 93 (2d Cir. 2008).

We respectfully submit that the good from David Levy's life dramatically outweighs the bad and justifies a probationary sentence.  Indeed, as the outpouring of support that David has received from family, friends, neighbors, business associates, religious leaders, prominent members of the community, and even representatives of Black Elk and investors of PPVA demonstrates (*see* Exhibits 8-109 attached hereto, respectfully submitted for Your Honor's consideration), David has lived a life filled with generosity and integrity.  The most common refrain of the letters sent in support of David is that he is a "mensch" – a Yiddish word roughly translated to mean "someone to admire and emulate, someone of noble character.  The key to being 'a real mensch' is nothing less than character, rectitude, dignity, a sense of what is right, responsible, decorous."  Ex. 83.

David's upright character stems from his upbringing. David was born on December 22, 1984, in New York, New York to Isaac and Bina Levy. PSR ¶ 88. Their firstborn child, Isaac and Bina describe David as an attentive, respectful, caring son; in Isaac's words, "[h]e is truly a good person and I love him with all my heart." Ex. 65. Isaac and Bina continue to fully support David; as the Court is aware, they were present every single day of the thirteen-week trial. PSR ¶ 88. David is descended from prominent and influential rabbis, and through his parents, have continued in their philosophy of charity and respect. *See* Ex. 62 & 65. David is the eldest of four boys, each of whom look up to David as a role model. *See* Exs. 63, 66 & 67. According to Michael, one of David's younger brothers, David is "a person that is oriented by a sense of responsibility. . . . He has always been kind, respectful, compassionate, reliable, helpful, and overall a person I am proud to call my brother." Ex. 66. Coming from a large family, David is also looked up to by his many cousins. *See, e.g.*, Exs. 35, 36 & 41.

David is the grandchild of Holocaust survivors, and from the time he was a young child, those in his life have marked his deep and innate respect for his grandparents, who, according to David's father-in-law, served as "the source of David's deep faith and humility." Ex. 52. Longtime friends of the Levy family recall that "[e]ven when the other teens were socializing outside [David] would stand by his grandfather's side all through the [temple] prayer service. And then we'd see him walking them home - a tall young boy leaning down to hold his grandparents' arms. It was a heartwarming sight." Ex. 103; *see also* Exs. 9, 11, 27, & 79. David's respect for his elders extends far beyond his own grandparents, however, and those who know him share stories of David taking time to visit and support elderly people in his community

"[a]ll without fanfare or credit." Ex. 107; *see also, e.g.*, Ex. 91. It was David's selflessness and abiding respect for older generations that first attracted him to his eventual wife, Daniella:

> It began when he simply noticed my grandparents (not knowing they were my grandparents) behind him on the taxi line, coming out of an event in Jerusalem, and insisted they take his cab. That was the second night we met. It was reinforced by the way in which he would interact with his own grandparents, both Holocaust survivors with incredible stories of survival, who were like a second set of parents to him. The genuine admiration, love, care, patience, and respect he showed them was truly special to observe.

Ex. 64; *see also* PSR ¶ 93.

From a young age, David "learned the value of hard and honest work" not for praise or reward, but simply because it was the right thing to do. Ex. 17. This included, amongst other things, working several days a week as a teenager and college student at his grandparents' fast-food restaurant, where he would serve customers at the counters or bus tables. *See, e.g.*, *id.* His penchant for hard work extended to academics, and he excelled as a student, obtaining a bachelor's degree in Finance from Yeshiva University in 2007. *See* PSR ¶ 100. David left a strong impression as a kind and diligent student at Yeshiva, such that years after he graduated, professors and staff would continue to remark about him to his brother Michael, who followed in his footsteps. *See* Ex. 66.

