# EXHIBIT 1

1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,   :   16-CR-640(BMC)
4
           Plaintiff,       :
5                                   United States Courthouse
       -against-            :   Brooklyn, New York
6
MARK NORDLICHT, DAVID LEVY,
7  and JOSEPH SANFILIPPO,    :
                                April 23, 2019
8          Defendant.        :   1:00 o'clock p.m.

9    - - - - - - - - - - - - -   X

10
                    TRANSCRIPT OF TRIAL
11         BEFORE THE HONORABLE BRIAN M. COGAN
          UNITED STATES DISTRICT JUDGE, and a jury.
12

13  APPEARANCES:

14
For the Government:        RICHARD P. DONOGHUE
15                         United States Attorney
                           BY: ALICYN COOLEY
16                             DAVID PITLUCK
                               PATRICK HEIN
17                             LAUREN ELBERT
                           Assistant United States Attorneys
18                         271 Cadman Plaza East
                           Brooklyn, New York
19

20
For Deft. M. Nordlicht:    JOSE A. BAEZ, ESQ.
21                         RONALD S. SULLIVAN JR., ESQ.
                           DUNCAN PATRICK LEVIN, ESQ.
22

23  For Deft. D. Levy:      MORRIS J. FODEMAN, ESQ.
                           MICHAEL S. SOMMER, ESQ.
24                         KATHERINE TALBOT MCCARTHY, ESQ.

25
```

Yee - Direct/Hein

1   Q     I think I cut you off, but which of the three options

2   again did you choose?

3   A     Option three, which is we did not sell our bonds back and

4   we did not give up our rights.

5   Q     Why did you decide not to tender your bonds?

6   A     Well, we went through earlier in the indenture where it

7   said that the company wanted to call the bonds, to buy them

8   back -- I'm sorry, backtracking.

9        They wanted to call the bonds between December 1st,

10  2013 and November 30, 2014.  They were obligated to pay 106

11  spot 875.  In our example, we were using, you own a bond that's

12  $100, you have to pay $106.87-1/2.  Basically, they are saying,

13  look, we don't want to pay you $106.87.  We just want to pay

14  $100.

15       We are sitting there saying, look, I want my $6.87

16  because that's the deal.  That's the indenture.  That's your

17  legal obligation.  Why am I giving that up?  Why would I give

18  up $6.87.  Right?

19       So we decided to vote.  We decided not to sell our

20  bonds back for that reason.

21       And in the second part is, as I mentioned, why would

22  we want to consent to these changes?  Why would we give up our

23  rights for nothing?  You can't take my rights away from me and

24  not give me anything back for it.  In the financial world you

25  are not --

MICHELE NARDONE, CSR -- Official Court Reporter

3833

Yee - Direct/Hein

1          MR. SOMMER:  Objection.

2          THE COURT:  Overruled.

3          You can continue.

4    A    (Continuing) So as bondholder we have these rights.  They

5    are in a legal document they have been stated; and this offer

6    they made did not give us any financial incentive to sell our

7    bonds back nor did it give us any financial incentive to give

8    up our rights.

9    Q    After the offer and consent solicitation expired on

10   August 13, 2014, did you find out the result of the vote?

11   A    Yes.  There was a press release that came out the next

12   day, and the press release stated that of approximately 150

13   million bonds outstanding, holders of 11 million bonds voted to

14   sell their bonds back to the company, that were tendered bonds

15   back is the legal term, at par, get $100 back; and then

16   another, in total, 110 million bonds, approximately, voted to

17   give up the rights in exchange for nothing.

18          MR. HEIN:  Okay.  If I could show the witness what's

19   been marked as Government Exhibit 8526, please.

20   Q    Do you recognize this document?

21   A    Yes, I do.

22   Q    What is it?

23   A    It's an 8-K.  As we discussed earlier, an 8-K is basically

24   any financial filing that states a change in any corporate

25   activity.

MICHELE NARDONE, CSR -- Official Court Reporter

Yee - cross - Sommer                          3916

1   Q    Well, let's see if we can agree on a definition and then
2   I can show you a document if we can't.
3          Caa means:  Obligations rated Caa are judged to be a
4   poor standing and are subject to very high credit risk.
