**WILSON SONSINI**

Wilson Sonsini Goodrich & Rosati
Professional Corporation

1301 Avenue of the Americas
40th Floor
New York, New York 10019-6022

O: 212.999.5800
F: 212.999.5899

July 19, 2022

**VIA CM/ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:     *United States v. David Levy*, No. 1:16-cr-00640-BMC

Dear Judge Cogan:

On behalf of David Levy, we respectfully submit this reply to the government's sentencing submission, ECF No. 922 ("Gov't Submission"), to assist the Court in determining the appropriate sentence to impose at the August 11, 2022 sentencing of Mr. Levy.  As set forth below, the correct "loss" amount is zero, and the applicable Guidelines range is 0-6 months imprisonment.  We ask the Court to sentence Mr. Levy to probation.

In its opposition sentencing submission, the government asks the Court to sentence Mr. Levy to a "substantial custodial term."  Gov't Submission at 1.  But in doing so, the government has ignored virtually every factual and legal issue presented to the Court by Mr. Levy that bears on the Guidelines loss calculation, and instead has advanced conclusory positions that are demonstrably wrong and at odds with both the evidence and the law.  Put simply, while we hoped that the government would agree with our assessment that there was no loss, we expected it, at least, to provide some articulation of how the bondholders – who were aware of all the material facts at a time when they could have still sold their bonds for par or higher, and elected not to for reasons having nothing whatsoever to do with any defendant in this case – suffered any loss.  But the government submission did neither.  It simply ignored the issue and declined to address controlling Second Circuit caselaw, just as it failed to address almost every other issue raised in our opening submission.

Set forth below are Mr. Levy's responses to the government's sentencing submission.

I.      THERE WAS NO "LOSS"

The government argues that there was a "loss" sustained by the Black Elk "independent bondholders" because Black Elk used $70 million of the Renaissance sale proceeds to repay holders of Series E Preferred Equity, which the government claims "essentially ensured Black Elk's eventual bankruptcy . . . ." Gov't Submission at 8. This assertion is baseless.

As an initial matter, the payment to the preferred equity holders was not some kind of theft of funds. It was the payment of a legal obligation that Black Elk owed to those securities holders. As noted in our opening submission, it reduced Black Elk's legal obligations to its remaining securities holders by one dollar for every dollar that Black Elk paid. *See* ECF No. 907 ("Mem.") at 21. The government points to no evidence whatsoever to substantiate its claim that the payment of the preferred equity holders hastened or "ensured" the bankruptcy of Black Elk, and the company would have been in the same financial position had that same $70 million been used to pay bondholders – which is what the government maintained at trial that Black Elk should have done. It is precisely because of this that the "loss" analysis must focus on the bonds – specifically, the impact on the price of the bonds held at the time of the press release announcing the change to the Indenture, and the decisions bondholders then made while fully aware that the company was using $70 million in proceeds from the Renaissance asset sale to extinguish the preferred equity ahead of the bonds. The government ignores all of this in its submission, and it is clear why: an objective assessment of the conduct of the independent bondholders demonstrates, clearly, that the change to the Black Elk Indenture was not the proximate cause of any loss to the bondholders.

As we presented in our opening submission, at the time that Black Elk conducted the public consent solicitation, and in the months that followed the change to the Indenture, third-party valuation firms had determined that Black Elk had sufficient assets to meet all its obligations to both bond and equity holders. *See* Mem. at 12. The government simply pretends that these valuations do not exist and ignores its failure to present the slightest evidence that the valuations were even remotely inaccurate. In fact, as noted in our opening submission, the evidence was so clear that the third-party valuations were accurate that the Court instructed the jury that the valuations were to be accepted as so. *See* Mem. at 12 n.5. Therefore, it is plainly wrong for the government to suggest that it was somehow foreseeable to Mr. Levy – or even that it is remotely true – that payments to the preferred equity holders somehow hastened Black Elk's bankruptcy. As the Probation Department recognized (*see* PSR ¶ 62), and as is obvious from the evidence at trial, it was the unforeseeable and historic drop in oil and gas prices that caused Black Elk to have insufficient assets to pay all of its securities holders – not the repayment of one group of securities holders before another, which had little if any impact at all on Black Elk's eventual bankruptcy filing.

