

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DCP/LHE/NMA
F. #2016R00505

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 9, 2022

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Daniel Small
               Criminal Docket No. 16-640 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in opposition to the defendant's motion for entry of a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"), ECF Dkt. No. 954 (the "Mot."). As set forth below, the defendant's motion, which notably never articulates the applicable legal standard, rests entirely on specious inferences and strained readings of the record in the defendant's favor. The Court must apply the proper standard under Rule 29, viewing the evidence in the light most favorable to the government and deferring to the jury's role as finder of fact. The government respectfully submits that the motion should be denied.

I.    Applicable Law

      Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." See Fed. R. Crim. P. 29(c).[1] As the Second Circuit has observed, "a defendant challenging the sufficiency of the evidence bears a heavy burden." United States v. Landesman, 17 F.4th 298, 319 (2d Cir. Nov. 5, 2021) (citing United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017)) (internal quotation marks omitted). The Court "must determine whether upon the evidence, giving full pay to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Id. (citing United States v. Autuori, 212 F.3d 105, 114 (2d Cir.

---

[1]    Motions for relief under Rule 29(a) and Rule 29(c) are subject to the same legal standard; the only distinction is the timing of the motion. United States v. Romano, 859 F. Supp. 2d 445, 454 (E.D.N.Y. 2012).

2000). "In considering such a challenge, [the reviewing court] must credit every inference that could have been drawn in the government's favor and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." United States v. Reifler, 446 F.3d 65, 94-95 (2d Cir. 2006); see also United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (reviewing courts must "view the evidence presented in the light most favorable to the government," and "all permissible inferences must be drawn in the government's favor."). Moreover, "[p]ieces of evidence must be viewed not in isolation but in conjunction." Reifler, 446 F.3d at 94-95. "[I]f the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." Autuori, 212 F.3d at 114 (alterations in original) (internal quotation marks omitted). Relief under Rule 29 is therefore not available "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Guadagna, 183 F.3d at 130 (emphasis in original) (quoting United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987)).

In resolving a Rule 29 motion, a court "must be careful to avoid usurping the role of the jury." Autuori, 212 F.3d at 114; see also United States v. Florez, 447 F.3d 145, 154-55 (2d Cir. 2006) (in evaluating evidence in connection with a Rule 29 motion, courts must be "mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court"). "A court must 'defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.'" Landesman, 17 F.4th at 310 (citing United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019)). The "high degree of deference [afforded] to a jury verdict is especially important when reviewing a conviction of conspiracy." United States v. Anderson, 747 F.3d 51, 72-73 (2d Cir. 2014). "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. at 73. The "agreement [to participate in the conspiracy] may be inferred from the facts and circumstances of the case[, and] both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." United States v. Wexler, 522 F.3d 194, 207-08 (2d Cir. 2008). "Moreover, seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general." Landesman, 17 F.4th at 320.

II. Shearer Did Not Count All of the Platinum Votes, and He Told Small That He Was Not Going to Count Affiliated Bonds

Small first argues, in flat contradiction to the record and frankly, bizarrely, that "Shearer and BakerHostetler counted all of the Platinum Votes." Mot. at 1-3. The evidence is squarely to the contrary. Shearer not only testified that he decided to exclude all of the Platinum-affiliated votes (of which he was aware) from the vote, but that he informed Small of his decision to do so. Specifically, Shearer testified that on August 14, 2014, after receiving the email from Small when, for the first time, Small revealed the existence of $43,293,000 bonds held by parties he characterized as "not deemed affiliates," see GX 761, Shearer had a call with Small. Tr. 289-90. During the call, Shearer discussed the new information of the "$43 million of bonds that were referenced as 'not deemed affiliates.'" Id. at 290. Specifically, Shearer asked Small to explain what this new category of bonds was, and Small "explained that the bonds were held by certain entities, but . . . didn't think that Platinum beneficially owned them." Id. Shearer testified that

2

he did not believe Small provided him with the names of the entities that held the $43 million in bonds.  Id.  As a result of that call, Shearer concluded that "the information was sufficiently unclear that we concluded that we should just treat those bonds as also being owned and controlled by Platinum," meaning that they would be "exclude[d] from the calculation."  Id. at 290-91.  Shearer conveyed that to Small, who had no specific reaction to that decision.  Id. at 291.

