UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
UNITED STATES OF AMERICA,                                      :
                                                               :
- against –                                                    :   **MEMORANDUM DECISION AND**
                                                               :   **ORDER**
MARK NORDLICHT and                                             :
DAVID LEVY,                                                    :   16-cr-00640 (BMC)
                                                               :
                              Defendants.                      :
                                                               :
-------------------------------------------------------------- X

**COGAN,** District Judge.

Before the Court is (1) defendant Mark Nordlicht's renewed motion for a new trial under Fed. R. Crim. P. 33, in which defendant David Levy joined, and (2) defendants' supplemental briefing addressing the Supreme Court's recent decision in Ciminelli v. United States, 143 S. Ct. 1121 (2023), which the Court construes as a renewed motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. For the reasons that follow, both motions for a new trial are denied. The Court grants judgment of acquittal on Nordlicht and Levy's convictions for conspiracy to commit wire fraud and otherwise denies their motion for a judgment of acquittal.

## BACKGROUND

Nordlicht and Levy were tried in 2019, and a jury found them guilty of three of the eight counts charged in the indictment, namely, securities fraud, conspiracy to commit securities fraud, and conspiracy to commit wire fraud. I granted Nordlicht's motion for a new trial under Rule 33 and also granted Levy's motion for judgment of acquittal under Rule 29. See United States v. Nordlicht, No. 16-cr-00640, 2019 WL 4736957, at *1 (E.D.N.Y. Sept. 27, 2019). I also alternatively granted Levy's Rule 33 motion in the event that his judgment of acquittal was later reversed. The Second Circuit did reverse, United States v. Landesman, 17 F.4th 298 (2d Cir.

2021), holding that this Court erred in granting Levy's Rule 29 motion and abused its discretion in granting both defendants a new trial.

Back before this Court on remand, Nordlicht and Levy filed renewed Rule 29 and Rule 33 motions, which were denied. United States v. Nordlicht, No. 16-cr-640, 2022 WL 1469393, at *1 (E.D.N.Y. May 10, 2022). After that, in the summer of 2022, Nordlicht and Levy's co-defendant, Daniel Small, went to trial. Small was charged in the same scheme as Nordlicht and Levy and was originally set to be tried jointly with them, but Small's trial was ultimately severed at the last minute due to counsel unavailability. The jury found Small guilty of securities fraud and conspiring to commit securities fraud but not guilty of conspiring to commit wire fraud.

Nordlicht and Levy now renew their Rule 33 motion for a third time, based in part on additional evidence adduced at Small's trial.

## **DISCUSSION**

### I. Legal Standard

Under Rule 29(c), "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." "When a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984).

"A reasonable mind must be able to conclude guilt on each and every element of the charged offense." Id. "However, all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense." Id. "The evidence is to be viewed not

in isolation but in conjunction," id., "as each fact may gain color from others," Landesman, 17 F.4th at 319.  Moreover, "the Government need not negate every theory of innocence."  Id.

As a result, "a defendant challenging the sufficiency of the evidence bears a heavy burden."  Id.  The "high degree of deference afforded to a jury verdict is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  Id. at 320.  However, a conviction based on speculation alone cannot stand.  Specious inferences should not be indulged "because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting Sullivan v. Louisiana, 508 U.S. 275, 278 (1993)).

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Second Circuit has recently described the circumstances under which a district court may grant a Rule 33 motion for a new trial to those in which the "evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  United States v. Archer, 977 F.3d 181, 187 (2d Cir. 2020).  Granting a Rule 33 motion is an abuse of discretion unless "the evidence was patently incredible," the evidence "defied physical realities," "an evidentiary or instructional error compromised the reliability of the verdict," or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony."  Landesman, 17 F.4th at 331.  Although "this is not an exhaustive list," the Second Circuit has cautioned that granting Rule 33 motions is only appropriate "in the most extraordinary circumstances."  Id. at 330-31.