In 2011, David married the love of his life, Daniella. PSR ¶ 91. Daniella describes David as a "deeply competent, deeply caring, deeply generous person who will go out of his way to help anyone in need." Ex. 64; *see also* PSR ¶ 93 (Daniella describing David as "'an extraordinary human being' who 'goes above and beyond' to help."). Even with his own large extended family, David quickly integrated into Daniella's family as well. Lorraine Kahane, Daniella's grandmother, states that David is an "intelligent, caring person," and "exactly the kind

of person every grandmother would want for her granddaughter." Ex. 47. Those who know David and Daniella describe their marriage as the bedrock of their lives, and together they have built a home that is always open to others, where friends and strangers alike can find "safety and understanding[.]" Ex. 59. Friends and family remark how supportive David is of Daniella's professional career and personal causes, including supporting women's rights; as one friend puts it, "[t]hough women are occasionally acknowledged for supporting their game-changing husbands, men rarely are. David is one of those silent champions. I legitimately have never seen a greater cheerleader." Ex. 95; *see also* Ex. 43.

The pride of David and Daniella's lives are their three daughters, Mia (eight years old), Sienna (six years old), and Grace (nineteen months old). PSR ¶ 92. Nearly every letter sent in support of David attached to this submission describes David's remarkable attentiveness to his children and the absolute love and care he puts into fatherhood in ways both big and small. According to Tamar Kahane, David's mother-in-law, David "has prioritized being there for his girls - taking them to school and to after-school activities, going to their school events, waking up with them in the middle of the night when they have bad dreams, taking them bowling on rainy days, and putting them to bed at night." Ex. 49. Friend Eli Cohen explains that David "spends every free moment with his daughters, dedicating his life to educating them and expounding the value of kindness, benevolence and ethical behavior." Ex. 23. Sister-in-law Alexandra Kahane describes how Mia's "whole demeanor changes when [David] walks into the room—and there's almost an immediate sense of peace and safety that's evidenced in her body language. He is her safety. He is this for all of them—Mia, Sienna, Grace and Daniella." Ex 50.

David and Daniella have sought to instill the values of charity and gratitude in their daughters; as Talya Jacobs, David's sister-in-law, shares about the children:

> Their parents have modeled for them how to be generous, compassionate, and sensitive people. At the young age of 8 and 5 their older two girls are already collecting toys to donate to children's hospitals and holding lemonade stands for charity (all ideas they thought of on their own, but from the values instilled in them by their parents).

Ex. 43; *see also* Ex. 8 (friend Maya Cohen Abitbol noting how Mia and Sienna "had hundreds of toys donated and they proudly delivered them to less fortunate children before the holiday. It was heartwarming to see the look of pride on David's face as his daughters shuttled huge piles of gifts through their lobby.").

David's attentiveness as a husband and father has not waned despite the pressures of this case. Daniella describes a particular incident, shortly after David's arrest, in which she slipped on black ice and shattered her ankle, leaving her immobile and in severe pain:

> Many men would have crumbled without their spouse holding them up in the face of such trauma of an indictment, but during those weeks, David was forced to be the "strong" one, for me, and for my kids — who I was physically unable to even lift, or pick up during those first few months after my fall. His ability to be present, and his refusal to see himself as a victim to life's circumstances, has been more than inspiring, it has been a sustaining force for our family.

Ex. 64. Scores of David's supporters note the tremendous damage that would be dealt to the Levy family unit, including in particular David's children, should David be incarcerated. *See, e.g.*, Ex. 23 (friend Eli Cohen explaining that "[t]he possibility of incarceration in addition to what [David] has already endured and the serious effect it would have on his young and impressionable daughters would be devastating. The mental and emotional duress they have already experienced is quite evident. I am horrified to think of the significant negative impact

and consequences of not having their father present in their lives, for any period of time, would have on them."); Ex. 40 (aunt Laura Huberfeld describing how she is "certain [David's] wife Daniella and his girls will be profoundly harmed and injured from any absence if David is sent away from them"); Ex. 71 (Rabbi Adam Mintz: "[David's] relationship with his three young children is exemplary. He is a doting father who shares both the responsibility of child-rearing and the delight of watching them grow up. Both Daniela and the children rely on David's presence at home and would be adversely affected if he was away for a long period of time.").