5          Does that sound right?
6   A    I don't have the document in front of me, so I'm going to
7   accept what you're saying is accurate.
8   Q    I'm not asking you to accept anything.
9          MR. SOMMER:  May I approach the witness to show him?
10         THE COURT:  I am asking you to accept his accepting
11  you accepting him.  Let's assume that's what you accept.
12         MR. SOMMER:  That's so accepting.  Let's move on.
13  BY MR. SOMMER:
14  Q    Let me just ask you about one other risk with these
15  bonds, if you consider it such a risk.
16         By buying Black Elk bonds, did you believe that you
17  faced a risk from the possibility of falling oil prices, was
18  that a risk?
19  A    It's a commodity, so yes; commodity prices go up,
20  commodity prices go down.  So yes, that is a risk.
21  Q    So let's make sure we are all together on this.
22         If, after you buy these Black Elk bonds, oil prices
23  start going down dramatically, one impact that could have is
24  there's less revenue to Black Elk, which means less cash for
25  Black Elk, which means a higher possibility of default on

Yee - cross - Sommer                          3917

1   these bonds; is that fair?

2   A    That's -- that's an assumption, but it's accurate.  It's

3   a fair assumption.

4   Q    It's an accurate assumption, right?

5   A    It's a fair assumption.

6   Q    Fair assumption, okay.  And you are aware, sir, that

7   beginning in September of 2014, after you bought these Black

8   Elk bonds and after you said no thank you to being paid a

9   hundred cents on the dollar, that oil prices in fact started

10  an historical precipitous drop; are you aware of that?

11  A    Yes.

12  Q    All right.  You were asked some questions about the

13  indenture during your questioning from the prosecutor.

14       Do you remember that?

15  A    Yes.

16  Q    And we looked at Government Exhibit 9507 in evidence,

17  which is the indenture.

18       You referred to it as a legal document, do you

19  recall that?

20  A    Yes.

21  Q    And you read to us some of the language from that

22  document, with all the open parentheses, closed parenthesis,

23  semi-colons, do you remember that?

24  A    Yes.

25  Q    I take it, it would come as no surprise to you, sir, that

1  from the asset sale.  So let's start with the first one,

2  that's 4(b)(1), right here (indicating).

3          Okay; and, again, it's a lot of legalese, but can we

4  agree, sir, that it can repay indebtedness, among other

5  things?  Do you see that?

6  A    Yes.

7  Q    And that would include the notes, right?

8  A    Yes.

9  Q    Okay.  So Option 1 -- and I am not going to write them

10  out on the flip pad, but the first option is, we get the money

11  in, we can pay the bondholders.

12          That's one option, right?

13  A    Yes.

14  Q    I'm sorry?

15  A    Yes.

16  Q    Thank you.  Okay.

17          By the way, let's just go up for one second to (b)

18  here (indicating), where I'm underlining, and let's make one

19  thing clear to the jury:

20          When this money comes in from an asset sale, the

21  company may apply those net proceeds at its option to any

22  combination of the following.

23          Do you understand what that means?

24  A    Yes.

25  Q    Can we agree that that means that Black Elk gets to

1    decide how it uses that money and it can use it in any

2    combination that I am about to take you through, including the

3    one we already covered, paying back the bonds, right?

4    A    Yes.

5    Q    Okay.  So let's go to the next one, under 4.10(b)(2),

6    (b)(3) and (b)(4), they can decide not to pay back the

7    bondholders and use the money on other things, right?

8    A    Yes.

9    Q    For example, they could buy other oil and gas companies

10   or other oil and gas properties; that's in (b)(2), right?

11   A    Yes.

12   Q    They could acquire the majority of the voting stock in

13   another oil and gas company; that's (b)(3), correct?

14   A    Yes.

15   Q    They could purchase other long-term assets; that's

16   (b)(4), correct?

17   A    Yes, but I also want to remind people that this is

18   standard boilerplate language.

19        When you have an asset sale, the company controls

20   what they do with asset sales.  They can go out and buy other

21   businesses, continue in investor-owned businesses, or they can

22   pay off their debt.