As for the bondholders themselves, the sole evidence in the record concerning the decisions of the independent bondholders is the testimony of Mr. Yee and Mr. Pulvino. Both thought the change to the Indenture would not pass; both then saw the press release announcing that the Indenture had been amended; and both then elected to continue to hold their bonds with the full knowledge that proceeds from the Renaissance asset sale would be used to repay the preferred equity holders ahead of the bondholders. *See* Mem. at 9-13. Mr. Yee even bought millions more of the bonds, fully aware of the change to the Indenture.

2

As we discussed in our opening submission – and there is no dispute from the government – these bondholders could have chosen to sell their bonds after learning that the Indenture had been amended, and they could have obtained par or higher. *See id.* at 10-11. Had they done so, they would not have suffered any loss at all. But they chose not to do so at the time and instead decided to embrace the risks attendant with continuing to hold the bonds (and buy more), fully aware that the $70 million pointed to by the government would no longer be available to repay the bondholders.

The issue here for the Court is not what happened over the course of the ensuing year as oil and gas prices marched lower and lower, causing substantial drops in the value of debt instruments at all comparable oil and gas exploration companies, as depicted in the chart in our opening submission, Mem. at 17 (which is also not disputed by the government). Rather, the issue is what impact the charged fraud – the alleged fraudulent change to the Indenture – had on the value of the bonds. That is why the analogy to pump-and-dump cases is so salient; in such cases, the dumping of the stock causes the value of the stock to plummet. Loss is easy to calculate: the day prior to the dump, the stock is trading at $10, and immediately after the dump, with no other material intervening events, the stock is trading at 10 cents. The loss is the difference in the value of the stock. But here, as noted in our opening submission, the Black Elk bonds did not lose *any* value at all after the public disclosure notifying bondholders that the Indenture had been amended (the event that the government argued could have only been achieved by a "rigged" process). Indeed, the Black Elk bonds were trading **higher and above par following the public disclosure of the amendment.** *See id.* at 10-11. This too cannot be disputed and has not been disputed by the government.

The Second Circuit's decision in *United States v. Rutkoske,* 506 F.3d 170 (2d Cir. 2007), is directly on point and controlling. In that case, the government persuaded the district judge to calculate loss by taking the difference between the price investors paid for the stock and the price approximately two years later, when price data thereafter became unavailable. The defense unsuccessfully objected to this methodology because the government's theory failed to account for intervening events over that two-year period that had nothing to do with the conduct of the defendants. The defense argued, therefore, that the government had failed to demonstrate that the loss was proximately caused by the wrongful conduct of the defendants, as required for the Guidelines loss analysis. *Id.* at 178-79.

The Second Circuit reversed the district court's loss determination. Citing its decision in *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), the court emphasized that "'[t]he loss must be the result of the fraud[,]'" and that "'[l]osses from causes other than the fraud must be excluded from the loss calculation.'" *Rutkoske*, 506 F.3d at 178-79 (quoting *Ebbers*, 458 F.3d at 128). The court also approved of the Fifth Circuit's decision in *United States v. Olis*, 429 F.3d 540 (5th Cir. 2005), which held that "'there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines'" and that the portion of a price decline caused by other factors must be excluded from the loss calculation. *Rutkoske*, 506 F.3d at 179 (quoting *Olis*, 429 F.3d at 546). The *Rutkoske* court, therefore, found that the date two years later used by the district court was "arbitrary[,]" and that the correct date should have been the date of the disclosure of the fraud. *Id.* at 180.

The *Rutkoske* court found additional support for its position in the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), on which the Fifth Circuit relied in *Olis*. As the Second Circuit described in *Rutkoske*:

> [In *Dura Pharmaceuticals*], the Supreme Court rejected the Ninth Circuit's "inflated purchase price" theory of loss causation, which held that plaintiffs in a civil stock fraud case could establish loss causation simply by showing that the purchase price was inflated because of the defendants' misrepresentation. *See* 544 U.S. at 340, 125 S.Ct. 1627. In rejecting this theory, the [Supreme] Court observed that although an artificially inflated price might cause an investor's loss when the investor sells his shares "after the truth makes its way into the marketplace," *id.* at 342, 125 S.Ct. 1627, other factors, such as changed economic conditions, might also contribute to a stock's decline in price, *see id.* at 343, 125 S.Ct. 1627, and a plaintiff must prove that the misrepresentation proximately caused the economic loss, *see id.* at 346, 125 S.Ct. 1627.