Seemingly ignoring this clear testimony,[2] Small relies upon (1) Black Elk's press release announcing the results of the vote, which did not reflect the exclusion of any bonds, and (2) Shearer's opinion letter in support of his claim that the PPCO and PPLO bonds were in fact counted during the public consent solicitation process.  Mot. at 2.  As to the press release, Shearer explained that when Baker Hostetler "prepared the first draft [of the press release]," which did reflect the exclusion of the $18.3 million bonds held by PPVA, "we were aware of the 18.3 and were comfortable that that number was held by affiliates because that's what we had been told.  After receiving the additional information from Dan Small and the somewhat ambiguous explanation of whether they were owned or not, we didn't feel comfortable including those numbers in the press release."  Tr. at 295.  As a consequence of that discomfort, Shearer "took out any reference to the affiliated bonds that were excluded from the vote" from the press release.  Id.  Consequently, there is no support in the record for Small's claim that the press release shows the PPCO and PPLO votes were actually counted—the testimony is directly contrary.

As to Shearer's opinion letter, that letter expressly relies upon the Officer's Certificate signed by John Hoffman as Chief Executive Officer of Black Elk.  That Certificate merely affirms that "a majority in aggregate principal amount of the Notes outstanding have consented to the Second Supplemental Indenture . . . excluding any Notes held by the Permitted Holders, the Issuers or any Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Permitted Holders, the Issuers or the Guarantor."  GX 780 at p. 29 (emphasis added).  As the Court is aware, a majority of the Notes voted in favor of the Second Supplemental Indenture even after the notes held by PPCO and PPLO were excluded from the vote,[3] see GX 761, and the Officer's Certificate expressly refers to affiliated bonds having been excluded.   Thus, the opinion letter, which relies for its determination that the vote was successful on Hoffman's Officer's Certificate, provides no support for Small's conclusion either.

Given that the evidence conclusively establishes that the PPCO and PPLO bonds were, in fact, excluded from the vote, Small must implicitly be arguing that Shearer's testimony on this point is false and should not be credited.  This argument is both contrary to law and irrelevant.  First, such wholesale discrediting of witnesses is contrary to the legal standard

---

[2]  To the extent Small's point is that Shearer excluded $43,260,000 in bonds but did not specifically exclude PPCO and PPLO's bondholdings, that point has no bearing.  Shearer was never told what specific entities held the "not deemed affiliates" bonds—the point is that they were not included in the tabulation of the vote.

[3]  The success of the vote was achieved by covertly voting the bonds held by the Beechwood entities, which were counted in the vote as Shearer was unaware of their affiliate status.

governing Rule 29 motions. United States v. Coté, 544 F.3d 88, 99-100 (2d Cir. 2008) (reversing entry of a Rule 29 order where that order was premised upon the court's rejection of the government's evidence on credibility grounds).

More importantly, even if Small were correct and, contrary to all of the actual evidence, Shearer counted the PPCO and PPLO bonds to determine that the consent solicitation vote had passed, that fact would not exonerate Small. There is no evidence that Small provided Shearer with truthful or complete information as to the facts of the PPCO and PPLO bondholdings, indeed Shearer testified that he did not believe Small even provided the names of the potentially affiliated entities. And, the evidence shows that Small acted to conceal the role of Beechwood in the consent solicitation vote, whose votes were unlawfully counted. Furthermore, regardless of what Small belatedly disclosed—once he knew he could—the consent solicitation document transmitted to bondholders falsely represented that Platinum controlled $18.3 million bonds. If Shearer had counted the PPCO and PPLO bonds in determining the outcome of the vote, that would not mean Small is not guilty of the fraud charges against him, because the fraudulent scheme was already complete by the time Shearer determined that enough votes had consented to pass the second supplemental indenture.

Finally, Small argues that because bonds voted by PPCO and PPLO were included in the first "private process" attempt to amend the indenture in earlier 2014, the government's evidence has failed to prove his fraudulent intent in connection with the successful public process. Mot. at 2-3. The private process failed due to concerns raised by the Trustee relating to the issue of a record date and the prospect of bondholders being able to submit multiple votes. Tr. at 202-03, 220. No amendments were passed, and those amendments that were sought did not involve paying the preferred equity in any event. Tr. at 658. Given the evidence that Small was expressly advised, repeatedly, following the private process that affiliate bonds cannot participate in the consent solicitation vote, and given his knowing and willful misrepresentations about the number of Platinum's affiliated bond-holdings, the government's evidence is sufficient to establish Small's fraudulent intent in connection with his actions in orchestrating the successful scheme to fraudulently amend the indenture to allow payment of the Series E preferred equity, as charged.