3

**II.     The BakerHostetler Memo and Hoffman's 3500 Materials**

Nordlicht and Levy argue, first, that they were convicted on the "demonstrably false" theory" that they hid Platinum's relationship with Beechwood from Black Elk and Black Elk's law firm, BakerHostetler. The Government's theory, they claim, is belied by the July 1, 2014 memo from BakerHostetler litigator Paul Francis to Black Elk's then-CEO, John Hoffman, and then-General Counsel, Marizza Piché.[1] The memo notes: "Platinum [h]as stated that it intends to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, which will leave $90 Million in bond debt in the hands of so-called 'friendly' bond holders, most of which is held by Platinum itself." Nordlicht and Levy also highlight Shearer's testimony that in April or May of 2014, before the public consent solicitation process, Shearer learned that Platinum owned roughly $100 million in Black Elk bonds. In defendants' view, this evidence fatally undermines the Government's theory of scienter.

This Court relied on the BakerHostetler memo and Shearer's knowledge of Black Elk's ownership when granting defendants new trials back in 2019. See Nordlicht, 2019 WL 4736957, at *17-18. The Second Circuit disagreed, concluding neither Shearer's knowledge nor the BakerHostetler memo negated the jury's finding regarding Nordlicht's criminal intent. Addressing the BakerHostetler memo, the Second Circuit emphasized there was no evidence in the record that (1) Nordlicht provided the information that formed the basis for this memo, (2) the memo was completed at Nordlicht's request, (3) the memo opined on the affiliate status of any of the Platinum-related entities, or (4) Nordlicht received or relied on any such memo in formulating his views about the affiliate rule. See Landesman, 17 F.4th at 338.

---

[1] This memo was excluded as hearsay at both trials.

Nordlicht and Levy now argue that point (1) was false because Hoffman's 3500 materials reveal that the relevant information in the BakerHostetler memo did, in fact, come from Nordlicht. The Court agrees with defendants that Hoffmann's 3500 materials reveal that the information about "friendly" bondholders in the BakerHostetler memo must have come from Nordlicht, as Hoffman told the Government that, prior to meeting with Nordlicht, he "did not know who the bond holders were." Yet, as the Government points out, these 3500 materials were produced to defendants long before the Nordlicht-Levy trial, and defendants did not call Hoffman as a witness or raise this argument in any of their previous post-trial submissions. As a result, this argument is untimely. See Fed. R. Crim. P. 33(b)(2) ("[A]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.").

Timeliness aside, the Court agrees with the Government that this argument fails on the merits under Landesman. Nordlicht was charged with misleading bondholders, not with deceiving Black Elk's management, and his disclosure to Hoffman was not reasonably calculated to reach bondholders. When Nordlicht shared this information with Hoffman, he had no idea that Hoffman would turn around and tell Francis, especially since Hoffman went to Francis for advice on whether he should sue Platinum, Nordlicht's company. Nor was there any reason to think Hoffman, a litigator, would share that information with Shearer, the deal lawyer overseeing the consent solicitation process.

The Second Circuit was clearly focused on the information Nordlicht concealed from Shearer. See Landesman, 17 F.4th at 337-38. But even if Nordlicht had called up Shearer in July 2014 and told him that $90 million in bonds were held by Platinum and "friendly" bondholders – that wouldn't necessarily reveal an intent to comply with the affiliate rule unless

Nordlicht also "identif[ied] his 'friendly holders,'" "explain[ed] why they were not considered 'affiliates,'" or "ask[ed] any questions or s[ought] further advice regarding the application of the Affiliate Rule." Id. at 332.[2] Nordlicht and his co-defendants had every opportunity to raise the question of Beechwood's affiliate status with Shearer before the public consent solicitation, but they chose not to. This, combined with other circumstantial evidence of criminal intent, persuaded a jury beyond a reasonable doubt that Nordlicht and Levy intended to deceive bondholders. Although I disagreed with that finding, this question has already been decided decisively in the Government's favor.

Nordlicht and Levy also argue that the Government "knew or should have known" that they misled this Court and the Second Circuit when they represented that Nordlicht "had no involvement" in the BakerHostetler memo. They argue the Government's false statements violated due process and warrant a new trial.

The Government's prior presentation to this Court – that "any information in the [BakerHostetler memo] came not from Platinum, the Defendants, or their co-conspirators" – was certainly misleading, if not outright false. We now know that this information came from Nordlicht via Hoffman. But, again, defendants have had Hoffman's 3500 materials since 2018 and did not raise this issue until now. The most likely explanation is not, as defendants suggest, that the Government intentionally misled this Court and the Second Circuit but rather that the Government (like defendants) simply overlooked it.