Another key refrain from David's supporters is appreciation for his incredible generosity. As described by Dr. and Mrs. Charles and Shoshana Traube, longtime family friends of the Levys, "[David] believes that all people are inherently good, and would give the shirt off his back for someone in need." Ex. 103. As such, David's friends recognize him as a source of great comfort during their darkest hours; whether it is the passing of a loved one, a severe illness, or financial hardship, David's family and friends consistently identify him as providing vital support at the time it is needed most. Kelila Kehane, another of David's sisters-in-law, describes how David responded when her sister, Talya, was diagnosed with a brain tumor in 2015:

> David called any medical contacts he had to ask about upcoming trials she might join, or physicians that might have alternative guidance for how to proceed. He sat in the hospital lobby with me and my four siblings, while my sister had her 6-hour excisional surgery, until the surgeon came out to let us know she was in recovery.

Ex. 100. When friend Eli Spiro was diagnosed with arthritis,

> David spent hours on the phone with me over multiple phone calls helping me assess the proper treatment and even recommending certain doctors based on his own experience. I was amazed at how he was so meticulous and thoughtful even though he was going through so much personal anguish - he really cares about his friends and I care about him.

Ex. 96.  When brother-in-law Tuvia Tendler needed serious eye surgery, David drove four hours to visit and spend time with him.  *See* Ex. 101.  When family friend Howard Kagan's son passed away, David and family made "every single arrangement for [his] family[.]"  Ex. 45.  According to David's aunt Laura Huberfeld, when her daughter Jessica was diagnosed with diabetes, "David Levy was the angel that eased our hearts. He was there for all of us and most especially to hold Jessica's hand at a challenging time."  When friend EJ Bliner was experiencing financial troubles, "[i]n an unbelievably kind, gracious and classy way, David suddenly offered me a loan and told me that he and Daniella would be there for me through thick and thin."  Ex. 19.  Friend and business partner Isaac Barber describes how, when he was engaged in a lengthy custody battle, "[n]otwithstanding that I had become toxic as a reputational risk to those who would risk working closely with me, and in addition to the fact that during this time I wasn't very productive, . . . David knew I was being falsely accused and stood by me; he did everything in his power to make sure I was secure with my job and continued to get paid," allowing him to "keep [his] dignity, [his] sanity and to muster the strength to fight and pull through."  Ex. 10. The list goes on and on – helping those diagnosed with illnesses (*see, e.g.*, Ex. 55), supporting friends going through a rough divorce (Ex. 108) ("'Anytime, you tell me, I'm here for you' was [David's] motto.")), providing childcare for busy parents (Ex. 101), or simply reaching out and letting those going through difficult times that he is there for whatever they need (*see, e.g.*, Ex. 58).  The letters sent in support of David are replete with examples of him helping others without any expectation of praise or reciprocity, in a way, we submit, is truly extraordinary.  David's mother-in-law perhaps sums it up best with a simple phrase: "David shows up."  Ex. 49.

David is also dedicated to the professional development of the younger generation and those in need of employment. According to Jack Simony, who has spent 25 years in the financial sector, "David distinguishes himself from virtually any other executive on Wall Street" with his dedication to "go the extra mile" for people who David couldn't personally hire:

> When he identified a special person, with talent, with a family, and with a desire and passion to succeed, he took it upon himself to help that person. I witnessed on several occasions that Mr. Levy would not only call numerous people seeking to place that individual, but also offered to personally cover the first several months of salary for that individual.

Ex. 92; *see also* Exs. 10, 53 & 102.

David's generosity extends far beyond his personal connections and those in his community, as demonstrated by his extensive public service and charity. As family friend and attorney Jay Lefkowitz notes, "[i]n addition to his previous work in the field of finance, [David] has engaged in public service both in the office of the Mayor of New York City and in the United States Senate as a young staffer." Ex. 60. David is also dedicated to several philanthropic causes. Recently, amongst other charitable works, David has worked to help Afghani refugees escape the Taliban. As described by friend Kerry Propper:

> [T]he past summer, I was confronted with a call for help from families I worked with in Afghanistan. My first call for help was to David. I had an urgent request to assist 38 Afghans, of which 31 were women and girls, who wanted to get to freedom. He immediately sprang into action, helping me to arrange safe passage and homes for the refugees. We managed to get the families out of Afghanistan as Kabul fell. They are now safe in Pakistan.