23   Q    Okay, thank you for that.

24        I am just asking you, through the legal contract

25   that you described, as to what they can do with the money.

Yee - cross - Sommer                           3928

1  language, right?

2  A    It's standard language.

3  Q    Standard language, and it's standard because it's warning

4  you of certain things that you should consider when you're

5  making your decision of whether to consent or not, fair?

6  A    I'll give you that.

7  Q    Thank you.  Okay, let's just go through a couple of

8  these.

9           MR. SOMMERS:  Let's go to the very next line and

10  highlight that, please, for the jurors to see.

11  BY MR. SOMMERS:

12  Q    The very first things that you're asked to consider,

13  we -- that's Black Elk, right?

14  A    Uh-hum.

15  Q    -- we may not be able to generate sufficient cash flow to

16  meet our debt service obligations.

17           Do you see that?

18  A    Yes.

19  Q    And what that means, in simple speak, is we're not -- we

20  may not have enough cash to pay the bondholders, right?

21  A    Yes.

22  Q    Okay.  Then it goes on to warn you more specifically

23  below that.  Let's highlight the next paragraph.

24           And the first line says:  The oil and gas properties

25  to be sold in the Renaissance sale represents a significant

1   CROSS EXAMINATION

2   BY MR. SOMMER:  (Continuing)

3   Q    So you're told get this material.  It's mid-July 2014.

4   You're told warning, sir, warning.  There is a chance if you

5   don't tender, if you don't take 100 cents on the dollar now

6   there's a chance you will get nothing?

7            MR. HEIN:  Objection to form.

8            THE COURT:  Overruled.

9   Q    Correct, you are warned of that possibility?

10  A    It doesn't say nothing.

11  Q    I think you told us yesterday after bankruptcy happened

12  you sold some of your bonds for 25 cents, right?  Is that

13  right or not?

14  A    That was two years later.

15  Q    Two years later.

16           So, you're warned -- I'll rephrase it.  That's fair.

17  You're warned, sir, that if you don't sell your bonds for 100

18  cents on the dollar that the company can be in trouble

19  financially and it may have to file for bankruptcy, you're

20  warned of that; right?

21  A    The warning is very clear.

22           MR. HEIN:  Objection.  Asked and answered.

23  Q    The warning is very clear.  You're right.

24           Okay.  Let's go to the next italic bold section and

25  this says the proposed members.  Let's stop there.  This is

1  Q    Okay.  So let's just quick recap.  You received a consent

2  solicitation in mid-July 2014; correct?

3  A    Correct.

4  Q    By that time you had seen the two Moody's downgrades;

5  correct?

6  A    Yes.

7          MR. HEIN:  Objection, Your Honor, to recap.

8          THE COURT:  Overruled.

9  Q    And before any change to the indenture, we agree that the

10 bondholders were not legally entitled to any of the proceeds

11 from the Renaissance sale; correct?

12         MR. HEIN:  Objection.

13         THE COURT:  Overruled.

14 A    Yes.

15 Q    Okay.  And then July, you had the consent solicitation

16 and you're warned about all these risks if you don't tender;

17 correct?

18 A    Yes.

19 Q    Okay.  And you recall yesterday saying to the jury why

20 should I leave 6.875 on the table.  Do you remember that

21 statement to the jury?

22 A    Yes.

23 Q    Let me give you a reason and you tell me if you agree

24 with it or not.  How about this as a reason for leaving that

25 on the table:  You're being offered 100 cents on the dollar

Yee - cross - Sommer                    3956

1        MR. HEIN:  Objection.

2    A    Yes.

3    Q    Thank you.

4        Let me just ask one more thing about your being

5    shocked and flabbergasted.  Can we agree, sir, that you were

6    so shocked and flabbergasted that this consent solicitation

7    passed that within just a couple days you were buying more

8    Black Elk bonds?  Can we agree on that?

9    A    Yes.

10   Q    You bought more Black Elk bonds on August 20; correct?

11   You bought more Black Elk bonds on August 19th, correct?

12       Would you like to see a document to refresh your

13   recollection?