*Id.* at 179.

And while the government in *Rutkoske* argued that *Dura Pharmaceuticals,* a civil securities fraud case, should not apply to the calculation of loss at a criminal sentencing, the Second Circuit squarely rejected that position, stating, "we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." *Id.*

Finally, the *Rutkoske* court addressed the very analogy we set forth above of a pump-and-dump case, but added one caution:

> [C]ases might arise where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud. Even there, however, a coincidentally precipitous decline in shares of comparable companies would merit consideration. For example, a fraud disclosed just as the dotcom bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks.

*Id.* at 179-80.[1]

---

[1] This is precisely why we included in our opening submission a chart showing the steep decline suffered by comparable oil and gas exploration companies during the same period of time – all related to the drop in the oil and gas markets, and having nothing to do with any alleged conduct by the defendants. Mem. at 17. The government neither disputed nor addressed that chart.

4

We cited these decisions, including the controlling decision of the Second Circuit in *Rutkoske* in our opening submission. *See* Mem. at 10-11, 16-17. The government elected not to address them at all. But the application of these decisions is perfectly clear:

- Any loss calculation must only capture the loss from the fraud and not from other factors; and

- There is no loss if the price of the security does not decline when all the material facts become known; a subsequent decline in price is not proximately caused by the fraud.

The government's selection of an unidentified date sometime well after the Black Elk bankruptcy filing, when Mr. Yee then sold some of his bonds, squarely runs afoul of controlling authority as it is as arbitrary a date as that urged by the government in *Rutkoske*.[2] The relevant date, of course, is August 14, 2014, the date when the press release was issued and the date when Black Elk bondholders, including Mr. Yee and Mr. Pulvino, became aware of all the material facts: that the Indenture had been changed such that asset sale proceeds were going to be used to pay preferred equity holders ahead of bondholders. That was the date that the consequences of the alleged fraud were disclosed to the market. If the fraud had caused Mr. Yee and Mr. Pulvino to decline to tender their bonds because they had assumed that the unaffiliated bondholders would vote against the amendment (as those witnesses testified at trial), then they plainly learned on that date that the Indenture had been amended. At the time, they still could have sold their bonds without suffering any loss, because the bonds were still trading at or above par at the time of this disclosure. And as we know, armed with all the relevant and material facts, these bondholders elected not only to hold their bonds, but to buy more. The intervening events over the next year or two, as oil and gas prices precipitously declined, were intervening events causing loss of value to the bonds that the Second Circuit has made clear are not attributable to the conduct of the defendants – as a matter of law.

The government asserts in its submission – without the slightest explanation – that the decisions by Mr. Yee and Mr. Pulvino immediately following the change to the Indenture are "irrelevant" to the question of whether the bondholders sustained a loss resulting from the alleged fraud. Gov't Submission at 8. It is impossible to even begin to understand the government's assertion in this regard. The government seems to be of the view – directly

---

[2] The government notes in its submission that well more than a year *after* the Indenture was changed, and *after* oil and gas prices had historic lows, and at some unspecified time *after* the Black Elk bankruptcy was commenced, Mr. Yee sold his bonds at 25 cents on the dollar, and Mr. Pulvino's bonds also then lost value. *See* Gov't Submission at 8. Aside from being irrelevant, as explained above, the government's assertions are not even forthright. Mr. Pulvino made clear that he made over $4 million in profits from his Black Elk investments (*see* PSR ¶ 61; Trial Tr. 5266). And as for Mr. Yee, the government included in his "loss" the difference in the price Mr. Yee paid for bonds that he purchased *after* the Indenture had been amended and the price he then sold those bonds at well after the Black Elk bankruptcy filing. Moreover, the government fails to alert the Court that Mr. Yee sold many of his other bonds near par, as he confirmed in his interview with the prosecutors on November 9, 2016.

5

contrary to controlling precedent of the Second Circuit – that what happened a year or two after the public disclosure of the allegedly fraudulent behavior is somehow relevant, but what the bond market and the bondholders themselves did directly in reaction to that disclosure (precisely what the Second Circuit directs should be analyzed to assess Guidelines loss) is irrelevant. The government's position cannot be sustained as it is in defiance of binding precedent (and common sense).