III.    The Evidence Shows Small Knew PPVA, PPCO, PPLO and Beechwood Were Affiliates

Next Small argues that "there was no evidence that [he] knew that Beechwood was anything more than a 'friendly' entity." Mot. at 3. On the contrary, there is no evidence in this record that Small knew what a "friendly" was, nor, indeed, is there any evidence at all of what a "friendly" in fact is. There is, however, abundant evidence that Small was informed, repeatedly, what an affiliate was, and that he knew that PPVA, PPCO, PPLO and Beechwood were all affiliates.

In connection with this argument, Small relies heavily on documentary evidence that in no way reflects that it was ever seen by, or discussed with, Small. See, e.g. DX-6701, DX1-271; DX1-272; DX-6291. Indeed, the defense cites only one email received by Small that so much as referred to "friendlies," DX-1-533, in which Mark Nordlicht wrote, "Hold for a little. We have friendly buying 20 million." Setting aside that it is entirely unclear what Nordlicht even intended by the use of the term "friendly" in this context, this communication was also sent in

4

March of 2014—more than three months prior to the launch of the public consent solicitation process—and Nordlicht's email to Small and others did not include Shearer. While Small then devotes the bulk of his argument to emphasizing information that Black Elk's outside counsel, Robert Shearer, arguably learned about Nordlicht's use or intended use of "friendly" bondholders from a concerned employee, see Mot. at 2, DX-1-533 is the slim reed to which his argument about Small's claimed knowledge of friendlies rests. What Shearer was told about Nordlicht's potential use of friendly bondholders is entirely irrelevant to Small's state of mind absent evidence that Shearer's knowledge was then imparted to Small—and there is no such evidence.[4] Again, other than a single email from March of 2014, there is no evidence of Small being exposed to or understanding the concept of a "friendly." And there is no evidence whatsoever of Small, or even Nordlicht, being told or otherwise having the understanding that Beechwood, PPCO, or PPLO were "friendlies." It also strains credulity to believe that the defendant thought PPCO and PPLO—Platinum funds controlled by the defendant and his boss—were mere "friendlies" not affiliates. But that is the improper inference the defendant has asked this Court to draw. For substantially the same reasons, the Second Circuit rejected this argument when it was made by Nordlicht and Levy: "we are not aware of any evidence in the record that Levy, Nordlicht, or Small disclosed the PPLO-, PPCO-, or Beechwood-owned bonds to Shearer prior to the dissemination of the Consent Solicitation, or sought Shearer's – or any other attorney's – advice regarding whether PPCO, PPLO, or Beechwood qualified as affiliates and should therefore be excluded from the consent calculation." Landesman, 17 F.4th at 328.

This stands in stark contrast to what the evidence does show: that prior to and during the public consent solicitation process, which began in June 2014, Shearer told both Small and Jeff Shulse, repeatedly, that affiliate votes could not be counted in connection with determining whether the consent solicitation passed. See, e.g., GX 1896 (June 3, 2014 email from Shearer attaching draft consent solicitation); GX 1899 (July 3, 2014 email from Sakowitz conveying legal advice that affiliate bonds cannot be counted); GX 1903 (request for officer's certificate relating to Platinum's bondholdings); Tr. at 455 (Shearer "I do recall that I told them we wouldn't count the affiliate bonds"), 457 ("I told Jeff Shulse . . . that we could not count affiliate's bonds in the public process."), Tr. at 487 ("We had talked about the affiliate rule [with Small]."). Moreover, the evidence is clear that Small understood the application of this rule; see GX 690 (July 3, 2014 email from Small to Shearer, Brittany Sakowitz and Jeffrey Shulse asking Shearer or Sakowitz to "confirm that under the TIA, if $5 million of the bonds were owned by an affiliate, then in order for the consent to be approved, a majority of 145 million, greater than 72.5 million, would need to consent."); GX 695 (July 9, 2014 email from Small to Sakowitz, Shearer and other Baker Hostetler attorneys stating "$18,321,000 bonds are controlled by PPVA and should be disclosed and excluded from the calculation); GX 726 (July 28, 2014 email from Small again seeking to confirm how the exclusion of affiliate bonds would affect the determination of the outcome). The evidence is also clear that Small never, not once, expressed confusion about what constitutes a

---

[4] Moreover, Small mischaracterizes even Shearer's testimony on this point. Far from testifying that "it was permissible, and not illegal, for friendly bondholders to vote in the Consent Solicitation Process," Mot. at 3, Shearer testified (1) that he recalled general testimony that so long as a friendly bondholder is not an affiliate, votes by such a friendly bondholder would be proper, and (2) that he "did not know what Mr. Nordlicht meant by a friendly bondholder [and] was speculating what a friendly bondholder might be." Tr. at 361-63.