---

[2] For this reason, it doesn't much matter whether Shearer learned the contents of the BakerHostetler memo around June 26, 2014, before the public consent solicitation vote. In assessing defendants' criminal intent, we must look at defendants' conduct, not what Shearer may have learned through the grapevine. Although one might think it reasonable to rely on lawyers to ask the right questions, Shearer failed to do so, and defendants let him.

Nor does Government bad faith really matter; introducing a false statement in a criminal proceeding can violate due process even where the prosecutor is ignorant of its falsity. See Mills v. Scully, 826 F.2d 1192, 1195 (2d Cir. 1987). Rather, defendants' due process claim fails because they cannot show a "reasonable likelihood" that the Government's statements affected the outcome of the case. See Jenkins v. Artuz, 294 F.3d 284, 292 (2d Cir. 2002). Although the Second Circuit relied on the fact that there was "no evidence in the record that Nordlicht provided the information that formed the basis for the [BakerHostetler] memo," Landesman, 17 F.4th at 337, it did so when considering whether Nordlicht concealed PPCO and PPLO's affiliate status. The panel had already separately concluded that Nordlicht concealed Beechwood's status, which is enough by itself to sustain his convictions. As the Landesman panel explained, "even if the district court were correct that the evidence demonstrates that Nordlicht never intended to conceal PPCO and PPLO's affiliate status . . . there is . . . substantial circumstantial evidence from which a jury could conclude that Nordlicht understood that Beechwood was an affiliate and intended to conceal its affiliate status from the bondholders." Id. Of course, the reference to "friendlies" in the BakerHostetler memo likely also refers to Beechwood, but Nordlicht's statements to Hoffman still do not "preponderate[] heavily against a finding that Nordlicht harbored criminal intent" as to Beechwood. For these reasons, the Government's inaccurate statements were harmless.

### III. Intent to Harm Bondholders

Nordlicht and Levy also argue that two documents introduced at Small's trial show that defendants wanted all non-affiliated bondholders to tender their bonds and be paid in full. The Court agrees; indeed, there is a mountain of evidence that defendants were trying to get rid of debt to save the company. Black Elk was spiraling towards bankruptcy and saddled with two

7

types of onerous debt: $150 million in bonds, on which Black Elk had to pay 13.75% in annual interest, and $110 million in preferred equity at 20% interest, which, if not redeemed after 14 months, escalated to 36%. A reasonable individual sitting on Black Elk's board would conclude: "If we want to fix this failing company, we need to get rid of some of this debt." Getting rid of preferred equity was obviously a priority, given the higher interest rate and that the rate was going to increase. Even so, the evidence at Small's trial made clear that defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders before using the remaining proceeds to pay off the high[er]-interest preferred equity.

For example, on August 9, 2014, shortly before the end of the consent solicitation period, Shulse emailed Nordlicht, informing him that the week ended "with the consents at 67%, so the new indenture passed!" and remarking that although "the tender is still open," it was "interesting that only $2.8 million of the bonds have tendered, I would have expected more … obviously a lot can show up at the last minute." Nordlicht responded: "That's not really our desired result. I think some tenders will show up last minute." In other words, Nordlicht told Shulse that his "desired result" was for bondholders to tender their bonds and receive the proceeds of the Renaissance sale. Indeed, throughout 2014, Platinum was affirmatively reaching out to independent bondholders to try to buy their bonds. And during the public consent solicitation process, Platinum encouraged bondholders to tender. Pulvino, one of the non-affiliated bondholders, testified that during the public consent process, Platinum reached out to bondholders and told them: "[We] really think it would be a good idea for you to tender, [we] would like you to tender your bonds."

The evidence also reflects Nordlicht, Levy, and Small's shared expectation that all independent bondholders would tender and receive the proceeds of the Renaissance sale. For

8

example, while the tender offer was outstanding, Small – at Nordlicht's direction – sent Nordlicht and Levy a chart of the expected uses of the Renaissance proceeds. The chart showed that $65 million of the proceeds were being set aside for tendering bondholders, enough to pay back all non-affiliated bondholders. Even Shearer, the Government's star witness, testified that he thought all the bondholders would tender because if "somebody offers all your money back and interest and you've got a lot of risk, it's a good deal for you, you should take that." There is simply no evidence that defendants intended to steal from the bondholders[3] or jump anyone in line. Rather, defendants expected that all the bondholders would cash in their bonds and expressed frustration when they didn't.