Ex. 82. Samuel Rosenberg, another friend involved in this project, remarked on the "many hours" David poured into helping relocate the Afghani refugees, noting that David's "passion and desire to help is limitless." Ex. 85.

Dov Kahane, David's father-in-law, attributes David's passion for helping those in times of crisis at least in part to David's grandparents' experience in surviving the Holocaust. As Mr. Kahane describes:

> One example of this is David's work on behalf of the Yazidi, a small ethnic minority who live in Kurdistan and Iraq and who, after the resurgence of the Taliban in Iraq became the target of "ethnic cleansing". David and his friends heard about the atrocities being committed and worked to get many of the Yazidi women - who were most at risk - to safety. They did this quietly and with little public fanfare.

Ex. 52. These are but several examples of philanthropic activities David is involved in. *See, e.g.*, Ex. 12 (friend Ezra Beren describing David and Daniella's involvement with Leket Israel, "the leading food rescue organization in Israel."). David is also a fixture at numerous charitable events. Jay Grossman, a board member of UNICEF, states that "whenever I need ideas of how to fundraise or how to think about ways to help underprivileged children around the world, David has been a consistent supporter." Ex. 31 (J. Grossman).

David is a religious man, and heavily involved in his community. His deep ties to the community around him are apparent in the letters submitted on his behalf by four respected rabbis. Rabbi Adam Mintz of Congregation Kehilat Rayim Ahuvim, an Orthodox synagogue on the Upper West Side of Manhattan, says of David:

> He is a sought-after advisor to both the rabbis and the lay leadership of the synagogues he attends as his level-headed advice is appreciated in the world of synagogue politics. Yet, his contributions to the community are most strongly felt in quiet ways. He is a generous donator to the local charities. He helps support the children's school and his local synagogue. But, he is most active in helping individuals in the community in a quiet and caring manner. He is the one who quietly pays the tuition for the friend or colleague who has lost his job. David is the one who quietly pays the bills for a family in the community that is in need. The willingness of David to generously assist people

without a need for recognition or gratitude reflects a rare quality of righteous[ness] that I have seldom seen in my thirty-five years in the pulpit rabbinate.

Ex. 71.  Rabbi Avraham Rabinowitz, Chief Rabbi of the Biala movement, describes David's dedication to the Jewish teaching of *tikkun olam*, one's obligation to "heal the world":

> Whether it's working to help feed the poorer members of our community by volunteering to pack and distribute food for the needy, or building bridges among students from countries that have experienced ethnic strife and intolerance, or his heroic efforts in saving dozens of Afghani refugees from near certain death at the hands of the Taliban, David has embodied the charge to dedicate oneself to helping fix the entire world perhaps more than anyone that I know.

Ex. 83.  Rabbi Ahsher Stern of Congregation Bais Avrohom Zev in Lawrence, Long Island, has observed David's resolve during the pendency of this case: "Throughout this ordeal David has continued to act with equanimity, not allowing his personal plight affect his interaction with friends and fellow congregants."  Ex. 97.  Finally, Rabbi Shaul Robinson, Senior Rabbi of Lincoln Square Synagogue on the Upper West Side, explains how, as a scholar of ethical behavior and standards, he has "never once written a letter asking for leniency from a Judge before, and do not intend to ever again" but that, due to David's character, he "honestly feel[s] that the case of David Levy is exceptional, and worth an exception to [his] firm rule."  Ex. 84.