14   A    Our firm did, yes.

15   Q    So you were so shocked, so flabbergasted, so cheated, so

16   rigged that you and your firm bought more Black Elk bonds

17   within days of the consent solicitation passing?

18       MR. HEIN:  Objection to form.

19       THE COURT:  Sustained.

20   Q    And, in fact, after this consent solicitation passed --

21   you know it passed; right?

22   A    Uh-hum.

23   Q    Yes?

24   A    Yes.

25   Q    Phoenix kept receiving its interest payments from Black

Shearer - Cross/Sommer

1   some of the money in, I can pay the bondholders, right?

2   A    Correct.

3   Q    But there are three other options under that, correct?

4   A    Yes.

5   Q    We don't need to go through all three of them, if we can

6   agree on the following, sir.

7           Can we agree that the bondholders had no right to

8   the money from an asset sale, Black Elk could have used it for

9   any of these other three purposes, correct?

10          MS. COOLEY:  Objection.

11          THE COURT:  Overruled.

12  A    That's not exactly correct.

13  Q    Not exactly correct.  Okay.  I thought we would try to do

14  it the quick way.

15          Let's just look at the next one, two, sub two:

16  Acquire all or substantially all of the properties or assets

17  of a person engaged in the oil and gas business.

18          Do you see that?

19  A    Yes.

20  Q    So Black Elk, if it sells assets, the money comes in,

21  they can use that money for what I just read in number two,

22  correct?

23  A    Correct.

24  Q    They don't have to pay the bondholders, correct?

25  A    Correct.

*Shearer - cross - Sommer*                                              5110

1   A     That's correct.

2   Q     You were the person tabulating the votes for the trustee;

3   is that right?

4   A     I don't know if I was doing that for the trustee but

5   certainly we were tabulating votes, yes.

6   Q     You were tabulating the votes, and since you were fully

7   aware that the Platinum entities together had about 62 million

8   in Black Elk bonds, you decided not to count any of those

9   votes, right?

10  A     Correct.

11  Q     Zero, right?  Right?

12  A     Correct.

13  Q     Can we agree that not a single Black Elk bond owned by

14  any of the Platinum funds that you've seen, PPLO, PPCO, PPVA,

15  not one was counted in round two toward changing the

16  indenture, can we agree on that?

17  A     We excluded votes that Mr. Small told us were controlled

18  by Platinum and so I don't know exactly what these entities

19  owned or other Platinum entities owned.  I do know what he

20  told us and that's what we excluded.

21  Q     So, let's just quickly go through the numbers, do a quick

22  math then.  There were 150 million out there, right?

23  A     Yes.

24  Q     You excluded about 62 million, right?

25  A     Yes.

1  because you just start typing David Levy and his email address

2  pops up.

3  Q    Okay.  And that's because of something called

4  auto-populate, right?

5  A    Correct.

6  Q    Which means a lot of prior emails to and from David Levy,

7  to the extent they existed, would have also had the Beechwood

8  address?

9  A    They could have, yes.

10  Q    Let's look at one more, let's see if that refreshes your

11  recollection.

12          Let's look, just for the witness, at Defense Exhibit

13  3415.  This is from Deirdre Pierson to you and others,

14  correct, on August 15th saying:  We're done, the change is

15  done, good to go; right?

16  A    Yes.

17  Q    And do you see that David Levy is at a Beechwood email

18  address?

19  A    I can see that here, yes.

20  Q    Can we agree, sir, that David Levy was not trying to hide

21  a Beechwood email address from you?

22  A    I have no reason to believe that.

23  Q    Thank you.

24          Now, just about done, sir.  Can we agree, sir, that

25  in 2014 in either round one or round two you performed no

1          MS. COOLEY:  Objection.

2          THE COURT:  Overruled.

3     A    If it did not meet that test, yes.

4          MR. SOMMER:  Judge, just one moment.

5          (Pause.)

6     Q    Oh, I'm sorry, never trust a lawyer that says one last

7     thing.