In this case, there should be no dispute that the determinative factors are these: at the time Black Elk announced the amendment to the Indenture, the bondholders could have still sold their bonds and been paid par because the price of Black Elk bonds did not decline at all at the time of that disclosure. The bondholders therefore suffered no loss that was proximately caused by the alleged fraud. The bondholders made their own independent decisions to continue to hold their bonds following the distribution of the Renaissance proceeds to the preferred equity holders, and the fact that some of those bondholders may have suffered a loss a year or more later was caused by reasons that were separate and apart from any illegal conduct of the defendants. Under controlling precedent of the Second Circuit, the loss calculation for Guidelines purposes is therefore zero.[3]

## II. THE USE OF "GAIN" AS A PROXY FOR LOSS IS ERRONEOUS

As there was no "loss," then the Guidelines make clear that using "gain" as a proxy for loss is not permitted. Guidelines Application Note 3(B) to Section 2B1.1. But even if the Court determines that there was some amount of loss caused by the alleged fraud, such that the use of "gain" as a proxy for "loss" is permissible, then the "gain" determinations by the Probation Department and the government must be scrutinized, for they are both fatally flawed.

### A. The Probation Department "Gain" Calculation

The Probation Department determined that while the offense of conviction created some amount of loss to the Black Elk bondholders, it was impossible to calculate any particular amount given events outside the control of and unforeseeable to the defendants. PSR ¶ 62. As a result, the Probation Department determined to use "gain" as the proxy for "loss," and concluded that the gain should include the amounts received by Mr. Levy and his co-conspirators. This amount, according to the Probation Department, was approximately $9 million. *Id.*

In our opening submission, we explained why the Probation Department's gain calculation was flawed. First, while it may be proper to include gains obtained by co-conspirators, (*see* Mem. at 19), here, the only actual funds received by any conspirators were the funds received by Mr. Levy and Mr. Small, and those amounts were $256,679 and $102,672, respectively. PSR ¶ 59, 62. The other funds labeled by the Probation Department as "gain" were

---

[3] We noted in our opening submission that the other independent but unidentified bondholders had the same opportunity to sell their bonds as Mr. Yee and Mr. Pulvino, and some plainly did, as evidenced by Mr. Yee's purchase of an additional $3 million in bonds. There exists no reason to treat these unidentified bondholders any differently that Mr. Yee and Mr. Pulvino, and the government does not dispute the logic of this unassailable conclusion.

6

reimbursements to Mark Nordlicht's father and two charitable foundations, *see* Mem. at 19, and no evidence whatsoever was presented by the government (and none exists) that they were co-conspirators or played the slightest role in the change to the Black Elk Indenture. Accordingly, including such amounts from non-conspirators was error. The government in its opposition does not dispute that neither Jules Nordlicht nor the foundations were co-conspirators.[4]

Second, the payments to Mr. Levy and to Mr. Small noted above were ***not*** payments from Black Elk to repay preferred equity holders. To the contrary, both Mr. Levy and Mr. Small had an investment in PPBE, which owned Black Elk ***bonds.*** In other words, had there been no change to the Black Elk Indenture, and had the asset sale proceeds been used to repay bondholders instead of preferred equity holders, as the government has steadfastly urged, Mr. Levy and Mr. Small would have received the exact same payment amount. As a result, even those relatively modest amounts paid to Mr. Levy and Mr. Small were not properly included in "gain." The government does not dispute this in its opposition either.

Accordingly, the Probation Department has not identified a single dollar in "gain" that is properly included in the alternative "loss" calculation.

### B.     The Government "Gain" Calculation

The government, in its sentencing submission, agreed with the Probation Department that "loss" was "difficult-to-impossible to quantify," and that "gain" should be used instead. Gov't Submission at 8-9. The government, however, argued that the amount of gain to the defendants is $70 million – representing the amount of the Renaissance asset sale proceeds that Black Elk used to repay the preferred equity holders. The justification for the government's position is its argument that the preferred equity holders were all "Platinum insiders." *Id.* at 8. The government's position is erroneous.

First, it is important to remember that the entire point of using gain as a proxy for loss is to come up with a reasonable ***loss*** amount sustained by the Black Elk bondholders. In our opening submission, we explained that two-thirds of the bonds were owned by various of the Platinum funds and its alleged affiliates. Mem. at 7. As those entities were participants in the alleged scheme, then they cannot simultaneously be considered victims and instruments of the fraud, as the PSR recognizes. *See* PSR ¶ 62. The government does not dispute this.