5

affiliate, or asked Shearer for any guidance at distinguishing between a friendly and an affiliate. Tr. 659.

The evidence likewise clearly shows that Small had knowledge of Beechwood's affiliate status. First, the evidence established that Small worked closely with David Levy, and that they had shared an office while Levy was an employee at Platinum. Tr. at 793. Levy and Small, together, continued managing the Black Elk position after Levy left to become the Chief Investment Officer at Beechwood, still under the direction of Mark Nordlicht. Tr. at 1342. For example, in GX 657, on June 22, 2014, right around the time the public consent process starts, Nordlicht emails Levy and Small together to discuss management of Black Elk generally and their work on the consent solicitation process. The fact that Levy, as Chief Investment Officer—a top executive—at Beechwood, was working simultaneously on Black Elk on behalf of Platinum, at the direction of Mark Nordlicht, who also founded Beechwood, is sufficient evidence, standing alone, to support an inference that Small was aware of Beechwood and Platinum's affiliate status. Levy was in a position to make investment decisions on behalf of Beechwood and was simultaneously working for Nordlicht—together with Small, who was himself simultaneously engineering the consent solicitation that relied on Beechwood's consent votes being counted.

Second, the evidence shows that Small, together with Levy, Nordlicht and Shulse, was engaged, starting in April 2014, in tracking the ownership of the Black Elk bonds across Platinum and Beechwood entities. See, e.g., GX 584, 8, 693, 731. This evidence goes beyond merely knowledge that Beechwood held bonds, but further supports an inference that the conspirators were aware that the Platinum entities and the Beechwood entities were affiliated. Among other things, information about who is the beneficial owner of a given number of bonds is not publicly available; the very fact that the conspirators had access to real-time information about the status of Beechwood's books is circumstantial evidence of their relationship. Moreover, the series of emails makes clear that the bonds are merely being moved around across the various entities, the overall total does not materially change. And, it is clear from the documents that the conspirators were all aware of how Beechwood would vote in the consent solicitation—and the jury could reasonably infer that this awareness resulted from their knowledge that Nordlicht would dictate Beechwood's votes. Also, in GX 731, the conspirators go beyond updating one another on the status of the overall holdings across Beechwood and Platinum. In this document, Small includes a calculation, adding all the bonds controlled by Platinum across the various Platinum and Beechwood entities, and subtracting the disclosed holdings of PPVA, and determined that they held sufficient bonds to dictate the outcome of the vote. As the Court in Landesman found, this evidence does not merely show that the defendants knew Beechwood held bonds, but "the fact that the table only excludes the $18.3 million bonds held by PPVA supports an inference that Levy knew the PPCO-, PPLO- and Beechwood held bonds had been concealed from Shearer and the bondholders and were being voted to ensure the amendment would pass." Landesman, 17 F.4th at 325-26. Of course, if that inference applies to Levy it also applies to Small who coordinated the voting of the PPCO and PPLO bonds in late July, before Shearer ever suggested voting Platinum's bonds. See GX-294, 719.

Third, other circumstantial evidence in the record supports an inference that Small was aware of Beechwood's affiliate status. Among other things, Small sends several emails during the consent solicitation process arranging various meetings with Mark Nordlicht and David

6

Levy and a company called Delek, and proposes the meetings can take place at Platinum or Beechwood, GX 68, 69, and himself participated in meetings relating to joint investments across Platinum and Beechwood. GX-73. And, Small proposed himself, while a Platinum employee, working as a portfolio manager on a Beechwood investment. GX-34.