However, none of that matters as to Nordlicht and Levy's securities fraud convictions. As the Government correctly argued in summation at Small's trial: "You can't lie to somebody, even if you do want to pay them off." "Intent to harm" is not part of the scienter element of securities fraud. United States v. Litvak, 808 F.3d 160, 178 (2d Cir. 2015). It is enough that defendants intended to "deceive" or "manipulate" the bondholders. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). The jury and the Second Circuit found sufficient evidence that Levy and Nordlicht intended to "deceive" bondholders, Landsman, 17 F.4th at 326, 329, 337, and none of the evidence introduced at Small's trial fatally undermines that finding.

The analysis is different, though, for Nordlicht and Levy's wire fraud conspiracy convictions. Wire fraud, unlike securities fraud, does require "an intent to deprive the victim of money or property." United States v. Calderon, 944 F.3d 72, 85 (2d Cir. 2019). At the time

---

[3] The Government argues that defendants did intend to "steal" from the bondholders because – at the time of the public consent solicitation – they were entitled to 106.875 cents per bond, not the 100 cents being offered. This assumes there would've been 106.875 left for each of the bondholders had Black Elk not paid down some of its debt with the Renaissance sale proceeds. Moreover, everyone expected that all non-affiliated bondholders would tender, at which point the result of the vote – and the fact that it was rigged – would not have mattered to them.

9

defendants filed the instant motion, the law in the Second Circuit was that the term "property" in the above standard included "intangible interests such as the right to control the use of one's assets." Id. at 85. It followed, said the Second Circuit, that a defendant was guilty of wire fraud if he schemed to deprive investors of "potentially valuable economic information" "necessary to make discretionary economic decisions." United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015). This was known as the "right-to-control theory" of wire fraud.

While the instant motion was *sub judice*, the Supreme Court decided Ciminelli v. United States, 143 S. Ct. 1121, 1128 (2023), which rejected the Second Circuit's right-to-control theory as inconsistent with "traditional concepts of property," the text of 18 U.S.C. § 1343, and the structure and history of the federal fraud statutes. This Court thus ordered supplemental briefing to address whether Ciminelli requires vacatur of Nordlicht and Levy's wire fraud conspiracy convictions.[4]

The parties quibble about whether the Government presented a "right-to-control" theory at trial, but either way, no reasonable jury could find beyond a reasonable doubt that Nordlicht and Levy intended to defraud bondholders of the proceeds of the Renaissance sale except under a "right-to-control" theory. As a preliminary matter, the bondholders never had a claim to the Renaissance proceeds, as the original indenture permitted Black Elk to use asset sale proceeds in a variety of ways that didn't include paying back bondholders. Even if bondholders did have such a claim, the Government has not pointed to a single exhibit or portion of witness testimony

---

[4] Defendants' supplemental briefing argues that Ciminelli also requires vacatur of their securities fraud convictions, but in drafting 15 U.S.C. §§ 78j and 78ff, Congress chose not to include a requirement that "money or property" be the object of a securities fraud. The Court declines to read such a requirement into a statutory scheme distinct from that at issue in Ciminelli. To be sure, Ciminelli held that the "common understanding" of the phrase "to defraud" assumes some damage to property rights, 143 S. Ct. at 1126, but the securities laws criminalize not only schemes "to defraud" but "any manipulative [or] deceptive device or contrivance," § 78j(b), including material misstatements or omissions, 17 CFR § 240.10b–5.

10

in support of its argument that Nordlicht and Levy misled bondholders with the intent to deprive them of the Renaissance proceeds (and tellingly resorts to citing its own indictment and prosecutor's arguments at trial to support that claim).