Despite David's conviction, he is regarded by those around him as a person with integrity and strong moral character.  According to friend and business associate Jacob Sod, "[David's] word is his bond and his integrity is beyond compare."  Ex. 93.  Mr. Spiro states that "David acts, operates and conducts every aspect of his business and personal affairs with utmost care for truth, sincerity and making absolutely certain that he is doing whatever he possibly can to help those around him."  Ex. 96.  As such, Mr. Spiro and others have reached out to David, even after

he was charged and convicted, to ask for his advice on ethical and moral concerns. Friend David

Parker, for instance, recounts asking for David's advice when faced with a life-altering business

decision: "He pushed me to make the right choice and breathed into me the courage to actually

do it." Ex. 78. Nicholas Thacker, another of David's friends and an investment manager with

degrees from the University of Chicago and Columbia University, extols David's

trustworthiness:

> I would trust him without a second thought to manage all of my own
> and my family's assets . . . . His approach to assessing risk, pricing risk
> and mitigating risk has always been highly disciplined, never cavalier.
> His commitment to strong reputation, ethical behavior, creative and
> intelligent structuring, and so on, makes him amongst the most capable
> and trustworthy market participants I know. . . . I have absolutely zero
> doubt that at all times David treated his fiduciary responsibility as his
> highest obligation.

Ex. 102. People engaged in business dealings with David after his time with Platinum have

found him to be honest and filled with integrity, including being forthright about his legal

troubles. *See, e.g.*, Exs. 22 & 26.

Even those who engaged with David during his time at Platinum – the period in which

the charges in this case arise – have identified David as a person with strong moral character. As

Your Honor will recall, the government alleged that David and other members of Platinum

sought to "steal" the remaining value of Black Elk for themselves once the company began to

encounter financial troubles. But those actually involved paint a different picture. Karen

Vanacor, former Regulatory Manager at Black Elk, describes her interactions with David shortly

after the explosion at the West Delta-32 oil rig:

> The first lengthy visit David and I had was in my office on the days
> immediately following the West Delta incident. David started the
> conversation with "Karen, what can I do for you." I cried. We talked

for about an hour and I told him of the guilt I felt, the sorrow for the families, and the company being in an almost stalled position due to the incident. David Levy then said to me to continue doing the right thing in everything you touch. Continue to report out as required in an honest and forthright manner. Know that I am standing beside you. What I saw on that visit was a sensitive person with integrity that was unsure of what the future would be like for many – including him. And in that dark pain [David] decided that he was not going to isolate himself from the Black Elk employees but rather provide comfort where he could.

Ex. 105. Joe SanFilippo, former CFO of Platinum and David's former co-defendant, highlights a fact that was proven at trial – that David forewent his own salary and loaned his own personal money to the Funds in order to benefit the investors:

There were many good years at Platinum, but during the time in 2015 when there were severe liquidity problems, David advanced his own personal money, interest free, to help cover the costs of operations. Much of this money was unreturned when the Funds went into liquidation. In addition to this, he worked salary free during his entire time in 2015 as Co-Chief Investment Officer.

Ex. 86. It is not about the money for David; as his accountant describes:

I know David to be a very humble person. . . . I would advise him over the years that perhaps he should buy a property and buy different assets. His response would always be "Avi, what do I need? I have an apartment that I rent and my family is happy, that's all that matters". He never felt the need to buy fancy cars and fancy things. He's a very simple person and doesn't try to be ostentatious.

Ex. 28.

Perhaps most remarkable are how PPVA investors – those who stand to be the most aggrieved by the failure of the Platinum Funds – regard David. The Katz family was PPVA's largest single investor, and when the fund was liquidated, lost $50 million. Yet Michael Katz, a representative of the family and member of PPVA's Liquidation Committee, states:

When the firm started to show signs of trouble I personally witnessed the long days and sleepless nights David put in to do his best to cure the

liquidity crisis the firm was going through. I recall the many conversations we had about the fact that David stopped taking a salary and was not taking any form of compensation during the firm's crisis which lasted over two years. I insisted he not do so, that he needed to have some sort of salary during this time. He refused, saying that as long as the firm did not turn the corner he would not take a dime from the firm. . . . David's integrity throughout the crisis the firm went through and since then is in my opinion unimpeachable.