8          On August 14th, 2014, before the transaction

9     finished, before the press release went out, you're with me in

10    the time frame?

11    A    Yes.

12    Q    You've heard from Dan Small:  Hey, Rob, it's not 18.3, it

13    is 62 million, right?

14    A    Yes.

15    Q    Okay.  That's the time frame I'm talking about.  You

16    could have decided at that moment that since the bondholders

17    in the consent solicitation only got the 18.3 number, you

18    still could have stopped the process at that moment, correct?

19    A    Yes.

20    Q    And by stopping the process, that would have allowed you

21    to reissue the consent solicitation with 62 million instead of

22    18.3, correct?

23    A    Yes.

24    Q    And then there would be no one who could come in here and

25    say, oh, I was mislead by 18.3, correct?

1    A    Yes.

2    Q    Now, you discussed this very issue with high ranking

3    partners at your firm whether to stop the whole process and

4    start it over a third time, correct?

5              MS. COOLEY:  Objection.

6              THE COURT:  Overruled.

7    A    I don't remember specific discussions about that, no.

8    Q    You don't remember telling the prosecution quite recently

9    actually that you met with your partners to discuss whether

10   you should start the process over again but that you believed

11   it would be too expensive and too time consuming to do that,

12   does that sound right?

13   A    Just the part about who I discussed it with, I don't

14   recall who I discussed it with.  Certainly that is one -- that

15   would have been one option, yes.

16   Q    Let me see if I can refresh your recollection, sir, let

17   me show you the document.  If you can find the binder and turn

18   please -- sorry, just bear with me one second.

19              I don't think I have it in your binder.

20              Do you remember thinking, sir, that you could have

21   stopped the process --

22              MR. SOMMER:  Here comes Kate to my rescue.  Thank

23   you.

24   Q    Open up your binder to tab 1 and turn to page ten and

25   look at the very bottom paragraph and read that to yourself

1   please.

2          (Pause.)

3   A    Okay.

4   Q    Do you recall, does it refresh your memory that you told

5   the prosecutors that when you heard from Dan Small you still

6   could have stopped the process, do you remember telling them

7   that?

8   A    We could have stopped the process, yes.

9   Q    Do you remember telling the prosecutor that you discussed

10  this with members of your firm and explored whether a new vote

11  would be necessary, do you remember telling the prosecutors

12  that?

13  A    Yes.

14  Q    Do you remember telling the prosecutors that starting

15  over at that point would have been too expensive, do you

16  remember telling them that?

17  A    I think the context of the --

18  Q    It is a yes or no question, you either remember or you

19  don't.  Do you remember telling the prosecutors that, yes or

20  no?

21  A    No.

22  Q    That starting over would be too expensive, no?

23          Do you deny that you said that?

24  A    I think that is a summary of the discussion so I can try

25  to remember exactly what the discussion was if you like.

*Pulvino - direct - Hein*                                         5211

1        THE COURT:  I think that was the same question.

2        MR. HEIN:  I previously asked why did you decide not

3   to tender your bonds.

4        THE COURT:  I see.

5        MR. SOMMER:  It's the same question.

6        THE COURT:  No.

7   A    Could you just repeat the question please.

8   Q    Yes.  Why did you decide not to consent to the proposed

9   amendments to the indenture.

10  A    Because doing so would have eliminated a lot of the

11  protections that we had in the bond.  It would have basically

12  taken our senior secured position and put it underneath a more

13  junior secured, so that would not have been a good thing for

14  our investors or for our position.

15  Q    And why did you regard the offer to buy the bonds back at

16  par not one that was in your interest?

17       MR. SOMMER:  Objection, that one was asked and

18  answered.

19       THE COURT:  Sustained.

20  Q    After the offer, the consent solicitation expired in

21  August 2014 did you find out the result?

22  A    Yes.

23  Q    How did you find out what the result of the vote was?

24  A    There was a press release from Black Elk.

25  Q    Did you review that press release?

*Pulvino - direct - Hein*                                    5212

1  A    Yes.

2         MR. HEIN:  Could we show what's in evidence please

3  as Government Exhibit 8526-1 and if we could blow up just the

4  first paragraph please.