Another significant group of bondholders, who held roughly $11,433,000 in bonds, voted to tender their bonds. They were paid in full, experienced no loss, and therefore cannot be victims. *See* Mem. at 11. The government also does not dispute this.

---

[4] The Probation Department also suggested that these amounts could be included because the amounts went to family members of the defendants. *See* PSR ¶ 62. But as noted in our opening sentencing submission, there does not appear to be any legal authority for including payments to investors who happen to be a family member of one of the defendants. We also explained that neither Mark Nordlicht's father nor either of the two charitable foundations was a family member of David Levy. *See* Mem. at 20. The government did not dispute this point and cited no authority for including these amounts in "gain."

7

Finally, an additional group of bondholders, holding $600,000 in bonds, voted not to tender, but to amend the Indenture, *i.e.*, they independently voted to amend the Indenture and make the Renaissance asset sale proceeds available to the preferred shareholders, the same outcome that the government claimed to be the object of the conspiracy. Those bondholders cannot be viewed as victims because they supported the effort to amend the Indenture. *See id.* Again, the government does not dispute this.

Collectively, then, the bondholders who could have potentially experienced a loss held $38,735,000 of Black Elk bonds.[5] Even if every one of those bonds had been rendered completely worthless because of the change to the Indenture (and we know with certainty that was not the case) then the greatest possible loss would have been well less than $38.735 million – not $70 million. The government makes no effort to explain why it nonetheless insists on the $70 million figure.

Second, the government maintains that the amount that Black Elk paid out to the preferred equity holders went, *in toto*, to "Platinum insiders." Gov't Submission at 8. Yet there is no evidence at all to support the government's conclusory position. Indeed, the government does not even define what it means by "Platinum insiders." Does it mean co-conspirators? If so, as described above, the amount paid by Black Elk to preferred equity holders who were co-conspirators was $0. Does "Platinum insider" mean employees of Platinum? If so, the government has not identified a single Platinum employee that was a preferred equity holder. Does "Platinum insider" mean an investor in one or more of the Platinum funds? If so, the government has failed to account for how much money these investors would have received had the Indenture **not been changed** – as Platinum and its affiliates owned more than $100 million in Black Elk bonds. Accordingly, the government's conclusory statement about "Platinum insiders" is devoid of any factual support, even if a meaning to that term could be inferred.

The clearest evidence of the government's misguided approach to "loss" and "gain" is found in the following "sentence" from the government's submission:

> Indeed, as the evidence presented at trial demonstrated that many of the preferred bondholders [sic] were Platinum investors, including both close friends of the defendants and individuals who had substantial sums of money invested across Platinum funds.

Gov't Submission at 9 (citing GX 2203).

Putting aside the typographical and structural errors in this quote, the government's point can be distilled. The government is arguing that some amount of the Black Elk preferred equity was held by individuals and entities that were also Platinum investors, and some of these Platinum investors were close friends of the defendants. But the government fails to explain how that supports a determination of a $70 million "gain" or "loss." The government does not

---

[5] As noted in our opening submission, Mem. at 11 n.4, there were millions of bonds sold in the market shortly after the Indenture was changed at or above par. These bondholders also suffered no loss, making the total potential loss even lower.

8

identify an amount of preferred equity that was paid to a close friend of any defendant, much less a close friend of David Levy – for no such evidence exists. And the government completely fails to explain how payments to extinguish preferred equity holders who also happened to be investors in other Platinum funds relates to the issue of "gain" or "loss," particularly as those investors could have received substantial payments even if no change to the Indenture had been made.

Finally, the government's reference to GX 2203 is indeed curious. This was a chart prepared by the government's forensic accounting expert, tracing payments that went from PPCO to investors in PPBE – Platinum Partners Black Elk – a fund which held Black Elk ***bonds***.[6] In other words, the government exhibit does not show any payments from Black Elk for preferred equity at all.

In the end – and plainly because there is no factual or legal authority to support its position – the government elects to abandon its arguments about "friends," "close friends," "Platinum insiders" and "family members" as a basis for calculating "loss" or "gain," instead concluding with the following: "[T]he appropriate estimate of gain should be approximately $70 million, which comprises all of the diverted funds that were improperly paid out to the holders of the Series E preferred equity in this case, ***regardless of their relationship to the defendants***." Gov't Submission at 9 (emphasis added).