Finally, Small's surreptitious conduct in his dealings with Robert Shearer supports an inference not only of his knowledge of Beechwood's affiliate relationship with PPVA, but further, his intent to conceal that relationship. The evidence shows that Small never mentioned Beechwood to Shearer, despite tracking the bonds held by Beechwood for months, together with those held by the Platinum entities, and knowing, well in advance of the close of the consent, how Beechwood would vote. Even more significantly, the evidence shows that, after the close of the consent solicitation vote, Small decided to notify Shearer as to some number of votes submitted by bondholders that could be deemed affiliates of PPVA—which we now know to reflect the bonds held by PPCO and PPLO. Small never revealed to Shearer the fact that PPCO and PPLO, doubtless affiliates, held bonds and voted in the consent solicitation until after it was over.[5] And then he disclosed them using obfuscating language, and most importantly, never mentioned Beechwood's holdings. This conduct supports an inference that, to deleverage their potential legal risk, Small disclosed PPCO and PPLO's holdings to Shearer only after the vote closed and it was determined that enough bondholders had tendered that those votes were not needed to pass the consent. But, he chose not to flag the holdings of Beechwood because the consent would not have passed without them. See Landesman, 17 F.4th at 339 ("The jury was entitled to infer that Small's email – sent after the transaction closed and Platinum had secured a sufficient number of votes to ensure the amendments' passage – was simply an effort to cover their tracks, rather than an act in good faith."). If it were true that Small thought Beechwood or PPCO and PPLO were "friendlies" or that for some other reason there was no prohibition on them voting, the fact that the consent was destined to succeed would have been openly discussed with Shearer. Instead, the contemporaneous email correspondence shows the conspirators, on one side of the curtain, all openly tracking and discussing Beechwood and Platinum's bondholdings and ensuring they had sufficient bonds to succeed in the vote, and, on the other side of the curtain, telling Shearer only about PPVA. This conduct supports a reasonable inference of both knowledge and intent; crediting all reasonable inferences in favor of the government, as the law requires, results in the failure of Small's motion on this basis.

Small also argues that the evidence failed to establish Beechwood and Platinum's affiliate status—this is not the case. The evidence shows, among other things, that Nordlicht founded Beechwood, hired key personnel, staffed Beechwood with multiple C-level executives who worked for him at Platinum while also working at Beechwood, understood Beechwood to be under his control, moved Black Elk bonds to Beechwood at his mere instruction, and dictated how they would vote in the consent solicitation vote. As the Landesman Court found, viewed through the appropriate lens under Rule 29, there was enough evidence presented in 2019 to support a rational jury's finding that Beechwood and Platinum were affiliates—and nearly all of that

---

[5] The evidence further shows Small never disclosed that PPCO and PPLO, specifically, had voted those bonds.

7

evidence has been presented in this trial.[6] Landesman, 17 F.4th at 315, 322 (describing "Beechwood as Platinum-affiliated and controlled."), 329 ("[t]he email evidence supports an inference that Levy understood the Platinum-controlled bonds, including those owned by PPCO, PPLO and Beechwood, likely qualified as affiliates"), 330 ("Viewing the evidence as a whole, a rational jury could have concluded . . . that Beechwood likely qualified as an affiliate for the purposes of the Indenture."). Furthermore, DX-2102-B, the April 2015 letter from Elliot Feit in response to an inquiry from CohnReznick in connection with their work auditing PPCO, does not support an argument that anyone, at the time of the consent solicitation believed Beechwood and Platinum to not be affiliates. As an initial matter, the letter, prepared by a fairly junior Beechwood employee, substantially post-dates the consent solicitation process, by which time certain of the defrauded bondholders had begun asking questions about the legitimacy of the vote. Tr. at 931-9328 (testimony of Dixon Yee). Also, among other things, the letter it is attached to from Daniel Mandelbaum, CFO of PPCO, reflects over $100 million in transactions between Beechwood and a single Platinum entity, PPCO, during 2014. Given that Small himself has argued that Beechwood's own customer agreements forbid related party transactions, Tr. at 1246-48, Beechwood's submission of such a letter should be viewed with skepticism, and certainly provides no basis to dismiss the prosecution.

IV. Small Knew and Understood What Constituted an Affiliate Under the Indenture

Contrary to Small's argument, there is no evidence the defendant failed to understand the meaning of the word "control," and his argument otherwise depends on unwarranted and improper inferences in the defendant's favor. Mot. at 7. Rather, the evidence shows that the defendant repeatedly reviewed and commented on documents that defined the term "affiliate" in terms of control and applied those terms without any hesitation or request for follow up advice or clarification. It is irrelevant that Sakowitz's advice to the defendant was framed in terms of the Trust Indenture Act (the "TIA")—he saw substantially the same language in numerous other documents and there is no daylight between Section 316(a) of the TIA and Section 2.09 of the indenture.