The Government tries to rescue the wire fraud convictions by arguing, for the first time, that defendants misled bondholders in order to deprive them of their "contractual protections, priority claim to Black Elk's assets, and their security interest in Black Elk's assets." This is just a restatement of the same argument. The Government may be correct that, in some instances, a contractual right or security interest would constitute "money or property" within the meaning of 18 U.S.C. § 1343. But see Ciminelli, 143 S. Ct. at 1128, 1129 n.4 (rejecting "federal fraud theories that stray from traditional concepts of property" and distinguishing "traditional property interests" from interests that are "useful for protecting and making use of one's property"). But this is not a case where defendants tricked someone into, say, signing over their rights to royalty payments. And if defendants intended to steal the bondholders' contract rights, they wouldn't have been actively encouraging bondholders to extinguish those rights by tendering their bonds.

Moreover, the entire point of a security interest is to ensure you can still receive something of value in the event a debtor doesn't pay you back. It's absurd to claim that defendants intended to defraud Black Elk's bondholders of a security on a debt while simultaneously offering to pay off that debt. The consent solicitation sent to bondholders explicitly stated that the "Proposed Amendments would allow [Black Elk] to apply the Net Proceeds from the Renaissance Sale to . . . purchase for cash" its outstanding bonds. If the bondholders did what defendants wanted and tendered their bonds, there would be no debt to secure. And because defendants' plan was to get all of Black Elk's bonds into the hands of

Platinum and Platinum-related entities, the Government's argument amounts to a claim that defendants intended to defraud themselves.

At most, Nordlicht and Levy intended to deprive bondholders of the knowledge that conflicted bonds were voting on the indenture amendments. Ciminelli expressly rejected the notion that nondisclosure of a conflict could serve as the basis for a wire fraud conviction. Specifically, the Supreme Court pointed to United States v. Viloski, 557 F. App'x 28 (2d Cir. 2014) – a Second Circuit case affirming a wire fraud conviction based on an undisclosed conflict of interest – as an example of how the Second Circuit had "vastly expand[ed] federal jurisdiction without statutory authorization" by making "a federal crime of an almost limitless variety of deceptive actions." Ciminelli, 143 S. Ct. at 1128 (citing Viloski). Because no reasonable jury could find that defendants intended to defraud bondholders of anything other than "potentially valuable economic information," Ciminelli, 143 S. Ct. at 1127, Nordlicht and Levy's Rule 29 motion for a judgment of acquittal is granted as to their convictions for conspiracy to commit wire fraud.

The Court grants this motion under Rule 29 rather than Rule 33 because it concludes, in light of Ciminelli, that the evidence at the Nordlicht-Levy trial was insufficient to sustain their convictions for conspiracy to commit wire fraud. The Court construes Nordlicht and Levy's supplemental briefing as a renewed Rule 29 motion on the ground of excusable neglect – namely, an intervening change in the law. See Fed. R. Crim. P. 45(b)(1)(B); see also United States v. Parasmo, No. 19-cr-1, 2023 WL 1109649, at *15 (E.D.N.Y. Jan. 30, 2023).

That said, the Court also alternatively grants a new trial on the wire fraud charge in the interest of justice because (1) it's not clear which theory of intent the jury convicted under, and

(2) evidence at Small's trial (e.g., DX 6793, DX 6405, and Pulvino's testimony) established that defendants lacked the requisite criminal intent to sustain their wire fraud convictions.

IV. **Control**

Nordlicht and Levy also argue, briefly, that testimony at Small's trial further established that Feuer and Taylor, not Nordlicht, controlled Beechwood, such that Beechwood was not under common control with Black Elk. The Court has already concluded that the evidence at Small's trial was sufficient for a reasonable jury to conclude that Nordlicht "controlled" Beechwood within the meaning of the bond indenture. See United States v. Small, No. 16-cr-640, 2023 WL 4373392, at *14-15 (E.D.N.Y. July 6, 2023). I adhere to that determination.

## CONCLUSION

For the foregoing reasons, (1) Nordlicht and Levy's [999] motion for a judgment of acquittal is granted as to their conviction for conspiracy to commit wire fraud (Count 7) but denied as to their securities fraud convictions (Counts 6 and 8); and (2) Nordlicht's [971] renewed motion for a new trial [972], in which Levy joined, is denied as to the securities fraud convictions.

**SO ORDERED.**

*Brian M. Cogan*
U.S.D.J.

Dated: Brooklyn, New York
July 12, 2023