Ex. 53. Michael's grandmother, Adina Katz, who noted the "total loss of the hard-earned amounts my husband and I worked for over 50 years to accumulate," believes that David has "genuinely done his best to safeguard our investment, [and is] a man of utmost integrity and professionalism, someone who took no salary for years and worked tirelessly to do the right thing, facts that became very clear in the trial." Ex. 54. In a truly profound statement that speaks volumes of David's character, Ms. Katz has stated: "[I]f I had a choice between recovering our $50MM investment or ensuring David had the opportunity to rebuild his life today, in the blink of an eye I would opt for the latter." *Id.*

We respectfully ask the Court to consider these letters in fashioning an appropriate sentence for Mr. Levy.

**B.    The Need for the Sentence Imposed – Mr. Levy Has Already Been Punished Severely**

As the letters submitted on Mr. Levy's behalf demonstrate, Mr. Levy has already been punished severely for his actions in connection with his time at Platinum and relating to Black Elk. Mr. Levy has suffered both financially and emotionally in a way that is apparent to those around him:

- Benjamin Mayer, friend: "Financially and emotionally, [Mr. Levy] has suffered tremendously the past few years. His life, and the life of his wife and adorable children are living in tremendous pain." Ex. 70.

- Isaac Levy, father: "[As a result of the charges,] I watched my son and his beautiful wife begin to age overnight right before my eyes." Ex. 65.

- Seymour Huberfeld, uncle: "He was a rising young man with young children, now with no future and no career. He needed to be a husband and a father without any of the normal structure that would apply. He could not plan like any normal parent. Add to this the ups and downs of the verdict, [Your Honor's] decision and that of the appeals court and we have a life like someone suffering from a terrible illness." Ex. 41.

- Laura Huberfeld, aunt: "I have seen first hand the immense uncertainty, sadness, embarrassment and setback David has had to endure. This has kept him living under a cloud of pressure, with a tarnished name and an uncertain future." Ex. 40.

- Lori Huberfeld, aunt: "For the entirety of David's children's lives he has been embroiled in this case. The girls have never seen the carefree young man that I know and love. David has always been a very present and devoted father. But even during moments of supreme joy the shade of his court troubles have always been in the back of his mind. David has tried to be a focused father and spouse while also balancing the hardest fight of his life. I have seen the stress that this has placed on every aspect of David's life." Ex. 38.

- Eric Hecht, friend: "Your Honor, the stress of the last few years has already been a severe punishment for David and it has certainly made it harder for us to spend time together, which I wish had not been the case." Ex. 109.

- Ezra Beren, friend: "Virtually all his business contacts and prospects have disappeared. David through all this negativity, put his focus on his children and provided the most stable and warm home." Ex. 13.

Friends and family alike note in particular the emotional and psychological strain that Mr. Levy has suffered from having his conviction reinstated by the Second Circuit after this Court previously granted his Rule 29 motion. Daniella describes the "torture" David felt to "believe that the worst was behind you, to feel a sense of closure, to have people in your community, friends, and family tell you how happy they were to hear it had ended, only to have to explain not even believing it yourself, that the government appealed, that we had lost the appeal and that we were back to the guilty verdict again." Ex. 64. David's father, Isaac, recalls how the Second Circuit's reversal came on the eve of David's brother Josh's wedding:

> Two days before my youngest son Josh's wedding, we got the news that David was once again not free. It was absolutely devastating. David showed selflessness, loyalty, and a deep inner-strength of character to put aside his own emotions and stress inorder [*sic*] to make sure his little brother's special day was not overshadowed with sadness. It is something the entire family will never forget.

Ex. 65; *see also, e.g.*, Ex. 10 (Isaac Barber commenting how "when the court's ruling was reversed by the appellate court, it tore [David] up and caused him even more emotional agony then if this back and forth hadn't happened in the first place."); Ex. 69 (friend Jason Lyons describing: "One day guilty, one day innocent, one day a fair and Honorable ruling then a reversal[.] This individual and their family have been tortured emotionally through the ups and downs.").