5  Q    If you could read the first sentence of that first

6  paragraph please out loud?

7  A    The first sentence:  Each of Black Elk Energy Offshore

8  Operations LLC and Black Elk Energy Finance Corp., together

9  the company, today announced the expiration of its previously

10 announced tender offer (the offer) to purchase for cash all of

11 its outstanding $150 million aggregate principal amount of

12 13.75% Senior Secured Notes Due 2015 (the notes) in receipt of

13 the requisite consents needed to approve the adoption of the

14 proposed amendments to the indenture under which the notes

15 were issued in connection with its previously announced

16 consent solicitation (the consent solicitation.)

17         (Continued on next page.)

18

19

20

21

22

23

24

25

*Pulvino - direct - Hein*                                          5214

1   asset sale proceeds?

2   A    My understanding is that they were permitted to use the

3   asset sale proceeds to pay the $11.33 million to the bonds

4   that tendered, and that they were able to use whatever excess

5   there that remained from the asset sale to pay the preferred

6   equity holders.

7   Q    What, if anything, did you do after learning of the

8   result of the consent solicitation?

9   A    I had a discussion with my colleagues, Rocky Bryant and

10  John Eckert.

11  Q    Why did you talk to your colleagues?

12  A    Well, we were trying to figure out why so many

13  bondholders would have consented to changes but not tendered

14  their bonds, that didn't make any sense to us.  We thought

15  that if we were going to consent to those changes, you

16  wouldn't want to hold these bonds without the protections and

17  you probably would have tendered your bonds.

18  Q    What, if any, significance did the fact that Black Elk

19  could buy back the bonds at 106.875 have to your decision not

20  to tender your bonds?

21  A    Well, we didn't exactly know what was driving this entire

22  tender offer and consent solicitation, but one of the things

23  we considered was that rather than buying our bonds back at

24  for a hundred and six dollars, they preferred to pay a hundred

25  dollars, which makes sense.  And we decided that for the risk

1   process as to why he went along.  Go ahead.

2   A    Suppose that rather than 18 million they owned a hundred

3   20 million, just suppose, this is our thinking, then so that

4   would mean there's 30 million bonds, only 30 million that get

5   to vote.  That means if you divide that by two you need only

6   15 million to vote for the consents.  Well, that's a lot more

7   likely than getting 66 million to vote.

8              So in that case we would have thought more about

9   tendering our notes because we wouldn't have wanted to hold

10  these notes without the protective covenants that were in

11  place.  So that was a key -- that was a key part of our

12  thinking.  And I think if we -- you know, if the numbers were

13  different we would have either tendered our notes or I mean if

14  we -- if we thought that there were notes that were not

15  properly categorized, we would have contacted the indenture

16  trustee to make sure that the notes that were being voted were

17  not affiliate notes.

18             MR. HEIN:  One moment, Your Honor.

19             No further questions.

20             THE COURT:  All right.  Cross-examination.

21  CROSS-EXAMINATION

22  BY MR. SULLIVAN:

23  Q    Mr. Pulvino, you don't know Mark Nordlicht personally,

24  right?

25  A    No.

1  Q    We may not be able to generate sufficient cash flow to
2  meet our debt service obligations; do you see that?
3  A    Yes.
4  Q    And just to be clear, debt service obligations means
5  paying you on your bonds, right?
6  A    Correct.
7  Q    And, again, I am not going to take you through all that.
8  There's another -- the very next paragraph describes to you
9  how the second sentence, for example, says, our ability to
10  make payments on the notes and to fund plan capital
11  expenditures will depend on our ability to generate cash in
12  the future; do you see that?
13  A    Yes.
14  Q    And these are the types of things that you consider when
15  you are making that analysis of how much risk you're willing
16  to bear, correct?
17  A    Yes.
18  Q    Okay.  And then, for example, couple of paragraphs down,
19  they tell you that they may have to commence bankruptcy; do
20  you remember reading that one?