This conclusory assertion is completely detached from any analysis by the government, or any legal authority that would lead to the conclusion that money sent to investors, "regardless" of their relationship with criminal defendants, qualifies as "gain" to the defendants. It plainly does not. *See* Mem. at 19-20 (citing *United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011); *USA v. Hussain*, No. 16-CR-00462-CRB-1, 2019 WL 1995764, at *14 n.9 (N.D. Cal. May 6, 2019), *aff'd sub nom. United States v. Hussain*, 818 Fed. Appx. 765 (9th Cir. 2020)).

### III. THE TWO-POINT ENHANCEMENT FOR TEN OR MORE VICTIMS DOES NOT APPLY

As set forth in our opening submission, if there was no loss, then there is no legal basis for including the two-point enhancement for "ten or more victims[,]" as to qualify as a victim, the individual must have sustained a Guidelines loss. Mem. at 22. The government does not dispute this.

In addition, we explained that the only bondholders identified by the government were the entities for which Messrs. Yee and Pulvino traded. The government responds that these entities included multiple investors, thereby aggregating to more than ten. But the government misses the point: as these funds were not victims, as explained above, it does not matter how many investors in those entities there were. Accordingly, as the government has come forward

---

[6] The Court may recall that the government directed its forensic expert as to what names to include on this exhibit as the bank records showed that it was a far longer list of investors in PPBE that received payment for their bonds from PPCO. *See* Trial Tr. 5856-59; 5876-81.

9

with no evidence that any bondholder sustained a loss that was proximately caused by the conduct of the defendants, the enhancement for ten or more victims does not apply.

### IV.  MR. LEVY PLAYED A MINIMAL ROLE IN THE OFFENSE

The government argues that as "Levy was responsible for directing the appropriate votes in furtherance of the scheme and distributing the proceeds[,]" he should not receive a four-point reduction for his minimal role. Gov't Submission at 10. The government misstates the evidence.

This Court has already found that there was no evidence that Mr. Levy played any kind of meaningful role in the purported scheme. *See* ECF No. 800 at 30-32. And while it is true that the Second Circuit found that the jury was entitled to draw certain inferences from David Levy having been copied on certain emails, it is certainly far from true that the government *proved* that David directed any of the votes, or that he played a role in distributing any of the asset sale proceeds. As we noted in our opening submission, Your Honor can faithfully abide by the Second Circuit's determination about the possible inferences that could have been drawn by the jury without doing violence to your own determination concerning Mr. Levy's role here. *See* Mem. at 23-24. Accordingly, we maintain that a four-point reduction for Mr. Levy's minimal role is appropriate.

### V.  THE ADVISORY GUIDELINES CALCULATION AND RANGE

Based on the above, Mr. Levy's Total Offense Level is 3. As noted in the PSR, Mr. Levy has no prior criminal history, and therefore is in Criminal History Category I. *See* PSR ¶ 83. Based upon a Total Offense Level of 3 and a Criminal History Category of I, the applicable advisory Guidelines range is 0-6 months. This places Mr. Levy within Zone A of the Guidelines Sentencing Table, for which probation is an authorized Guidelines sentence under Guidelines Section 5B1.1. Yet, even without a minimal role reduction, Mr. Levy would still have an advisory Guidelines range of 0-6 months, would remain within Zone A, and would have an authorized Guidelines sentence of probation.

### VI.  RESTITUTION AND FORFEITURE

The government has not disputed the defense position that neither restitution nor forfeiture is appropriate for David Levy.

**CONCLUSION**

      For the reasons set forth above and those in our opening submission, we respectfully request that the Court sentence David Levy to a non-custodial sentence of probation with no restitution or forfeiture.

Dated:  July 19, 2022                        WILSON SONSINI GOODRICH & ROSATI
                                                   Professional Corporation

                                                   By: /s *Michael S. Sommer*
                                                          Michael S. Sommer
                                                          Morris J. Fodeman
                                                          1301 Avenue of the Americas, 40th Floor
                                                          New York, New York 10019
                                                          Telephone:  (212) 999-5800
                                                          Facsimile:  (212) 999-5899
                                                          msommer@wsgr.com
                                                          mfodeman@wsgr.com

                                                 *Attorneys for Defendant David Levy*