On July 3, 2014, Brittany Sakowitz, the BakerHostetler associate, wrote to Small to confirm that "[s]ecurities owned by the obligor or by any person <u>directly or indirectly controlling or controlled by or under direct or indirect common control</u> with the obligor must be disregarded for purposes of calculating the vote required to approve the proposal." GX-689 (emphasis added). Although Sakowitz cited the TIA, substantially the same language regarding control appears in numerous documents that the defendant reviewed, including documents he edited. The consent solicitation itself includes this language: "Otherwise neither we, nor any person <u>directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any notes</u>." GX-8406 at 5 (emphasis added). The draft officer certificate Small received from Robert Shearer on August 1, 2014 also explicitly defined the term "Affiliate" in terms of control. GX-737 at 2 ("As used herein, 'Affiliates' means, as to any person or legal entity, any other person or legal entity <u>directly or indirectly controlling or controlled by or under direct or indirect common control with</u> such specified person or legal

---

[6] Moreover, the documentary evidence, which is nearly identical to that admitted in 2019, has been supplemented by new evidence, including the testimony of Paul Poteat.

8

entity.") (emphasis added). The consent solicitation and Platinum officer certificate are substantially similar to Section 2.09 of the indenture. GX-9507 § 2.09 ("any Person <u>directly or indirectly controlling or controlled by or under direct or indirect common control</u> with the Permitted Holders, Issuers or any Guarantor") (emphasis added).

There is no evidence Small was confused about the meaning of the term "control"; evidence that he parsed the provisions of the indenture is not required. The indenture's definition of "affiliate" provides that "control" means "the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities, by agreement <u>or otherwise</u>." GX-9507 at BH-BEFILE0013896 (emphasis added). That definition is broad, not technical, and can be understood by applying common sense. Moreover, Small referred to "control" on multiple occasions in emails (in addition to reviewing the documents discussed above). <u>See</u> GX-681 (citing Annex-1-3 of the Consent Solicitation, which requires consenting holders to certify that they are not affiliates of the issuer and stating "In section 5 of the Signature Annex the holder is confirming the above representation. My reading of the language is that section 4 is duplicative."); <u>see also</u> GX-699 (informing Shearer and Sakowitz "per the attached email $18,321,000 bonds are controlled by and should be disclosed and excluded from the calculation."). Small's conduct did not suggest confusion—the best inference from the evidence is that he understood the meaning of control perfectly. After receiving Sakowitz's advice, Small didn't ask for clarification or additional advice, he didn't ask any follow-up questions at all. Instead he emailed Nordlicht and Levy, writing "See below regarding the majority consent solicitation." GX-689. A few days later, he wrote to them again, saying that the company must "disclose how many bonds are owned by affiliates . . . Let's discuss asap in order to finalize and launch by Thursday." GX-692. He applied the term "affiliate" as well, again, without any uncertainty as to its meaning, in his conversations with Nordlicht and Levy and with Robert Shearer. <u>Compare</u> GX-760 (characterizing PPCO and PPLO as "Possible Affil" in correspondence with Nordlicht and Levy), <u>with</u> GX-761 (describing the same PPCO and PPLO bonds as "Not Deemed Affiliates" with Shearer).

In short, there is no requirement the government present direct evidence Small studied particular provisions of the indenture, and the jury is entitled to infer that Small understood the meaning of the term of control from the numerous documents he received and commented on and from his conduct and communications.

V.      At a Minimum, the Court Should Defer Ruling

For all of the reasons set forth above, the government respectfully submits that an order entering a judgment of acquittal in this case would be contrary to the standard governing Rule 29. To the extent the Court is nevertheless inclined to grant such an order, however, the government requests that the Court defer its ruling until after the jury has reached a verdict. As the Advisory Committee Notes to Rule 29 recognize, there is a public interest in the government's right to appeal the Court's decision. The Court can fairly reconcile that interest with the defendant's interest in avoiding a second prosecution by deferring its decision to after the verdict. Rule 29 Adv. Comm. Notes to the 1994 Amendment. Should the jury convict in this case, and the Court then issue a Rule 29 order, the government can elect to pursue an appeal and, if successful, there would be no second trial of the defendant, instead the verdict would merely be

9

reinstated.  Id.  The government respectfully submits that its interest in preserving its right to appeal is particularly compelling in this case, where it has previously successfully appealed the Court's prior issuance of an order under Rule 29.  Consequently, while the government respectfully submits that a Rule 29 would be unjustified in this case at any time, it further respectfully requests that, at minimum, the Court defer its ruling in order to preserve the government's right to appeal.

          Respectfully submitted,

          BREON PEACE
          United States Attorney

By:    /s/
          David C. Pitluck
          Lauren Howard Elbert
          Nick M. Axelrod
          Assistant U.S. Attorneys
          (718) 254-7000

cc:    Clerk of the Court (BMC) (by ECF)
       Defense counsel (by ECF)