Mr. Levy's reputation, both in his community and in relation to his business prospects, has been severely tarnished. As his father describes, after Mr. Levy's arrest, "[t]hat's when the news articles began. [The U.S. Attorney's Office] gave a public press conference that destroyed my son's and our family's reputation forever. News reporters called my wife and I with hounding questions and allegations. Every person I met knew about the charges against my son." Ex. 65. Mr. Levy's friend, Nicholas Thacker, describes how Mr. Levy's future business prospects have dimmed because of his damaged reputation, which "will penalize his ability to return to the works he loves to do and to which he is a one-of-a-kind business mind; the investment world may have lost one of its brightest." Ex. 102.

The sentence this Court imposes will be in addition to an already long list of terrible consequences that have flowed from Mr. Levy's time at Platinum and Beechwood and his involvement with Black Elk. Mr. Levy is still actively litigating multiple civil lawsuits,

including by the SEC.  The harsh consequences that have already befallen Mr. Levy have served as real punishment and affected the necessary deterrence.

### C.    The Purposes of Deterrence Have Been Served

A custodial sentence is not necessary to afford adequate deterrence.  As mentioned above, the suffering that Mr. Levy and his family have already experienced because of his conduct, coupled with the onslaught of public scrutiny, provide adequate specific and general deterrence.  On a personal level, Mr. Levy has displayed tremendous remorse, minimizing the need for specific deterrence.  According to friend Michael Weisz:

> When we are able to speak, David often references the lessons learned, the hardships endured, the pain his children and wife live through thinking how terrible it would be if he is forced to be apart from them for a period of time.  When I asked what he meant by lessons learned, the first time he stared me straight in the eye and said "Michael, I sit before judge and jury with life hanging in the balance.  I must obviously learn from this experience and resolve to change."

Ex. 107.  Michael Levy, one of Mr. Levy's brothers, further describes:

> I've seen him display respect for the Court and the justice system throughout the trial.  I've seen, first hand, how David has been humbled by his experiences over the last few years.  He was already a temperate and considered person but has spent a significant amount of time and focus reflecting.  The changes he has internalized are consequential and impactful - they are lifelong.

Ex. 66.

We recognize, however, that the Court must also fashion a sentence that promotes deterrence more broadly so that others in the financial services industry are aware of the consequences that result from such a crime.  We submit that a non-custodial sentence is sufficient to accomplish this goal, particularly when the consequences to Mr. Levy have already been so substantial.

**D.      There Is No Need to Protect the Public from Mr. Levy**

Mr. Levy poses no risk of recidivism.  The suffering and embarrassment his arrest and conviction have caused not only to him, but to his family and friends, will ensure that he does not re-offend.  Despite those consequences, as the attached letters demonstrate, Mr. Levy is surrounded by family – particularly his wife and children – and friends who provide him enormous support and motivation to avoid ever finding himself on the wrong side of the law again.  *See, e.g.*, Exs. 9 & 80.  This is not a situation in which a sentence of imprisonment is necessary to protect the public from Mr. Levy.  In fact, as the letters and his good works demonstrate, sentencing Mr. Levy to a term of imprisonment will make the public worse off, not better.  Furthermore, Mr. Levy's conduct throughout the pendency of this case demonstrates his respect for the law and diminishes any likelihood of recidivism.  For nearly half a decade, Mr. Levy was on pretrial release, and was fully compliant with all restrictions and directives from the Court and his pretrial officer.  Despite Mr. Levy's full and continued belief in his innocence, Mr. Levy has always remained respectful of the Court, the government, and the criminal justice process throughout these difficult proceedings.  There is no risk Mr. Levy will re-offend if the Court orders a non-custodial sentence.