21  A    Not explicitly.
22  Q    Let me know you where it is.
23  A    I believe you, because these offerings, they all have
24  warnings like this.  Virtually every one will have these types
25  of warnings.

1  Q    Okay.  And you're sophisticated enough in this industry

2  to know that from one company to the next, the warnings may be

3  very significant warnings, or it may be, you know, minimal

4  warnings, right?

5          MR. HEIN:  Objection.

6          THE COURT:  I'll allow it.

7  A    Usually there's a pretty good list of warnings.

8  Q    Okay.  Let me turn next to the press release that you

9  talked about in your direct testimony, which is in evidence as

10  Government Exhibit 8526-1.  Can we put that up on the screen?

11          And you were asked -- let's just blow up the top

12  paragraph, because that's what you were asked questions about.

13  We will make it easier for you to read, Mr. Pulvino.  Can you

14  see that better now?

15  A    Yes.  Thank you.

16  Q    You're welcome.

17          Do you see on the third line where it says that

18  Black Elk, there was the receipt of the requisite consents.

19  Do you see that language?

20  A    Yes.

21  Q    What did you understand that to mean when you read this

22  press release?

23  A    I understood that to mean that they had received more

24  than 50 percent of the vote from unaffiliated bondholders and

25  that those votes had not been revoked.

1  (Open court.)

2  BY MR. HEIN:

3  Q    Mr. Pulvino, in July and August of 2014 with respect to

4  Black Elk, who was involved in -- who, if anyone, was involved

5  in assessing the risk of hold onto those bonds?

6  A    Myself, Rocky Bryant, and John Eckert.

7  Q    And did you, yourself, consider the risks of holding onto

8  the Black Elk bonds?

9  A    Yes.

10 Q    And what, if anything, did you do in considering those

11 risks, what steps did you take?

12 A    Well, in this case, primarily, thinking about what the

13 price of oil was, where the bonds were currently trading, and

14 whether we thought the company would have enough assets to pay

15 the senior secured note holders, even if it did go bankrupt,

16 given that the senior secured note holders were first in line.

17 Q    You were also asked by defense counsel about the distress

18 that Black Elk experienced in late 2014 and into 2015; do you

19 recall that?

20 A    Yes.

21 Q    Focus now on the time period of the consent, July and

22 August of 2014, had Black Elk missed an interest payment on

23 the bonds between when you bought them in November 2010 and

24 August 2014?

25 A    No.

Spaulding - cross - Sommer                    5910

1    Q     That shows a payment to David of $504.80 in January 2014,

2    correct?

3    A     Yes.

4    Q     And the next two lines, 36 and 37 show respectively

5    payments of $3,702 and $3,906 in January and in April 2014,

6    correct?

7    A     Yes.

8    Q     Last couple of things.

9              MR. SOMMER:  I'm offering in evidence Defense

10   Exhibits 39683 and 39685.  These are some of the --

11             MS. ELBERT:  No objection.

12             THE COURT:  Received.

13             MR. SOMMER:  Thank you.

14             (Defendants' Exhibit 39683 and 39685 received in

15   evidence.)

16   BY MR. SOMMER:

17   Q     Now, were you asked by the prosecutors when you were

18   doing your forensic work to look at the payroll records

19   showing what people were paid by Platinum in 2015 or 2016?

20   A     No.

21   Q     Okay.  Let me show you what just got received in

22   evidence.  Let's start with the 2015, which is Defense

23   Exhibit 3968-3 -- hold on, let me get my pen so I can do the

24   math.

25             MR. SOMMER:  And please turn, Jeff, to the page --

1  second -- I believe it's the second page the exhibit, and I
2  just ripped the number.  The one with David Levy, the second
3  from the bottom, and let's blow that up.  Okay.  Can you blow
4  up the left side, please?  Make it nice and big if we can.
5  Right there, good.
6  Q    Now, do you see that David Levy worked over 2,080 hours
7  in 2015?