**E.      Mr. Levy Does Not Need Treatment**

Pursuant to section 3553(a)(2)(D), the Court must also consider the need for any sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  This does not apply to Mr. Levy who is physically and mentally healthy (although having benefitted from mental health counseling).  And as the numerous letters from Mr. Levy's colleagues, business partners, and community

members demonstrate, Mr. Levy is a highly active and productive member of his communities. In any event, Mr. Levy does not require vocational training, and the services available to him through incarceration would not serve to rehabilitate him. Instead, being able to continue to care for his children will have the greatest rehabilitative force, whereas a term of imprisonment would further punish not just him, but his entire family.

### F.      The Kinds of Sentences Available

The Court must also consider the "kinds of sentences available." 18 U.S.C. § 3553(a)(3). In this case, we respectfully submit that alternatives to incarceration – such as probation, home confinement, community service, and the like – would best serve the purposes of section 3553 and the interests of justice. U.S.S.G. §§ 5F1.2, 5F1.3. The Sentencing Commission has recognized that probation can satisfy the purposes of sentencing, including providing just punishment for the offense. U.S.S.G. Manual, Chapter 5, Part B, Introductory Cmt. In this case, probation, coupled with community service, is an adequate sentence.

We respectfully submit that sending Mr. Levy to prison and requiring his wife and three children to lose his emotional and financial support would impose a punishment that would serve no rehabilitative or other legitimate purpose as to Mr. Levy.

If the Court determines that probation and community service is not sufficient on its own, the Court should consider home confinement. This would be a meaningful punishment because it would severely restrict the activities that Mr. Levy could engage in on a daily basis and would further punish him by limiting his current business and charitable endeavors, but would still allow him to remain with his family and provide additional support to his children.

**G.    The Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentencing disparities among defendants. This factor weighs heavily in favor of a sentence of probation for Mr. Levy.

The loss amount, as discussed above, is zero. Mr. Levy's role in the scheme was at best minimal. And the other individuals who were situated similarly to Mr. Levy face no prison time at all: Joseph Mann, who was in the marketing department of Platinum, and Jeffrey Shulse, the former CFO of Black Elk, both received deferred prosecution agreements from the government. *See* ECF Nos. 843 & 878 (orders granting dismissal of Indictment against Mann and Shulse). Mr. Shulse, in particular, was intimately involved in the consent solicitation process at the heart of the Black Elk charges for which Mr. Levy was convicted. Mr. Shulse was directly engaged in communicating with Attorney Rob Shearer, Black Elk's outside counsel at BakerHostetler, and Mark Nordlicht, including in emails the Second Circuit found could support a rational inference of criminal intent. *See United States v. Levy*, No. 19- 3207-cr (L) (2d Cir. Nov. 5, 2021), ECF No. 138 at 54, 63. Indeed, Mr. Shulse was the individual Mr. Levy was talking to when Joe Bruno purportedly overheard Mr. Levy say "it's covered," which the Second Circuit also concluded showed participation in the charged scheme. *See id.* at 62-63. Nevertheless, Mr. Shulse received a deferred prosecution agreement and will face no sentence. As such, a non-custodial sentence for Mr. Levy would avoid any unwarranted sentencing disparity.

**H.    The Need to Provide Restitution**

Finally, Section 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims of the offense."  For the same reasons mentioned above concerning the loss amount, the correct restitution amount as to Mr. Levy is $0.

The Court also should not order any forfeiture amount.  The purpose of forfeiture is to disgorge ill-gotten gains from a criminal.  As the trial record demonstrated conclusively, Mr. Levy received no ill-gotten gains; he possesses no property that constitutes or is derived from proceeds traceable to the conspiracy.  Because Mr. Levy never profited from any criminal conspiracy, he has no gains from which criminal forfeiture should be ordered.

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court impose a non-custodial sentence of probation and community service with no restitution or forfeiture.

Dated:   June 28, 2022

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s *Michael S. Sommer*
        Michael S. Sommer
        Morris J. Fodeman
        1301 Avenue of the Americas, 40th Floor
        New York, New York 10019
        Telephone:  (212) 999-5800
        Facsimile:  (212) 999-5899
        msommer@wsgr.com
        mfodeman@wsgr.com

*Attorneys for Defendant David Levy*