8          Do you see that?
9  A    Yes.
10         MS. ELBERT:  Objection, Your Honor.  Scope.
11         THE COURT:  Say that again.
12         MS. ELBERT:  Scope.
13         THE COURT:  No, it's connected enough.
14  BY MR. SOMMER:
15  Q    Do you see that?
16  A    Yes.
17  Q    Okay, I got my pen ready.  Tell us how much he was paid
18  in salary for 2015 according to the payroll records.
19  A    Zero.
20  Q    Zero, good, okay.
21         Now let's bring up -- oh, well, let's be fair.
22  Let's go over to the right side.  Let's be fair.
23         He did get health and dental and vision; he got
24  that, right?
25  A    Yes.

Spaulding - cross - Sommer                5912

1   Q    Let's go to 2016, which is Defense Exhibit 3968-5 in

2   evidence, and, again, this time it's page 3, I think, we will

3   find David Levy.

4         MR. SOMMER:  Can we blow up the first half?

5   Q    Again, over 2,000 hours.

6         Do you see that?

7   A    Yes.

8   Q    And can you tell, read it out there, yell it on out,

9   what's the number of his compensation for his work in 2016?

10  A    Zero.

11  Q    Zero.

12        MR. SOMMER:  Couple of concluding questions and I

13  think I'm done.

14        First of all, Judge, at this time, I offer in

15  evidence DX3959, my chart, which I have now completed.

16        THE COURT:  Received.

17        (Defendants' Exhibit DX3959 received in evidence.)

18  BY MR. SOMMER:

19  Q    Can we agree, ma'am, that the money David received in

20  2015 and 2016 consisted entirely and solely of money he got as

21  an investor?  Can we agree on that?

22        MS. ELBERT:  Objection, Your Honor.

23        THE COURT:  Sustained.

24  BY MR. SOMMER:

25  Q    Let me ask it a different way.

Spaulding - cross - O'Brien                     5913

1              You have no idea -- well, you have no idea, as you

2    sit here, whether this young man over there got paid a penny

3    for the work he did at Platinum in 2015 and 2016, do you?  You

4    have no idea, right?

5    A    Well, I didn't until you showed me his pay stubs.

6    Q    So now you do have an idea.

7    A    Yes.

8    Q    He got paid nothing, right?

9    A    According to the pay stubs he didn't get anything as an

10   employee.

11             MR. SOMMER:  No further questions, Judge.  Thank

12   you.

13             THE COURT:  Anyone else?

14             MR. O'BRIEN:  Yes, Your Honor.

15             THE COURT:  Okay.

16   CROSS-EXAMINATION

17   BY MR. O'BRIEN:

18   Q    Good afternoon, ma'am.

19   A    Good afternoon.

20             MR. O'BRIEN:  Technical difficulties.

21             Melonie, do you have a spare?

22             THE COURTROOM DEPUTY:  Yes.

23             (Pause.)

24   Q    Okay.  Ma'am, my name is Kevin O'Brien.  I represent Joe

25   Sanfilippo.  He's a defendant in this case, too.  I don't

Jury Charge                                    7101

1   testimony and seen exhibits about Platinum's valuation of its

2   assets.  Judge Cogan has found that the valuation of

3   Platinum's asset was proper and you must accept that as a

4   fact.  Therefore --

5            MR. SOMMER:  Judge, could we ask you just the start

6   over I'm having a little trouble hearing you.

7            THE COURT:  Absolutely, I am happy to start over.

8   Sorry about that.

9            Ladies and Gentlemen of the Jury, you have heard

10  testimony and seen exhibits about Platinum's valuation of its

11  assets.  Judge Cogan has found that the valuation of

12  Platinum's assets was proper and you must accept that as a

13  fact.  Therefore, fraudulent valuations cannot serve as a

14  basis to convict any defendant.

15           I am also instructing you that the practice of

16  paying preferential redemptions to investors is not illegal

17  and the Government is not alleging that preferential

18  redemptions are illegal.

19           Now, I will read to you the jury charges.

20           They are written in Judge Cogan's voice and I will

21  read them in that manner, so I will not be substituting.

22  Where he references himself, you will assume that it is

23  Judge Cogan sitting before you today.

24           Members of the Jury:

25           Now that the evidence has been presented, it is my